First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon 'A' " and "Barecon 'B' ". Revised and amalgamated 1989. Revised 2001

| | |
|---|---|
| **1. Shipbroker** | **BIMCO STANDARD BAREBOAT CHARTER CODE NAME: "BARECON 2001"** PART I |
| | **2. Place and date** Singapore, 11 Apr 2014 |
| **3. Owners/Place of business (Cl. 1)** Castleton Commodities Shipping Co. Pte. Ltd., and guaranteed by Castleton Commodities International LLC.,USA Singapore | **4. Bareboat Charterers/Place of business (Cl. 1)** Hudson Shipping Lines Inc. Deerfield, Illinois, USA |
| **5. Vessel's name, call sign and flag (Cl. 1 and 3)** To be named by owners, Shin Kurushima Toyhashi Hull No. S 3670, Panama Flag | |
| **6. Type of Vessel** About 61,000 dwt general bulker | **7. GT/NT** About 35,000 tons / |
| **8. When/Where built** Shin Kurushima Toyohashi Shipbuilding Co. Ltd., Japan, 2016 | **9. Total DWT (abt.) in metric tons on summer freeboard** About 61,000 dwt |
| **10. Classification Society (Cl. 3)** NK, NS* (CSR, BC-A, BC-XII. Grab20, EQ C DG, PSPC-WBT) (ESP) MNS* | **11. Date of last special survey by the Vessel's classification society** N/A |
| **12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)** As per builder's outline specification DWG No.101-110-00 - Shipyard full specifications to be attached to charter party (See Appendix F) | |
| **13. Port or Place of delivery (Cl. 3)** The vessel shall be delivered to the charterers during April 1st to September 30th 2016 at the building yard at Toyohashi Shipyard Co. Ltd.. - See Rider Clause 4 | **14. Time for delivery (Cl. 4)** At the time of dropping Dock Master at Shipyard - See Rider Clause 4 & 5 — **15. Cancelling date (Cl. 5)** 2359hrs 30th September 2016 - See Rider Clause 4 |
| **16. Port or Place of redelivery (Cl. 15)** See attached Memorandum of Agreement | **17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)** See attached Memorandum of Agreement |
| **18. Running days' notice if other than stated in Cl. 4** See attached Memorandum of Agreement | **19. Frequency of dry-docking (Cl. 10(g))** See Clause 10 |
| **20. Trading limits (Cl. 6)** Worldwide within IWL otherwise as per Clause 6 | |
| **21. Charter period (Cl. 2)** See Rider Clause 1 | **22. Charter hire (Cl. 11)** USD 7,850 pdpr - See Rider Clause 2 |
| **23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))** See Rider Clause 9 | |
| **24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV** LIBOR + 2.0% / Annum | **25. Currency and method of payment (Cl. 11)** See Rider Clause 2 |
| **26. Place of payment; also state beneficiary and bank account (Cl. 11)** Bank HSBC<br>Address 21 Collyer Quay,<br>#01-01 HSBC Building<br>Singapore 049320<br><br>Account No. 260-794409-178<br>Swift HSBCSGSG<br>In favor of Castleton Commodities Shipping Co. Pte Ltd<br><br>Reference _________/ HSL Charter party dated | **27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)** N/A |
| **28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)** to be informed by owners later | **29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)** See Clause 13 and Rider Clause 8 |
| **30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))** Up to and including the values set out in Rider Clause 9 - See Rider clause 7 (f) | **31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))** Any amounts above minimum values set out in Rider clause 9 |
| **32. Latent defects (only to be filled in if period other than stated in Cl. 3)** N/A | **33. Brokerage commission and to whom payable (Cl. 27)** Zero |
| **34. Grace period (state number of clear banking days) (Cl. 28)** Charterers to have remedy for four(4) US banking days against their simple error delaying after which agreed interest to accrue on hire. See Clause 11 (F) | **35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30)** English Law |
| **36. War cancellation (indicate countries agreed) (Cl. 26(f))** N/A | |

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br>Yes | 38. Name and place of Builders (only to be filled in if PART III applies)<br>See Rider Clause 4 |
|---|---|
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br>(Owners to please inform) | 40. Date of Building Contract (only to be filled in if PART III applies)<br>To be nominated later |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br>a)<br><br>b) N/A<br>c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional)<br>N/A - See attached Memorandum of Agreenent | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional)<br>N/A |
| 44.Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br>N/A | 45. Country of the Underlying Registry (only to be filled in if PART V applies)<br>N/A |
| 46. Number of additional clauses covering special provisions, if agreed<br>Additional rider clauses 1-18 and Appendix (A) - (F) | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|

CASTLETON COMMODITIES SHIPPING CO. PTE. LTD.
DAVID A. WALLACE
DIRECTOR AND PRESIDENT

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



## PART II
## "BARECON 2001" Standard Bareboat Charter

**1. Definitions**
In this Charter, the following terms shall have the meanings hereby assigned to them:
"The Owners" shall mean the party identified in Box 3;
"The Charterers" shall mean the party identified in Box 4;
"The Vessel" shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.
"Financial Instrument" means the mortgage, deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.

**2. Charter Period**
In consideration of the hire detailed ~~in Box 22,~~ ***See Rider clause 2***
the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

~~**3. Delivery**~~
~~(not applicable when Part III applies, as indicated in Box 37)~~
~~(a) The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy And in every respect ready in hull, machinery and equipment for service under this Charter.~~
~~The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.~~
~~(b) The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.~~
~~(c) The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.~~

~~**4. Time for Delivery**~~
~~(not applicable when Part III applies, as indicated in Box 37)~~
~~The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15.~~
~~Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.~~
~~The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.~~

~~**5. Cancelling**~~
~~(not applicable when Part III applies, as indicated in Box 37)~~
~~(a) Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.~~
~~(b) If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.~~
~~(c) Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.~~

**6. Trading Restrictions**
The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.
The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof. ***Charterers option to break IWL against obtaining and paying for additional insurance coverage for such trading areas.***

~~**7. Surveys on Delivery and Redelivery**~~
~~(not applicable when Part III applies, as indicated in Box 37)~~
~~The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-hire Survey including loss of time, if any, and the Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof.~~

**8. Inspection**
The Owners shall have the right at any time after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-
(a) to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;
(b) in dry-dock if the Charterers have not dry-docked Her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and
(c) for any other commercial reason they consider necessary (provided it does not ~~unduly~~ interfere with the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.
All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the Charter Period.-
The Charterers shall also permit the Owners to inspect

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel. ***All time used for inspections and surveys, which are solely initiated by the Owners, shall be for Owner's Account***

**9. Inventories, Oil and Stores**

A complete inventory of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers ~~in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively. The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel.~~ ***A complete inventory of the vessel's entire equipment, outfit including spare parts, appliances in accordance with Class minimum requirement on board when the vessel to be delivered from the builder to the owners, shall be made by owners and the builder. The charterers shall at time of delivery of the vessel take over and pay to the owners for all remaining bunkers, unused lubricating oil, at back to back prices as submitted by shipyard to owners otherwise "see rider clause 7"***

**10. Maintenance and Operation**

(a) (i) Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, ~~except as provided for in Clause 14(l), if applicable~~, at their own expense they shall at all times keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.

(ii) ~~New Class and Other Safety Requirements - In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent. of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30.~~ ***In the event of any improvement structural changes or new equipment becoming necessary for the continued operation of the vessel by reason of new class requirement or by compulsory registration to be applied at the Charterers decision at the Charterers cost, expense and time.***

(iii) Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof.

The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(b) Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.

Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.

(c) The Charterers shall keep the Owners and the mortgagee(s) advised of the ~~intended employment~~, planned dry-docking and major repairs of the Vessel, as reasonably required.

~~(d) Flag and Name of Vessel - During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.~~ ***Charterers shall have the liberty to paint Charterers logo along hull of vessel in their time and at their expense.***

(e) Changes to the Vessel - Subject to Clause 10(a)(ii), the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof ***which consent shall not be unreasonable withheld***. ~~If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter.~~

(f) Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, ~~provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted~~. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk ~~but the Charterers shall remove such equipment at the end of the period if requested by the Owners~~. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



**PART II**
**"BARECON 2001" Standard Bareboat Charter**

regulations.
(g) Periodical Dry-Docking - The Charterers***, at their discretion,*** shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, ~~but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such~~ ***and*** other period as may be required by the Classification Society or flag State.

**11. Hire**
(a) The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.
(b) The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated ~~in Box 22~~ ***See Rider Clause 2*** which shall be payable ~~not later than every thirty (30) running days~~ ***a calender month*** in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.
(c) Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26.
(d) Final payment of hire, if for a period of less than ~~thirty (30) running days~~ ***a calender month***, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.
~~(e) Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.~~ ***Owners shall receive hire until the point of timing insurance amount is to be paid by Hull insurance Company against insured amount for the coverage of total loss of the vessel but latest 10 days after declaration of total loss after which time hire shall cease – See Clause 28 c) and Rider Clause 9***
(f) Any delay ***from four (4) US banking days*** in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. ~~If Box 24 has not been filled in~~, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply.
(g) Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.

**12. Mortgage**
(only to apply if Box 28 has been appropriately filled in)
*) ~~(a) The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~ ***See Box 28***
*) (b) The Vessel chartered under this Charter is financed by a mortgage according to the Financial Instrument. The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with the Financial Instrument. The Charterers confirm that, for this purpose, they have acquainted themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s). The Owners warrant that they have not effected any mortgage(s) other than stated in Box 28 and that they shall not agree to any amendment of the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.
*) (Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28).

**13. Insurance and Repairs**
(a) During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve, which approval shall not be un-reasonably withheld. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any), and The Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the Financial Instrument, if any, and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for***, and in accordance with insurance policy and loss payable clause (See Appendix B)***.
The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.
All time used for repairs under the provisions of sub-clause 13(a) and for repairs of latent defects ~~according to Clause 3(c) above~~, including any deviation, shall be for the Charterers' account.
(b) If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.
(c) The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to comply with the insurance provisions of the Financial Instrument.
(d) Subject to the provisions of the Financial Instrument, if any, should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 13(a), all insurance payments for such loss shall be paid to the Owners who shall distribute the moneys between the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a total loss as defined in this Clause.
(e) The Owners shall upon the request of the Charterers, promptly execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



(f) For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 13(a), the value of the Vessel is the sum indicated in Box 29.

**14. Insurance, Repairs and Classification**
(Optional, only to apply if expressly agreed and stated in Box 29, in which event Clause 13 shall be considered deleted).
~~(a) During the Charter Period the Vessel shall be kept insured by the Owners at their expense against hull and machinery and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or appurtenances covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. Insurance policies shall cover the Owners and the Charterers according to their respective interests.~~
(b) During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve which approval shall not be unreasonably withheld.
(c) In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.
(d) The Charterers shall, subject to the approval of the Owners or ***the Vessel's mortgagee*** ~~Owners' Underwriters~~, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances. ~~provided for under the provisions of sub-clause 14(a).~~ The Charterers to be secured reimbursement through the ~~Owners'~~ ***Charterer's*** Underwriters for such expenditures upon presentation of accounts.
(e) The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.
(f) All time used for repairs under the provisions of sub-clauses 14(d) and 14(e) and for repairs of latent defects ~~according to Clause 3 above~~, including any deviation, shall be for the Charterers' account and shall form part of the Charter Period.
The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.
(g) If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.
~~(h) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 14(a), all insurance payments for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~
~~(i) If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause 14(a), this Charter shall terminate as of the date of such loss.~~ ***See Rider Clause 8 & 9***
~~(j) The Charterers shall upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to the insurers and claim a constructive total loss.~~
~~(k) For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 14(a), the value of the Vessel is the sum indicated in Box 29.~~
~~(l) Notwithstanding anything contained in sub-clause 10(a), it is agreed that under the provisions of Clause 14, if applicable, the Owners shall keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.~~

**15. Redelivery** ***See Attached MOA***
~~At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place as indicated in Box 16, in such ready safe berth as the Owners may direct. The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than fourteen (14) running days' definite notice of expected date and port or place of redelivery. Any changes thereafter in the Vessel's position shall be notified immediately to the Owners.~~
~~The Charterers warrant that they will not permit the Vessel to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the Vessel within the Charter Period. Notwithstanding the above, should the Charterers fail to redeliver the Vessel within The Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 per cent. or to the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. All other terms, conditions and provisions of this Charter shall continue to apply.~~
~~Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.~~
~~The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.~~

**16. Non-Lien**
The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. The Charterers further agree to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter Period a notice reading as follows:
"This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and by the terms of the Charter Party neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

**17. Indemnity**
(a) The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.
Without prejudice to the generality of the foregoing, the

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.
(b) If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, the Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.
In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention.

**18. Lien**
The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all ***legitimate*** claims under this Charter, and the Charterers to have a
lien on the Vessel for all moneys paid in advance and not earned.

**19. Salvage**
All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**20. Wreck Removal**
In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

**21. General Average**
The Owners shall not contribute to General Average.

**22. Assignment, Sub-Charter and Sale**
(a) The Charterers shall not assign this Charter ~~nor sub-charter the Vessel on a bareboat basis~~ except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve. ***During any sublet via bareboat charter, the technical manager should be taken over without changing from the previous manager and full responsibility of bareboat charterers described in Box 4 should be always remain in force.***
~~(b) The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting an assignment of this Charter.~~

**23. Contracts of Carriage**
*) (a) The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause.
*) ~~(b) The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto.~~
*) Delete as applicable.

**24. Bank Guarantee**
~~(Optional, only to apply if Box 27 filled in)~~
~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter.~~

**25. Requisition/Acquisition**
(a) In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter.
(b) In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".

**26. War**
(a) For the purpose of this Clause, the words "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(b) The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners shall have the right to require the Vessel to leave such area.
(c) The Vessel shall not load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.
(d) If the insurers of the war risks insurance, when Clause 14 is applicable, should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



**PART II**
**"BARECON 2001" Standard Bareboat Charter**

and remain within, any area or areas which are specified by such insurers as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be ***paid by charterer*** ~~reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due~~.

(e) The Charterers shall have the liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

~~(f) In the event of outbreak of war (whether there be a declaration of war or not) (i) between any two or more of the following countries: the United States of America; Russia; the United Kingdom; France; and the People's Republic of China, (ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter shall apply until redelivery.~~ ***Vessel allowed to proceed in such zones if Charterer maintaining War Risk Insurance***

**27. Commission**

~~The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33 on any hire paid under the Charter. If no rate is indicated in Box 33, the commission to be paid by the Owners shall cover the actual expenses of the Brokers and a reasonable fee for their work.~~

~~If the full hire is not paid owing to breach of the Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire.~~

**28. Termination**

(a) Charterers' Default

The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if:

(i) the Charterers fail to pay hire in accordance with Clause 11. However, where there is a failure to make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice;

(ii) the Charterers fail to comply with the requirements of:
(1) Clause 6 (Trading Restrictions)
(2) Clause 13(a) (Insurance and Repairs)
provided that the Owners shall ~~have the option~~ ***give***, by written notice to the Charterers, ~~to give the Charterers~~ a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice; ***Charterers to be allowed 27 days grace period to remedy any maintenance / performance related issues***

(iii) the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as ~~practically~~ ***reasonably*** possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced. ***Charterers to be allowed 27 days grace period to remedy any maintenance / performance related issues***

(b) Owners' Default

If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of ~~fourteen (14)~~ ***Twenty (20)*** running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners.

(c) Loss of Vessel

This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.~~-~~***unless otherwise, the vessel shall be deemed to be on charter and hire shall be paid to the owners (See Rider clause 8 and Appemdix B).***

(d) Either party shall be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(e) The termination of this Charter shall be without prejudice to all rights accrued due between the parties prior to the date of termination and to any claim that either party might have.

**29. Repossession**

~~In the event of the termination of this Charter in accordance with the applicable provisions of Clause 28, the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities. Pending physical repossession of the Vessel in accordance with this Clause 29, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners. The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably~~

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



~~practicable following the termination of the Charter. The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative. All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers.~~

**30. Dispute Resolution**

*) (a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London-in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

*) ~~(b) This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~

*) ~~(c) This Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

~~(d) Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.~~

~~In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:-~~

~~(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.~~

~~(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.~~

~~(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.~~

~~(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.~~

~~(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.~~

~~(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.~~

~~(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.~~

~~(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)~~

~~(e) If Box 35 in Part I is not appropriately filled in, sub-clause 30(a) of this Clause shall apply. Sub-clause 30(d) shall apply in all cases.~~

~~*) Sub-clauses 30(a), 30(b) and 30(c) are alternatives; indicate alternative agreed in Box 35.~~

**31. Notices**

(a) Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, registered or recorded mail or by personal service ***and or via Email provided email receipt is acknowledged.***

(b) The address of the Parties for service of such communication shall be as stated in Boxes 3 and 4 respectively.

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



**"BARECON 2001" Standard Bareboat Charter**

**OPTIONAL PART**

## PART III
## PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY

(Optional, only to apply if expressly agreed and stated in Box 37)

**1. Specifications ~~and Building Contract~~ *and full specification and relative drawings (Charterers need to review same)***

(a) The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") ~~as annexed to this Charter~~, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, ~~such Building Contract~~, specifications and plans having been counter-signed as approved by the Charterers .

(b) No change shall be made ~~in the Building Contract or~~ in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.

(c) The Charterers shall have the right to send their ***Japanese*** representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.

(d) The Vessel shall be built in accordance with the ***full Specification*** ~~Building Contract~~ and shall be of the description set out therein. ~~Subject to the provisions of sub-clause 2(c)(ii) hereunder,~~ the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the ~~Building Contract~~ ***full specification***, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. ***See rider clause 10***

Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers). The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred.

Any liquidated damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties.

The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.

**2. Time and Place of Delivery** ***See Rider Clause 3 & 4***

(a) Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of ~~the Charterers~~ ***a surveyor(s) of MMS described in Rider Clause 7***, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.

(b) If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.

(c) If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon

(i) if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or

(ii) if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/or take delivery of the Vessel from the Builders and deliver her to the Charterers;

(iii) in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;

(iv) if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.

(d) Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.

**3. Guarantee Works** ***See also Rider clause 10***

If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.

~~**4. Name of Vessel**~~

~~The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.~~

**5. Survey on Redelivery-** ***See Attached MOA***

~~The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery. Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred. The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.~~

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



"BAREC0N 2001" Standard Bareboat Charter

OPTIONAL PART

## PART IV
## HIRE/PURCHASE AGREEMENT

(Optional, only to apply if expressly agreed and stated in Box 42)

***See Attached MOA***

~~On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for.~~

-

~~In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.~~

-

~~The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter.~~

-

~~The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account.~~
~~In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers.~~
~~The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession.~~

-

~~The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment.~~

-

~~The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description.~~

-

~~The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place.~~

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



"BARECON 2001" Standard Bareboat Charter

OPTIONAL PART

## PART V
## PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY

(Optional, only to apply if expressly agreed and stated in Box 43)

**1. Definitions**

~~For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them:~~

~~"The Bareboat Charter Registry" shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.~~

~~"The Underlying Registry" shall mean the registry of the state in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.~~

**2. Mortgage**

~~The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 12(b) (Part II) shall apply.~~

**3. Termination of Charter by Default**

~~If the Vessel chartered under this Charter is registered in a Bareboat Charter Registry as stated in Box 44, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 28, the Charterers shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 45.~~

~~In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 44, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter.~~

"This Charter Party is a computer generated copy of the BARECON 2001 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original BIMCO approved document shall apply. BIMCO and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document."



## ADDITIONAL CLAUSES

### 1) PERIOD OF CHARTER AND HIRE

SEVEN (7) YEARS BAREBOAT CHARTER OUTRIGHT PROVIDED THAT CHARTERERS HAVE AN ANNUAL OPTION TO PURCHASE OF THE VESSEL AFTER COMPLETION OF THIRD FULL YEAR OF BAREBOAT CHARTER AND PROVIDED FURTHER THAT CHARTERERS HAVE AN OBLIGATION TO PURCHASE OF THE VESSEL AFTER COMPLETION OF FULL TERM OF CHARTER.

### 2) HIRE RATE AND PAYMENT

HIRE RATE TO BE SEVEN THOUSAND EIGHT HUNDRED AND FIFTY US DOLLARS (US$7,850.00) PER DAY THROUGHOUT THE CHARTER PERIOD.

CHARTERERS TO PAY CHARTER HIRE IN THE TOTAL AMOUNT AT ABOVE RATE EVERY CALENDER MONTH IN ADVANCE TO OWNERS NOMINATED BANK ACCOUNT.

### 3) HIRE GRACE PERIOD

WHERE THERE IS A FAILURE TO MAKE PUNCTUAL AND REGULAR PAYMENT OF HIRE DUE TO OVERSIGHT, NEGLIGENCE, ERRORS, OR OMMISSIONS ON THE PART OF THE CHARTERERS OR THEIR BANKERS, THE CHARTERERS SHALL BE GIVEN BY THE OWNERS FOUR (4) USA FEDERAL BANKING DAYS WRITTEN NOTICE TO RECTIFY THE FAILURE AND WHEN SO RECTIFIED WITHIN SIX (6) USA FEDERAL BANKING DAYS FOLLOWING OWNERS NOTICE, THE PAYMENT SHALL STAND AS REGULAR AND PUNCTUAL. CHARTERERS TO PAY OWNERS INTEREST AT LIBOR PLUS 2% ANNUM FROM FOUR (4) DAYS TO SIX (6) DAYS OF THE DAYS DELAYING.

FAILURE BY THE CHARTERERS TO PAY THE HIRE WITHIN SIX (6) USA FEDERAL BANKING DAYS OF THEIR RECEIVING THE OWNERS NOTICE AS PROVIDED HEREIN, SHALL ENTITLE THE OWNERS TO WITHDRAW THE VESSEL. FAILING THE PUNCTUAL AND REGULAR PAYMENT OF THE HIRE, OR ANY FUNDAMENTAL BREACH WHATSOEVER OF THIS CHARTER PARTY, THE OWNERS SHALL BE AT LIBERTY TO WITHDRAW THE VESSEL FROM THE SERVICE OF THE CHARTERERS WITHOUT PREJUDICE TO ANY CLAIMS THEY (THE OWNERS) MAY OTHERWISE HAVE ON THE CHARTERERS.

AT ANY TIME AFTER THE EXPIRY OF THE GRACE PERIOD PROVIDED ABOVE AND WHILE THE HIRE IS OUTSTANDING, THE OWNERS SHALL, WITHOUT PREJUDICE TO THE LIBERTY TO WITHDRAW, BE ENTITLED TO WITHHOLD THE PERFORMANCE OF ANY AND ALL OF THEIR OBLIGATIONS WITHIN THE GOVERNING CHARTER PARTY, AND SHALL HAVE NO RESPONSIBILITY WHATSOEVER FOR ANY CONSEQUENCES THEREOF, IN RESPECT OF WHICH THE CHARTERERS HEREBY INDEMNIFY THE OWNERS, AND HIRE SHALL CONTINUE TO ACCRUE AND ANY EXTRA EXPENSES RESULTING FROM SUCH WITHHOLDING SHALL BE FOR THE CHARTERERS ACCOUNT.

### 4) DELIVERY OF VESSEL

THE VESSEL SHALL BE DELIVERED TO THE CHARTERERS DURING THE PERIOD APRIL 1ST, 2016 TO SEPTEMBER 30th, 2016 AT THE BUILDING YARD AT TOYOHASHI SHIPYARD OR ONISHI OF SHIN-KURUSHIMA DOCKYARD, IN JAPAN AT THE TIME OF DROPPING DOCK MASTER AT OFF SEA OF THE DOCKYARD.

### 5) CANCELLING AND DELIVERY NOTICE

THE VESSEL SHALL BE DELIVERED TO THE CHARTERERS DURING THE PERIOD FROM APRIL THE 1ST, 2016 TO SEPTEMBER 30TH, 2016, PROVIDED THAT CHARTERERS SHALL HAVE THE RIGHT TO CANCEL DELIVERY OF THE VESSEL BY ISSUANCE OF A CANCELLATION NOTICE TO OWNERS IF SUCH DELIVERY IS NOT EFFECTUATED PRIOR TO THE END OF THE DAY THAT IS THE LAST DAY OF THE DELIVERY PERIOD, PROVIDED FURTHER THAT ABSENT OWNERS EVENT OF DEFAULT ANY CANCELLATION NOTICE ISSUED TO OWNERS BY CHARTERER PRIOR TO 23:59 GMT ON SEPTEMBER 30TH, 2016 SHALL BE VOID AB INITIO AND OF NO FORCE AND EFFECT.

THE OWNERS SHALL KEEP THE CHARTERERS INFORMED OF THE BUILDING PROGRESS AND PROVIDE CHARTERERS WITH A MONTHLY PROGRESS REPORT AND FURTHER MORE GIVE THE CHARTERERS PRIOR DELIVERY NOTICE ON EACH OF NINETY (90), SIXTY (60), THIRTY (30) DAYS, FIFTEEN (15) DAYS, SEVEN (7) DAYS AND THREE (3) DAYS PRIOR TO DELIVERY.

## 6) PURCHASE OPTION PRICE AND PURCHASE OBLIGATION PRICE

CHARTERERS HAVE A PURCHASE OPTION TO PURCHASE OF THE VESSEL AFTER COMPLETION OF THIRD FULL YEAR OF BAREBOAT CHARTER AND PROVIDED FURTHER THAT CHARTERERS HAVE AN OBLIGATION TO PURCHASE OF THE VESSEL AFTER COMPLETION OF FULL TERM OF CHARTER.

PURCHASE OPTION DATE:  PURCHASE PRICE:

3 YEARS AFTER CP START DATE  US$27,250,000.-
4 YEARS AFTER CP START DATE  US$25,500,000.-
5 YEARS AFTER CP START DATE  US$24,000,000.-
6 YEARS AFTER CP START DATE  US$22,500,000.-

PURCHASE OBLIGATION DATE:  PURCHASE PRICE:

7 YEARS AFTER CP START DATE  US$20,500,000.-

## 7) BAREBOAT CHARTERERS' EXPENSES AND COSTS

A. INITIAL STORES/ SPARE PARTS EXCESS CLASS REQUIREMENTS/CONSUMABLE GOODS FOR CREWS/ INITIAL LUBE OIL WHICH TO BE PAID TO SHIPYARD BY CHARTERERS THROUGH OWNERS.

B. TECHNICAL MANAGEMENT - SUPERVISION TO BE DONE BY JAPANESE SUPERVISION BUT SHIP MANAGEMENT DURING CHARTER TO BE DONE BY MMS (MEIJI SHIPPING) MANAGEMENT OR ANGLO EASTERN IN CHARTERERS OPTION, IN CASE OF ANGLO EASTERN, OWNERS EXPECT IN CHARGE PERSON CAN SPEAK JAPANESE.

C. CHARTERERS EXTRA WORKS DURING CONSTRUCTION AND MODIFICATIONS INCLUDING MODIFICATIONS TO APPLY NEW CLASS RULES/APPLICATION WHICH SHOULD BE APPLIED BEFORE COMPLETION, ITS COST WHICH MAYBE REQUIRED BY NK CLASS, OR OTHER AUTHORITIES AFTER NEW BUILDING CONTRACT BETWEEN OWNERS/SHIPYARD.  WATER BALLAST TREATMENT SYSTEMS TO BE INCLUDED IN VESSEL SPECIFICATION.

D. GRABS / BUCKETS TO BE SUPPLIED BY CHARTERERS.

E. THE OWNER SHALL BE COVERED AS THE INSURED ON THE SAME POLICY SIMULTANEOUSLY WITH THE CHARTERERS PROTECTION AND INDEMNITY INSURANCE OF WHICH INSURANCE PREMIUM TO BE PAID BY THE CHARTERERS.

## 8) TERMINATION FOR VESSEL LOSS

IF THE VESSEL BECOMES AN ACTUAL, CONSTRUCTIVE, OR COMPROMISED OR AGREED TOTAL LOSS UNDER THE INSURANCE ARRANGEMENTS BY THE CHARTERERS IN ACCORDANCE WITH SUB-CLAUSE 28(C), THE CHARTERERS WILL PROCEED EXPEDITIOUSLY TO THEIR HULL INSURANCE UNDERWRITER TO COLLECT THE INSURED AMOUNT. THE PROCEEDS OF SUCH HULL INSURANCE POLICY WILL GO FIRST TO THE OWNERS UNDER THE UPSTREAM CHARTER PARTY AS IDENTIFIED IN RIDER CLAUSE 18 TO THIS CHARTER PARTY AGREEMENT TO SATISFY THEIR OBLIGATIONS TO MORTGAGEE UNDER THE APPENDIX (B), AND THEN TO THE CHARTERERS. OWNERS RECOVERY FROM CHARTERERS HULL INSURANCE FOR ANY TOTAL LOSS SHALL BE LIMITED ACCORDING TO THE AMOUNTS STATED IN RIDER CLAUSE 9.

## 9) INSURED AMOUNT ON THE VESSEL BY CHARTERERS

THE VESSEL SHALL BE INSURED BY THE CHARTERERS WITH A REPUTABLE INSURANCE PROVIDER IN THE FOLLOWING AMOUNTS AS OWNERS WITH OWNER AND CHARTERERS TO BE DESIGNATED AS LOSS PAYEE. PROCEEDS TO BE PAID ACCORDING TO RIDER CLAUSE 8 ABOVE.

1ST YEAR US$31,350,000.-
2ND YEAR US$29,750,000.-
3RD YEAR US$28,150,000.-
4TH YEAR US$26,550,000.-
5TH YEAR US$24,950,000.-
6TH YEAR US$23,250,000.-
7TH YEAR US$21,700,000.-

## 10) OWNERS RESPONSIBILITY

OWNERS ENDEAVOUR TO NEGOTIATE WITH THE BUILDER AGAINST AND TO REMEDY, FREE OF CHARGE TO THE CHARTERERS, ANY DEFECTS IN THE VESSEL WHICH ARE DUE TO DEFECTIVE MATERIAL AND/OR BAD WORKMANSHIP ON THE PART OF THE BUILDER AND, PROVIDED THAT THE DEFECTS ARE DISCOVERED WITHIN A PERIOD OF 12 MONTHS AFTER DATE OF DELIVERY OF THE VESSEL AND A NOTICE THEREOF IS DULY GIVEN TO THE OWNERS, BUT EXCLUDES ANY PART FOR THE VESSEL WHICH HAVE BEEN SUPPLIED BY THE CHARTERERS.

HOWEVER, THE OWNERS' LIABILITY TO THE CHARTERERS SHALL BE LIMITED TO THE EXTENT THE OWNERS HAVE A VALID CLAIM AGAINST THE OWNERS UNDER THE UPSTREAM CHARER PARTY AGREEMENT IDENTIFIED IN RIDER CLAUSE 18.

THE CHARTERERS SHALL BE BOUND TO ACCEPT SUCH SUMS AS THE OWNERS ARE REASONABLY ABLE TO RECOVER UNDER CLAUSE 1, PART III AND SHALL MAKE NO FURTHER CLAIM ON THE OWNERS FOR THE DIFFERENCE BETWEEN THE AMOUNT(S) SO RECOVERED AND THE ACTUAL EXPENDITURE ON REPAIR, REPLACEMENT OR REMEDYING DEFECTS OR FOR ANY LOSS OF TIME INCURRED.

## 11) SHIPYARD SUPERVISION

THE OWNERS APPOINTED SHIPYARD SUPERVISOR SHALL PERFORM HIS DUTY AGAINST THE DOCKYARD / SHIP BUILDER ON BEHALF OF THE OWNERS AND ALL REPORTS MUST BE MADE TO OWNERS. SHOULD THERE BE ANY ISSUES AND/OR DISCREPANCIES THAT ARISE FROM THE BUILDING CONTRACT OR DRAWINGS/ SPECIFICATIONS, THE SUPERVISOR SHALL IMMEDIATELY CONSULT OWNERS WHOSE DECISION MUST BE RESPECTED FIRST.

THE SHIPYARD SUPERVISOR SHALL LIAISE WITH OWNERS AND SEND ALL NECESSARY REPORTS TO CHARTERERS THROUGH OWNERS.

THE SUPERVISOR MUST ACT ON BEHALF OF OWNERS OR OWNERS NOMINEE WITH PRIORITY AGAINST BUILDERS AND LIAISING WITH CHARTERERS THROUGH OWNERS.

TECHNICAL SPECIFICATION AND SUPERVISION CONTRACT PRIOR TO DELIVERY TO BE ARRANGED BETWEEN OWNERS OR OWNERS NOMINEE AND APPROVED TECHNICAL MANAGEMENT COMPANY, WITH COST OF SAME TO BE SHARED EQUALLY BETWEEN OWNERS AND CHARTERERS.

CHARTERERS TO BE ALLOWED TO OBSERVE THE VESSEL DURING CONSTRUCTION FROM TIME TO TIME , AND TO ATTEND SEA TRIALS. ANY COMMENTS FROM CHARTERERS TO BE DISCUSSED BETWEEN OWNERS, CHARTERERS AND SHIPYARD SUPERVISOR FOR MUTUAL AGREEMENT ON POINT RAISED BY CHARTERERS.

IN THE EVENT THE BUILDING CONTRACT BECOMES NULL AND VOID DURING CONSTRUCTION, OWNERS WILL TAKE FULL RESPONSIBILITY AND NOT CHARTERERS. DURING THE BAREBOAT

CHARTER, IF FOR ANY UNFORESEEN REASON, THE BAREBOAT CONTRACT IS TERMINATED THEN OWNERS TO HAVE THE SAME RESPONSIBILITY AGAINST ANY THIRD PARTY.

IN ACCORDANCE WITH THE ABOVE POINTS, THE SUPERVISORY CONTRACT IS TO BE CONCLUDED DIRECTLY BETWEEN TECHNICAL SUPERVISOR AND OWNERS OR OWNERS NOMINEE.

## 12) CONTRACT PURCHASE PRICE OF HEAD CONTRACT

CHARTERERS AND OWNERS HEREBY AGREE THAT A CONDITION TO THE EFFECTIVENESS OF THIS CHARTERPARTY AGREEMENT SHALL BE THE PAYMENT BY CHARTERERS TO OWNERS OF THE SUM OF THREE MILLION THREE HUNDRED THOUSAND US DOLLARS (US$3,300,000) INTO OWNERS DESIGNATED ACCOUNT (THE "CP PURCHASE PRICE"). IN ACCORDANCE WITH THAT CERTAIN LETTER OF INTENT DATED FEBRUARY 10, 2014 BETWEEN OWNERS AND CHARTERERS (THE "LOI"), CHARTERERS HAVE REMITTED THE SUM OF US$3.3MILLION (THE "CP PURCHASE PRICE FUNDS") INTO THAT ESCROW ACCOUNT ESTABLISHED WITH CITIBANK, N.A. ("CITI") PURSUANT TO THE ESCROW AGREEMENT BETWEEN OWNERS, CHARTERERS AND CITI DATED AS OF FEBRUARY 26, 2014 ("ESCROW AGREEMENT"). THE PARTIES ACKNOWLEDGE AND AGREE THAT (I) THE CP PURCHASE PRICE FUNDS SHALL BE RELEASED TO OWNERS IN ACCORDANCE WITH THE TERMS OF THE ESCROW AGREEMENT AND THE OWNERS SHALL DELIVER TO CHARTERERS CONCURRENTLY A TRUE AND COMPLETE COPY OF ALL DOCUMENTS SUBMITTED TO CITI AS REQUIRED UNDER THE ESCROW AGREEMENT FOR DRAWING THE CP PURCHASE PRICE FUNDS FROM ESCROW; AND (II) THE CP PURCHASE PRICE FUNDS RELEASED BY CITI TO OWNERS UNDER THE TERMS OF THE ESCROW AGREEMENT WILL BE APPLIED IN FULL BY OWNERS IN FULL OR PARTIAL SATISFACTION OF CHARTERERS OBLIGATION TO PAY THE CP PURCHASE PRICE UNDER THIS CHARTERPARTY AGREEMENT AND THE CHARTERERS AGREE TO REMIT THE SHORTFALL AMOUNT, IF ANY, INTO OWNERS DESIGNATED ACCOUNT WITHIN TWO (2) BUSINESS DAYS OF OWNERS REQUEST THEREFOR.

OWNERS AGREE TO RETURN THE CP PURCHASE PRICE TO CHARTERERS NOMINATED ACCOUNT WITHIN TWO (2) USA BANKING DAYS OF: (I) CHARTERERS DELIVERY TO OWNERS OF A VALID NOTICE OF CANCELLATION OF DELIVERY OF THE VESSEL AS THE RESULT OF EXPIRATION OF THE DELIVERY PERIOD (UNDER RIDER CLAUSE 5) OR (II) OWNERS EVENT OF DEFAULT OR OWNERS REPUDIATION OF ITS VESSEL DELIVERY OBLIGATIONS.

## 13) CHARTERERS PERFORMANCE GUARANTEE

CHARTERERS TO PROVIDE PERFORMANCE GUARANTEE TO OWNERS IN SUPPORT OF CHARTERERS OBLIGATIONS UNDER THIS CHARTERPARTY AGREEMENT AS SET FORTH BELOW IN THE FORM OF PERFORMANCE BOND, CASH COLLATERAL OR EQUIVALENT IN A FORM SATISFACTORY TO OWNERS.

SECURED PARTY: CASTLETON COMMODITIES SHIPPING CO. PTE. LTD.

PLEDGOR PARTY: HUDSON SHIPPING LINES, INC.

VALUATION AGENT: CASTLETON COMMODITIES SHIPPING CO. PTE. LTD.

INITIAL AMOUNT: US$4.25 MILLION PER VESSEL CONSISTING OF US$3.0 MILLION CASH (THE "INITIAL CASH AMOUNT") AND A US$1.25 MILLION PERFORMANCE BOND (THE "INITIAL BOND AMOUNT")

THE INITIAL BOND AMOUNT SHALL BE REDUCED ANNUALLY (THE FIRST REDUCTION TO BE ON THE FIRST ANNIVERSARY DATE OF THE DELIVERY DATE OF THE VESSEL) BY US$150,000 PER ANNUM

BAREBOAT LEASE
OBLIGATION:  US$7,850/DAY X REMAINING BAREBOAT HIRE DAYS UNDER THE CHARTERPARTY

VESSEL PURCHASE
OBLIGATION:  US$20.5 MILLION

EXPOSURE AMOUNT: THE SUM OF THE BAREBOAT LEASE OBLIGATION AND THE VESSEL PURCHASE OBLIGATION

MINIMUM
TRANSFER AMOUNT: US$250,000

CALCULATION
FREQUENCY: ON THE LAST DAY OF EACH CALENDAR QUARTER BEGINNING ON THE EXECUTION DATE OF THE CHARTERPARTY AGREEMENT CONTINUING THROUGH AND INCLUDING THE EXECUTION DATE OF THE FINAL PURCHASE OBLIGATION, EACH A "VALUATION DATE"

FAIR MARKET VALUE: FAIR MARKET VALUE SHALL BE DEFINED AS THE SUM OF THE CHARTERPARTY FMV AND THE VESSEL FMV AS EACH ARE DEFINED BELOW:

CHARTERPARTY FMV: CHARTERPARTY FMV SHALL EQUAL (THE WEIGHTED AVERAGE OF BALTIC SUPRAMAX TIME CHARTER INDEX FORWARD VALUE ASSESSMENT (BFA SUPRAMAX 5 TC) FOR EACH APPLICABLE CALENDAR YEAR (THE YEAR OF DELIVERY THROUGH THE PURCHASE OBLIGATION YEAR OF THE VESSEL) (2016 TO 2023), PLUS THE FIXED VESSEL FEATURE ADJUSTMENT (BELOW), LESS THE FIXED OPERATING EXPENSE AMOUNT (BELOW)) X REMAINING BAREBOAT HIRE DAYS (EXCLUDING ANY OFF-HIRE). FOR YEARS WHERE THE BFA IS QUOTED QUARTERLY, ONLY THE FUTURE QUARTERS FOR SUCH YEAR SHALL BE USED TO COMPUTE THE WEIGHTED AVERAGE. FOR FUTURE YEARS WHERE NO SWAP VALUE IS TRADED, THE VALUE SHALL BE THAT OF THE LAST AVAILABLE PUBLISHED SWAP YEAR

WHERE:

FIXED OPERATING EXPENSE AMOUNT = US$5,000 PER DAY PER VESSEL
FIXED VESSEL FEATURE ADJUSTMENT = US$4,000 PER DAY PER VESSEL

VESSEL FMV: VESSEL FMV SHALL EQUAL FAIR MARKET VALUE OF VESSEL (AS PUBLISHED BY VESSELVALUES.COM) DEPRECIATED TO 7 YEAR OLD VESSEL EQUIVALENT (STRAIGHT LINE DEPRECIATION OVER 25 YEARS TO SCRAP VALUE BASED ON US$400/LDT, WHERE LDT = 8,845 TONS)

CREDIT SUPPORT
AMOUNT: CREDIT SUPPORT AMOUNT SHALL EQUAL THE INITIAL AMOUNT PLUS THE FAIR MARKET VALUE PLUS THE TRANSFER BALANCE

WHERE:

TRANSFER BALANCE IS DEFINED AS SUM OF ALL DELIVERY AMOUNTS PAID BY PLEDGOR PARTY TO SECURED PARTY PURSUANT TO THE TRANSFER MECHANISM LESS THE SUM OF ALL RETURN AMOUNTS PAID BY SECURED PARTY TO PLEDGOR PARTY.

TRANSFER
MECHANISM: ON EACH VALUATION DATE,

a) IF THE EXPOSURE AMOUNT EXCEEDS THE CREDIT SUPPORT AMOUNT BY THE MINIMUM TRANSFER AMOUNT THEN PLEDGOR PARTY WILL MAKE A CASH PAYMENT TO THE SECURED PARTY FOR THE DIFFERENCE, THE "DELIVERY AMOUNT", SUCH THAT THE CREDIT SUPPORT AMOUNT SHALL ALWAYS MEET OR EXCEED THE EXPOSURE AMOUNT AS OF SUCH VALUATION DATE;

OR

b) IF THE CREDIT SUPPORT AMOUNT EXCEEDS THE EXPOSURE AMOUNT BY THE MINIMUM TRANSFER AMOUNT, THEN THE SECURED PARTY WILL MAKE A CASH PAYMENT TO THE PLEDGOR PARTY FOR THE AMOUNT OF THE DIFFERENCE IN EXCESS OF THE INITIAL AMOUNT, THE "RETURN AMOUNT",

PROVIDED, IN EITHER CASE, THAT THE PLEDGOR PARTY WILL MAINTAIN CREDIT SUPPORT FOR THE BENEFIT OF THE SECURED PARTY DURING THE ENTIRE TERM OF THE CHARTERPARTY AGREEMENT IN AN AMOUNT NOT LESS THAN THE INITIAL AMOUNT AND CASH CREDIT SUPPORT IN AN AMOUNT NOT LESS THAN THE INITIAL CASH AMOUNT. ALL CASH PAYMENTS MADE BETWEEN THE PARTIES PURSUANT TO THE TRANSFER MECHANISM, SHALL BE DUE AND PAYABLE WITHIN SEVEN (7) BUSINESS DAYS' OF WRITTEN NOTICE.

PERFORMANCE BOND: THE INITIAL BOND AMOUNT SHALL BE SATISFIED BY PLEDGOR PARTY THROUGH A PERFORMANCE BOND ISSUED BY AN INSURANCE OR BOND COMPANY HAVING AN A.M. BEST'S CREDIT RATING OF "A" (EXCELLENT) OR HIGHER AND A FINANCIAL STRENGTH OF "X" (SURPLUS BETWEEN US$500 - US$750 MILLION) OR HIGHER, A "QUALIFIED ISSUER". PLEDGOR PARTY AGREES TO:  (I) SUBMIT A COMPLETE GOOD FAITH APPLICATION TO SUCH AN INSURANCE OR BOND COMPANY FOR ISSUANCE OF SUCH PERFORMANCE BOND WITHIN TWO (2) BUSINESS DAYS OF EXECUTING THE CHARTERPARTY, SUCH BOND TO BE ISSUED WITHIN TEN (10) BUSINESS DAYS OF THAT SUBMISSION, AND (II) MAINTAIN SUCH BOND FOR THE DURATION OF ITS INITIAL AMOUNT OBLIGATIONS HEREUNDER. IF SUCH BOND IS ONLY CAPABLE OF BEING ISSUED ON AN ANNUAL BASIS, THE TERMS OF SUCH BOND SHALL PROVIDE FOR THE ISSUANCE OF CONTINUATION CERTIFICATES 60 DAYS PRIOR TO THE EXPIRATION OF EACH SUCCESSIVE ANNUAL PERIOD.

SECURED PARTY SHALL HAVE THE RIGHT TO MONITOR THE FINANCIAL STRENGTH AND CREDIT RATING OF THE QUALIFIED ISSUER. IN THE EVENT THAT QUALIFIED ISSUER NO LONGER MEETS THE MINIMUM A.M. BEST CREDIT AND FINANCIAL RATINGS ABOVE, THEN SECURED PARTY MAY REQUIRE PLEDGER PARTY TO REPLACE AND REISSUE SUCH PERFORMANCE BOND WITH AN INSURANCE OR BOND COMPANY WHO MEETS SUCH REQUIREMENTS. FURTHER, SAID INSURANCE OR BOND COMPANY SHALL PROVIDE THE PARTIES A MINIMUM THIRTY (30) DAYS' NOTICE OF A MATERIAL CHANGE IN SAID BOND.

FAILURE BY THE PLEDGOR PARTY TO MAINTAIN SUCH PERFORMANCE BOND AS SET FORTH HEREIN SHALL REQUIRE PLEDGOR PARTY TO REPLACE THE THEN APPLICABLE REQUIRED AMOUNT OF SUCH PERFORMANCE BOND WITH ADDITIONAL CASH COLLATERAL.

THE PERFORMANCE BOND SHALL BE MAINTAINED AT THE COST OF PLEDGOR PARTY.

JOINT ORDER ESCROW
ACCOUNT: THE CASH PAYMENTS MADE BY PLEDGOR PARTY HEREUNDER IN CONNECTION WITH THE APPLICABLE PORTION OF THE INITIAL AMOUNT AND ANY DELIVERY AMOUNT(S) SHALL BE RETAINED IN AN INTEREST BEARING ESCROW ACCOUNT TO BE ESTABLISHED WITH A MUTUALLY ACCEPTABLE FINANCIAL INSTITUTION OR TITLE COMPANY, PURSUANT TO A JOINT ORDER ESCROW AGREEMENT. THE ESCROWED FUNDS SHALL BE SUBJECT TO DISBURSEMENT IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THE JOINT ORDER ESCROW AGREEMENT.

## 14) LIQUIDATED DAMAGES

OWNERS AND CHARTERERS ACKNOWLEDGE THAT FOR PURPOSES OF THIS AGREEMENT, DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS. OWNERS AND CHARTERERS AGREE THAT UPON THE OCCURRENCE AND CONTINUATION OF AN OWNERS EVENT OF DEFAULT AND A TERMINATION OF THIS CHARTERPARTY AGREEMENT BY THE CHARTERERS OR, NOTWITHSTANDING CHARTERERS TERMINATION, IF THE OBLIGATIONS OF OWNERS BECOME VOID, VOIDABLE OR UNENFORCEABLE BY REASON OF ANY LEGAL LIMITATION, DISABILITY OR INCAPACITY ON OR OF OWNER, THEN CHARTERERS SHALL BE ENTITLED TO THE RECOVERY OF LIQUIDATED DAMAGES WHICH SHALL INCLUDE, BUT NOT BE LIMITED TO, CHARTERERS DAMAGES AS DEFINED BELOW, AND UPON THE OCCURRENCE AND CONTINUATION OF A CHARTERERS EVENT OF DEFAULT AND A TERMINATION OF THIS CHARTERPARTY AGREEMENT BY THE OWNERS OR, NOTWITHSTANDING OWNERS TERMINATION, IF THE OBLIGATIONS OF CHARTERERS BECOME VOID, VOIDABLE OR UNENFORCEABLE BY REASON OF ANY LEGAL LIMITATION, DISABILITY OR INCAPACITY ON OR OF CHARTERERS, THEN OWNERS SHALL BE ENTITLED TO THE RECOVERY OF LIQUIDATED DAMAGES WHICH SHALL INCLUDE, BUT NOT BE LIMITED TO, OWNERS DAMAGES AS DEFINED BELOW.

CHARTERERS
DAMAGES: 1. THE POSITIVE VALUE IF ANY OF THE CHARTERPARTY FMV MINUS THE BAREBOAT LEASE OBLIGATION (AS EACH ARE DEFINED IN CLAUSE 13 ABOVE); PLUS
2. THE POSITIVE VALUE IF ANY OF THE VESSEL FMV MINUS THE VESSEL PURCHASE OBLIGATION (AS EACH ARE DEFINED IN CLAUSE 13 ABOVE);
PLUS

3. ANY ADDITIONAL DIRECT AND VERIFIABLE COSTS OR EXPENSES INCURRED BY CHARTERERS AS A RESULT OF THE OWNERS EVENT OF DEFAULT;

PROVIDED THAT IN NO EVENT WILL CHARTERERS BE ENTITLED TO DOUBLE RECOVERY FOR ANY COSTS OR EXPENSES UNDER SUBSECTION 3 ABOVE THAT ARE INCLUDED IN ANY CALCULATION UNDER SUBSECTION 1 OR SUBSECTION 2 ABOVE.

OWNERS
DAMAGES: 1. THE POSITIVE VALUE IF ANY OF THE BAREBOAT LEASE OBLIGATION MINUS THE CHARTERPARTY FMV (AS EACH ARE DEFINED IN CLAUSE 13 ABOVE); PLUS
2. THE POSITIVE VALUE IF ANY OF THE VESSEL PURCHASE OBLIGATION MINUS THE VESSEL FMV (AS EACH ARE DEFINED IN CLAUSE 13 ABOVE);
PLUS
3. ANY ADDITIONAL DIRECT AND VERIFIABLE COSTS OR EXPENSES INCURRED BY OWNERS AS A RESULT OF THE CHARTERERS EVENT OF DEFAULT;

PROVIDED THAT IN NO EVENT WILL OWNERS BE ENTITLED TO DOUBLE RECOVERY FOR ANY COSTS OR EXPENSES UNDER SUBSECTION 3 ABOVE THAT ARE INCLUDED IN ANY CALCULATION UNDER SUBSECTION 1 OR SUBSECTION 2 ABOVE.


## 15) OWNERS PERFORMANCE GUARANTEE

IN CONSIDERATION OF CHARTERERS ENTERING INTO THIS CHARTERPARTY WITH OWNERS AND IN SUPPORT OF OWNERS' OBLIGATIONS UNDER THIS CHARTERPARTY, OWNERS SHALL CAUSE CASTLETON COMMODITIES INTERNATIONAL LLC (USA), REPRESENTED TO BE OWNERS' ULTIMATE PARENT CORPORATION, TO PROVIDE A PAYMENT AND PERFORMANCE GUARANTEE IN THE FORM ATTACHED HERETO AS SCHEDULE 1. ANY CHANGES TO SUCH FORM MUST BE ACCEPTABLE TO CHARTERERS, SUCH ACCEPTANCE NOT TO BE UNREASONABLY DELAYED OR WITHHELD.


## 16) MEMORANDUM OF AGREEMENT

OWNERS AND CHARTERERS AGREE THAT THE PURCHASE OF THE VESSEL BY THE CHARTERERS PURSUANT TO RIDER CLAUSE 6 SHALL BE ON THE TERMS OF THIS CHARTERPARTY AGREEMENT AND THE TERMS OF THE MEMORANDUM OF AGREEMENT IN THE FORM ATTACHED HERETO AS AN APPENDIX AND INCORPORATED INTO THIS CHARTERPARTY AGREEMENT AS AN INTEGRAL PART THEREOF, WITH THE TERMS OF THE PURCHASE AND THE PURCHASE PRICE OF THE VESSEL BEING AS DETERMINED PURSUANT TO THE CHARTERPARTY AGREEMENT INCLUDING RIDER CLAUSE 6 AND SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THE MEMORANDUM OF AGREEMENT.


## 17) OWNERS COVENANT

WITH RESPECT TO:

(I) THE PROPOSED 7 YEARS BAREBOAT CHARTERPARTY AGREEMENT (THE "UPSTREAM CHARTERPARTY") BETWEEN CASTLETON COMMODITIES SHIPPING CO. PTE. LTD. ("CC SHIPPING") AND A PANAMANIAN COMPANY TO BE NOMINATED AND GUARANTEED BY KN MARITIME CO. LTD., TOKYO (COLLECTIVELY "KN MARITIME") THAT SETS FORTH CC SHIPPING'S RIGHTS AND OBLIGATIONS AS CHARTERER THEREUNDER, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CHARTER THE VESSEL REFERENCED IN RIDER CLAUSE 4 ABOVE, SUCH UPSTREAM CHARTERPARTY TO BECOME EFFECTIVE UPON THE FULL AND FINAL AGREEMENT OF TERMS THERETO BETWEEN CC SHIPPING AND KN MARITIME, AND

(II) THE MEMORANDUM OF AGREEMENT OF EVEN DATE OF THE UPSTREAM CHARTERPARTY AND WHICH IS INTEGRATED INTO AND MADE PART OF THE UPSTREAM CHARTERPARTY (THE "UPSTREAM MOA") RELATED TO THE ACQUISITION BY CC SHIPPING FROM KN MARITIME OF THAT SAME VESSEL THAT IS THE SUBJECT OF THE UPSTREAM CHARTERPARTY,

OWNERS COVENANT AND AGREE TO THE FOLLOWING:

1) SUBJECT TO CHARTERERS EXERCISE OF ITS RIGHTS TO SUBROGATION UNDER SUBSECTION 2 BELOW WHICH SHALL OPERATE AS A WAIVER OF OWNERS OBLIGATION TO ENFORCE ANY OF ITS RIGHTS OR OBLIGATIONS UNDER SECTION 13 OF THE UPSTREAM MOA, TO ENFORCE ANY AND ALL RIGHTS AVAILABLE TO CC SHIPPING AGAINST KN MARITIME UNDER THE UPSTREAM CHARTERPARTY AND THE UPSTREAM MOA AND TO PERFORM ANY AND ALL OBLIGATIONS THEREUNDER TO THE EXTENT THAT CC SHIPPING'S FAILURE TO ENFORCE OR PROSECUTE SUCH RIGHT OR PERFORM SUCH OBLIGATION WILL MATERIALLY COMPROMISE (I) THE RIGHT OF CHARTERER UNDER THIS CHARTERPARTY TO RECEIVE THE BENEFITS OF ITS BARGAIN FOR ENTERING INTO THIS CHARTERPARTY AGREEMENT, OR (II) OWNERS OR CHARTERERS ABILITY TO PERFORM ANY OF THEIR MATERIAL OBLIGATIONS UNDER THIS CHARTERPARTY AGREEMENT OR THE MEMORANDUM OF AGREEMENT ATTACHED HERETO BETWEEN OWNERS AND CHARTERERS; AND

2) ABSENT A CHARTERERS EVENT OF DEFAULT UNDER THIS CHARTERPARTY (WHICH IS CONTINUING BEYOND ANY APPLICABLE NOTICE AND CURE PERIOD) OR CHARTERERS CANCELLATION OF DELIVERY OF THE VESSEL HEREUNDER, UPON THE OCCURRENCE OF AN EVENT OF DEFAULT BY KN MARITIME UNDER THE UPSTREAM CHARTERPARTY OR REPUDIATION BY KN MARITIME OF ITS VESSEL SALE OR DELIVERY OBLIGATIONS UNDER THE UPSTREAM CHARTERPARTY OR THE UPSTREAM MOA, OWNERS UNDER THIS CHARTERPARTY AGREEMENT HEREBY AGREE TO GRANT CHARTERERS A RIGHT OF SUBROGATION TO ANY OWNERS RIGHTS TO ENFORCE PERFORMANCE OR PROSECUTE A CLAIM FOR DAMAGES UNDER SECTION 13 OF THE UPSTREAM MOA UPON CHARTERERS NOTICE TO OWNERS OF CHARTERERS EXERCISE OF SUCH SUBROGATION RIGHT AND AT THE CHARTERERS SOLE COST AND EXPENSE. NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, THE EXERCISE OF SUCH SUBROGATION RIGHTS HEREUNDER BY CHARTERERS SHALL NOT ELIMINATE, WAIVE OR VARY ANY OF OWNERS ENFORCEMENT OR PROSECUTION OBLIGATIONS UNDER THE UPSTREAM CHARTERPARTY OR UPSTREAM MOA OTHER THAN THOSE RIGHTS OR OBLIGATIONS UNDER THAT SECTION 13 OF THE UPSTREAM MOA.

## 18) CONDITION PRECEDENT TO EFFECTIVE DATE OF THIS CHARTER PARTY

OWNERS AND CHARTERERS HEREBY AGREE THAT THE FOLLOWING WILL BE CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF THIS CHARTERPARTY AGREEMENT:

1) EXECUTION OF THE UPSTREAM CHARTERPARTY BY AND BETWEEN CC SHIPPING AND KN MARITIME; AND

2) EXECUTION OF THE UPSTREAM MOA BY AND BETWEEN CC SHIPPING AND KN MARITIME; AND

3) RECEIPT BY CHARTERERS OF AN ORIGINAL LETTER OF GUARANTEE IN THE FORM ATTACHED HERETO AS SCHEDULE 1, DULY EXECUTED BY CASTLETON COMMODITIES INTERNATIONAL LLC (USA).

OWNERS AGREE TO USE THEIR BEST EFFORTS TO EXPEDITIOUSLY CAUSE THE FULL EXECUTION OF THE DOCUMENTS REFERENCED IN THIS CLAUSE 18 BY 9 MAY 2014.

OWNERS AGREE TO PROVIDE PROMPT NOTICE TO CHARTERERS UPON THE SATISFACTION OF EACH OF THE CONDITIONS PRECEDENT LISTED ABOVE, OR WAIVER BY OWNERS IN OWNERS SOLE AND ABSOLUTE DISCRETION OF ANY OR ALL OF SUCH CONDITIONS PRECEDENT.

BY EXECUTION BELOW, THESE RIDERS ARE MADE PART OF THE CHARTERPARTY AGREEMENT EFFECTIVE AS OF THE DATE WRITTEN THEREAFTER. IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF THESE RIDERS AND THE TERMS OF THE CHARTERPARTY AGREEMENT TO WHICH THESE RIDERS ARE ATTACHED, THE TERMS OF THE RIDERS SHALL CONTROL.

| HUDSON SHIPPING LINES, INC. | CASTLETON COMMODITIES SHIPPING CO. PTE. LTD. |
|---|---|
| | [signature] |
| NAME: | NAME: DAVID A. WALLACE |
| TITLE: | TITLE: DIRECTOR AND PRESIDENT |
| DATE: | DATE: 11 APRIL 2014 |

## APPENDIX (A) NOTICE OF ASSIGNMENT OF CHARTER HIRES

MV "NAME OF SHIP"
ASSIGNMENT OF CHARTERHIRES

NOTICE OF ASSIGNMENT OF CHARTER HIRES

DATED: ____ DAY OF ______. _____

TO: CASTLETON COMMODITIES SHIPPING CO. PTE.LTD (THE "CHARTERER" )

WE REFER TO A BAREBOAT CHARTER PARTY (THE "CHARTER" DATED ___ DAY OF ______ 2014 ENTERED INTO BETWEEN YOURSELVES AND OURSELVES.

THIS IS TO NOTIFY YOU THAT:

(A) WE HAVE ASSIGNED TO ________ BANK, LTD. A JAPANESE BANK (THE "ASSIGNEE") BY WAY OF SECURITY ALL OF OUR RIGHT, TITLE AND INTEREST IN AND TO THE CHARTER INCLUDING ALL CHARTER HIRES AND ALL OTHER MONIES AND CLAIMS FOR MONEY WHATSOEVER DUE AND PAYABLE OR TO BECOME DUE AND PAYABLE TO US UNDER THE CHARTER.

(B) ALL HIRES AND ALL OTHER MONIES AND CLAIMS FOR MONEY WHATSOEVER UNDER THE CHARTER SHALL BE PAID TO AN ACCOUNT ESTABLISHED AND MAINTAINED IN THE NAME OF THE ASSIGNOR AND HELD AT THE MAIN OFFICE OF THE ASSIGNEE (US DOLLAR ACCOUNT NO. ____________) OR AN ACCOUN DESIGNATED BY THE ASSIGNEE FROM TIME TO TIME (THE "DESIGNATED ACCOUNT").

PLEASE CONFIRM YOUR UNDERSTANDING THAT:

(1) WE SHALL REMAIN LIABLE TO YOU TO PERFORM ALL OUR OBLIGATION AND LIABILITIES UNDER THE CHARTER. THE ASSIGNEE SHALL NOT BE UNDER ANY OBLIGATION OR LIABILITY UNDER THE PROVISIONS OF THE CHARTER.

(2) YOU SHALL PAY, TO THE DESIGNATED BANK ACCOUNT, ANY AND ALL CHARTER HIRE AND OTHER SUMS PAYABLE BY YOU TO US UNDER THE CHARTER. ANY PAYMENTS MADE BY YOU SHALL BE FINAL.

THE AUTHORITY, INSTRUCTION AND RESTRICTION HEREIN CONTAINED CANNOT BE REVOKED OR VARIED BY US WITHOUT THE ASSIGNEE'S PRIOR WRITTEN CONSENT.

YOURS FAITHFULLY
_______________SHIPPING s.a.

BY: ____________________
NAME: MASANORI ISHIOKA
TITLE: PRESIDENT

**APPENDIX (B) HULL AND MACHINERY AND WAR RISKS LOSS PAYABLE CLAUSE AND NOTICE OF CANCELLATION**

MV "NAME OF SHIP"
ASSIGNMENT OF INSRUANCE

HULL AND MACHINERY AND WAR RISKS LOSS PAYABLE CLAUSE
AND NOTICE OF CANCELLATION

M.V. "NAME OF SHIP" (THE "VESSEL")

IT IS HEREBY NOTED AND AGREED THAT _______ BANK, LTD., AS THE "MORTGAGEE" IS INTERESTED IN THE SUBJECT MATTER OF THIS INSURANCE AND THAT IS IS FURTHER NOTED AND AGREED:

(1) THAT, IN THE EVENT OF AN ACTUAL OR CONSTRUCTIVE OR COMPROMISED OR ARRANGED TOTAL LOSS ARISING OUT OF THE INSURED PERIL OF THE VESSEL, THE PROCEEDS OF INSURANCE SHALL BE PAID TO THE MORTGAGEE TO THE EXTENT OF EACH MORTGAGEE'S INTEREST, PROVIDED, THAT THE WRITTEN CONSENT TO A COMPROMISED OR ARRANGED TOTAL LOSS SHALL BE OBTAINED FROM ALL OF THE MORTGAGEE PRIOR TO SUCH TOTAL LOSS BEING AGREED WITH THE INSURER;

(2) THAT ALL OTHER INSRUED LOSSES EXCEEEDING TEN MILLION YEN (10,000,000 YEN) OR ITS EQUIVALENT IN AN OTHER CURRENCY IN RESPECT OF ANY ONE ACCIDENT SHALL BE PAID TO THE MORTGAGEE TO THE EXTENT OF MORTGAGEE'S INTEREST UNLESS THE MORTGAGEE GIVES ITS PRIOR WRITTEN CONSENT THAT SUCH LOSSES SHALL BE PAID TO THE OWNERS OR ITS ORDER; AND

(3) THAT ALL OTHER INSURED LOSSES NOT EXCEEDING TEN MILLION YEN (10,000,000 YEN) OR ITS EQUIVALENT IN ANY OTHER CURRENCY IN RESPECT OF ANY ONE ACCIDENT SHALL BE PAID TO THE OWNERS OR ITS ORDER UNLESS AND UNTIL EVENT OF DEFAULT OCCURS UNDER THE MORTGAGE AND IF THE INSURER HAVE BEEN NOTIFIED BY THE MORTGAGEE OF SUCH OCCURRANCE OF DEFAULT, THEN S UCH LOSSES SHALL BE PAID TO THE MORTGAGEE TO THE EXTENT OF EACH MORTGAGEE'S INTEREST.

THAT THIS CLAUSE SHALL HAVE EFFECT FROM ____________________

NOTICE OF CANCELLATION

THE INSURER HEREBY AGREE TO GIVE AT LEAST FOURTEEN (14) DAYS PRIOR NOTICE TO THE MORTGAGEE OF ANY FAILURE OF PAYMENT OF PERMIUMS, CANCELLATION, TERMINATION OR MODIFICATION OF THE POLICY ON WHICH THIS CLAUSE IS ENDORSED AND GIVE THE MORTGAGEE AN OPPORTUNITY TO REMEDY SUCH FAILURE OR CANCELLATION AND HEREBY FURTHER AGREES TO ADVISE ANYTHING WHICH WOULD, IN THE OPINION OF THE INSURER, AFFECT THE VALIDITY OR ENFORCEABILITY OF THE POLICY.

## APPENDIX (C) ASSIGNMENT OF INSURANCE

MV "NAME OF SHIP"
ASSIGNMENT OF INSURANCE

TO; ____________BANK, LTD.
CC: ____________SHIPPING S.A.

DEAR SIRS,

M.V. "NAME OF SHIP" (THE "VESSEL")
OWNERS: ________________SHIPPING S.A.

WE CONFIRM THAT:

(1) WE HAVE EFFECTED INSURANCES FOR THE ACCOUNT OF THE ABOVE OWNERS AS SET OUT
IN THE ATTACHED GOVERNING CHARTER PARTY,

(2) THE SAID INSURANCES INCLUDE THE LOSS PAYABLE CLAUSE(S) SET OUT IN APPENDIX "A" ATTACHED AND

(3) THE NOTICE OF ASSIGNMENT IN THE FORM OF APPENDIX "B" ATTACHED HAS BEEN ACKNOWLEDGED BY UNDERWRITERS IN ACCORDANCE WITH MARKET PRACTICE.

PURSUANT TO INSTRUCTIONS RECEIVED FRO THE ABOVE OWNERS AND / OR THEIR AUTHORISED MANAGER OR AGENTS AND IN CONSIDERATION OF YOUR APPROVING US AS THE APPOINTED BROKERS IN CONNECTION WITH THE INSURANCES COVERED BY THIS LETTER, WE HEREBY UNDERTAKE:-

1) TO HOLD
(A) THE INSRUANCE SLIPS OR CONTRACTS, AND

(B) THE POLICIES IF AND WHEN ISSUED, AND

(C) UNTIL THE TIME OF THE ISSUE OF ANY NEW OR REPLACEMENT LETTER OF UNDERTAKING, ANY RENEWALS OFSUCH CONTRACTS OR POLICIES OR ANY CONTRACTS OR POLICIES SUBSTITUTED THEREFOR WITH YOUR CONSENT AS MAY BE ARRANGED THROUGH OURSELVES, AND

(D) THE BENEFIT OF THE INSURANCES THEREUNDER TO YOUR ORDER IN ACCORDANCE WITH THE TERMS OF THE SAID LOSS PAYABLE CLAUSE(S); AND

2) TO ARRANGE FOR THE SAID LOSS PAYABLE CLAUSE(S) TO BE INCLUDED ON THE CONTRACTS OR POLICIES IF AND WHEN ISSUED; AND

3) TO HAVE ENDORSED ON EACH AND EVERY CONTRACT OR POLICY AS AND WHEN THE SAME IS ISSUED A COPY OF THE SAID NOTICE OF ASSIGNMENT; AND

4) TO ADVISE YOU PROMPTLY IF WE CEASE TO BE THE BROKER FOR THE ASSURED OR IN THE EVENT OF ANY MATERIALCHANGES WHICH WE ARE AWARE HAVE BEEN MADE TO THE SAID INSURANCES; AND

5) FOLLOWING A WRITTEN APPLICATION RECEIVED FROM YOU NOT LATER THAN ONE MONTH BEFORE EXPIRY OF THESE INSURANCES TO NOTIFY YOU WITHIN FOURTEEN DAYS OF THE RECEIPT OF SUCH APPLICATION IN THE EVENT OF OUR NOT HAVNG RECEIVED NOTICE OF RENEAL INSTRUCTIONS FROM OWNERS AND/ OR THEIR AUTHORISED MANAGERS OR AGENTS, AND IN THE EVENT OF OUR RECEIVING INSTRUCTIONS TO RENEW TO ADVISE YOU PROMPTLY OF THE DETAILS HEREOF; AND



6) TO FORWARD TO YOU PROMPTLY ANY NOTICES OF CANCELLATION THAT WE RECEIVE FROM UNDERWRITERS; AND

7) FOLLOWING A WRITTEN APPLICATION FROM YOU TO ADVISE YOU PROMPTLY OF THE PREMIUM PAYMENT SITUATION WHERE SUCH PREMIUM IS PAID OF PAYABLE THROUGH OUR INTERMEDIARY.

IF AND WHEN WE ARE RESPONSIBLE FOR THE PAYMENT OF PREMIUM TO UNDERWRITERS, OUR ABOVE UNDERTAKINGS ARE GIVEN SUBJECT TO OUR LIEN ON THE CONTRACTS OR POLICIES FOR PREMIUMS AND SUBJECT TO OUR RIGHT OF CANCELLATION ON DEFAULT IN PAYMENT OF SUCH PREMIUMS BUT WE UNDERTAKE NOT TO EXERCISE SUCH RIGHTS OF CANCELLATION WITHOUT GIVING YOU TEN DAYS NOTICE IN WRITING EITHER BY LETTER OR ELECTRONICALLY TRANSMITTED MESSAGE AND A REASONABLE OPPORTUNITY FOR YOU TO PAY ANY PREMIUMS OUTSTANDING.

IT IS UNDERSTOOD AND AGREED THAT THE OPERATION OF AUTOMATIC TERMINATION OF COVER, CANCELLATION OR AMENDMENT PROVISIONS CONTAINED IN THE POLICY CONDITIONS SHALL OVERRIDE ANY UNDERTAKINGS GIVEN BY US AS BROKERS.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN ANY PRIOR LETTER OF UNDERTAKING OR IN ANY LOSS PAYABLE CLAUSE OR IN ANY NOTICE OF ASSIGNMENT,

(A) THE PROVISIONS OF THIS LETTER OF UNDERTAKING SHALL ONLY APPLY TO THE INSURANCES SET OUT IN THE GOVERNING CHARTER PARTY DATED ____________, 2014 AND UNTIL THE TIME OF THE ISSUE OF ANY NEW OR REPLACEMENT LETTER OF UNDERTAKING, TO ANY RENEWALS THEREOF EFFECTED THROUGH OURSELVES, AND

(B) THE UNDERTAKINGS GIVEN ABOVE SHALL BE THE LIMIT OF OUR OBLIGATIONS TO YOU.

WE DO NOT ACCEPT ANY ACTUAL OR CONSTRUCTIVE NOTICE OF ANY INTEREST YOU MAY CLAIM IN ANY OTHER INSURANCE EFFECTED ON THE VESSELS REFERRED TO IN THE SAID GOVERNING CHARTER PARTY DATED _____________,2014 UNLESS AND UNTIL YOU GIVE US SPECIFIC NOTICE OF THAT INTEREST IN THE PARTICULAR INSURANCE AND SUCH NOTICE IS CONFIRMED BY THE OWNER.

NOTWITHSTANDING THE TERMS OF THE SAID LOSS PAYABLE CLAUSE(S) AND THE SAID NOTICE OF ASSIGNMENT, UNLESS AND UNTIL WE RECEIVE WRITTEN NOTICE FROM YOU TO THE CONTRARY, WE SHALL BE EMPOWERED

(I) TO PAY ALL RETURNS OF PREMIUM TO THE ASSURED OR ITS ORDER;
(II) TO ARRANGE FOR A COLLISION AND/ OR SALVAGE GUARANTEE TO BE GIVEN IN THE EVENTOF BAIL BEING REQUIRED IN ORDER TO PREVENT THE ARREST OF THE VESSEL OR TO SECURE THE RELEASE OF THE VESSEL FROM ARREST FOLLOWING A CASUALTY. WHERE A GUARANTEE HAS BEEN GIVEN AS AFORESAID AND THE GUARANTOR HAS PAID ANY SUM UNDER THE GUARANTEE IN RESPECT OF SUCH CLAIM, THERE SHALL BE PAYABLE DIRECTLY TO THE GUARANTOR OUT OF THE PROCEEDS OF THE SAID POLICIES A SUM EQUAL TO THE SUM SO PAID.

THIS UNDERTAKING SHALL TERMINATE AUTOMATICALLY IF THE ADDRESSEE OF THIS LETTER CEASES TO HAVE ANY INTEREST IN THE INSURANCES SET OUT IN THE GOVERNING CHARTER PARTY DATED ___________,2014.

THIS UNDERTAKING SHALL BE GOVERENED BY AND CONSTUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS UNDERTAKING SHALL BE SUBMITTED TO THE EXCLUSIVE JURISDICTION OF THE ENGLISH COURTS.

YOURS FAITHFULLY
THE INSRUANCE BROKER'S AUTHORISED SIGNATORY

## APPENDIX (D) MEMORANDUM OF AGREEMENT

This MEMORANDUM OF AGREEMENT

Dated: 11 April 2014

Without prejudice to terms and conditions of the 7 Years Bareboat Charter Party dated ~~, 2014,~~ April 11, 2014 as amended from time to time by any Riders, Amendments or Addenda thereto (collectively referred to as the "BBC").

It is the day mutually agreed that CASTLETON COMMODITIES SHIPPING CO. PTE LTD., SINGAPORE and guaranteed by CASTLETON COMMODITIES INTERNATIONAL LLC., USA (hereinafter called the Sellers), have today granted to sell, and the Buyers nominated by HUDSON SHIPPING LINES, DEERFIELD, ILLINOIS, USA (hereinafter called the Buyers), have today taken an option to exercise the right to purchase or to satisfy the purchase obligation in accordance with the terms of the BBC for that MV .

Classification: Nippon Kaiji Kyokai(NK)

Built: Shin Kurushima Toyohashi Shipbuilding Co., Ltd, in Toyohashi or Shin Kurushima Dockyard Co, Ltd, Onishi Factory

Flag: Panama Place of registry: Panama

Call sign: Register tonnage:

Register number:

On the following conditions:-

1. Price:-
As set forth in the BBC.

2. Down-Payment:-
The Buyers must give minimum 3 months' notice to the Sellers when declaring their purchase option, or 3 months' notice to the Sellers to exercise their purchase obligation prior to completion of 7 years bareboat charter in writing place/port for the Sellers consent. The Buyers and the Sellers will sign on an Original Memorandum of Agreement (hereinafter called "MOA") and each party exchange its signed MOA by Fax/ or Email.

After exchanging of this signed MOA , the Buyers shall pay a down-payment of ten percent (10%) of the Purchase Money within three (3) banking days from the date of the declaration of the notice to exercise the purchase option to the Sellers' nominated bank in Japan, interest, if any, to be credited the Buyers.

3. Payment:-
The Purchase Money shall be paid free of bank charge to the Sellers' nominated bank on delivery of the Vessel, but not later than three (3) banking days prior to the actual date of delivery of the vessel for the balance of ninety percent (90%) of the purchase money after the Vessel is ready for delivery and written or telexed notice thereof has been given to the Sellers by the Buyers.

Both ten percent (10%) down payment and the ninety percent (90%) balance shall be paid to the Sellers against the Sellers' presentation to the Sellers' bank a copy or an original Protocol of Delivery and Acceptance duly signed by duly authorized representatives of the Buyers and the Sellers.

Exchange of delivery documents and closing procedure shall take place in the Sellers' nominated place in Japan.

4. Inspection:-
The Buyers shall waive their inspection and therefore the vessel to be delivered to the Buyers strictly as she is where she is basis.

5. Place and time of delivery:-
The Vessel shall be delivered and taken over at/in a safe berth or anchorage safely afloat and a time and place to be mutually agreed.

The Buyers, as bareboat Charterers, shall keep the Sellers well posted about the Vessel's itinerary and estimated time and place of delivery.

Should the vessel become a total or constructive or compromised total loss before delivery, then Rider clause 8 of the BBC shall be applied and after an accurate account by the Buyers and the Sellers, this MOA thereafter null and void.

6. Dry-docking:-
The Buyers shall waive dry-docking inspection of the Vessel.

7. Spare /bunkers etc.:-
Every spares, remaining bunkers are owned by the Buyers/or BBC Charterers, if any, the Sellers' property, original certificates, documents or goods, the Sellers can ashored these or if the Buyers wish to buy/or take copy, the Sellers shall cooperate to the Buyers.

8. Documentation:-
In exchange for payment of the Purchase Money the Sellers shall furnish the Buyers with legal Bill of Sale of the said vessel free from all encumbrances and maritime liens or any other debts whatsoever, duly notarial attested and legalized by the Panamanian consul together with a certificate stating that the Vessel is free from registered encumbrances.

On delivery of the Vessel, the Sellers shall provide a letter of confirmation for the deletion of the Vessel from the registry of the vessel and deliver a certificate of deletion to the Buyers as soon as possible, but latest 3 months after delivery.

The Sellers shall, at the time of delivery, hand to the Buyers all owned classification certificate as well as all plans etc. which are on board the Vessel. Other technical documentation which may be in the Sellers possession shall promptly upon the Buyers instructions be forwarded to the Buyers within twenty-one (21) days after delivery to the Buyers.

9. Encumbrances:-
The Sellers warrant that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any other debts whatsoever except BBC Charterers' responsible items.

The Sellers hereby undertake to indemnify the Buyers against all consequences of such the Sellers' responsible items.

10. Taxes etc.:-
Any taxes, fees and expenses connected with the purchase and registration on the Buyers' flag shall be for the Buyers' account, whereas similar connected with closing of the Sellers' register shall be for the Sellers' account.

11. Condition on delivery:-
The vessel with everything belonging to her shall be at the Buyers' or BBC Charterers' risk and expense, but subject to the conditions of this contract and BBC.  The vessel shall be delivered and taken over as she is.

12. Buyers' default:-
Should the Down-payment not be paid as aforesaid, the Sellers have the right to cancel this contract, and the Sellers be entitled to claim compensation for their losses and for all expenses incurred together with interest rate of twelve percent (12%) per annum.

Should the balance of Purchase Money not be paid as aforesaid, the Sellers have the right to cancel this contract, in which case the amount of down-payment together with interest earned, if any, shall be forfeited to the Sellers. If the down-payment does not cover the Sellers' losses, they shall be entitled to claim further compensation for their losses and for all expenses together with interest at the rate of twelve percent (12%) per annum.

13. Sellers' default:-
If the Sellers fail to execute a legal transfer or to deliver the Vessel, and within the time specified above said clause 5 and in accordance with BBC clauses, the Buyers shall have the following rights:-

(i) the right to cancel this contract in which case the down-payment in full shall be returned to the Buyers together with interest at the rate of twelve percent (12%) per annum;
(ii) the right to pursue Seller for specific performance of the Sellers' obligations under this Memorandum of Agreement; and

(iii) the right to pursue any cause of action against Sellers for any and all damages available under contract or at common law.

14. Arbitration

If any dispute should arise in connection with interpretation and fulfilment of this contract, same shall be decided by arbitration in the city of London, English law to apply, and shall be referred to a single Arbitrator to be appointed by the parties hereto. If the parties cannot agree upon the appointment of the single Arbitrator, the dispute shall be settled by three Arbitrators' each party appointing one Arbitrator, the third being appointed by 4)the London Maritime Arbitrators' Association in London.

If either of the appointed Arbitrators refuses or is in capable of acting, the party who appointed him, shall appoint a new Arbitrator in his place.

If one of the parties fails to appoint an Arbitrator-either originally or by way of substitution for two weeks after the other party having appointed his Arbitrator has sent the party making default notice by mail, cable or telex to make the appointment, the party appointing the third Arbitrator shall, after application from the party having appointed his Arbitrator, also appoint an Arbitrator , also appoint an Arbitrator on behalf of the party making default.

The award rendered by the Arbitration Court shall be final and binding upon the parties and may if necessary be enforced by the Court or any other competent authority in the same manner as a judgment in the Court of Justice.
This contract shall be subject to the Law of the country agreed as place of arbitration.

For good and valuable consideration, the sufficiency of which is hereby acknowledged, the BUYERS and the SELLERS execute this MEMORANDUM OF AGREEMENT effective as of the date first written above.

THE BUYERS

THE SELLERS

X [signature]

CASTLETON COMMODITIES SHIPPING CO. PTE. LTD.
DAVID A. WALLACE
DIRECTOR AND PRESIDENT

## APPENDIX (E) OWNERS PERFORMANCE GUARANTEE

Date :

To:

Guaranty of Castleton Commodities Shipping Co. Pte. Ltd. ("Guaranty')
M.V "_________" (Shin Kurushima Dockyard Newbuilding)

Dear Sirs,

PAYMENT AND PERFORMANCE GUARANTY

We refer to the Charterparty dated ___ /____/____ (and the riders, addendum, appendices and memorandum of agreement attached thereto) for a period of seven (7) years bareboat-charter of the M.V. "______", Shin Kurushima Dockyard newbuilding (hereinafter referred to as "the Vessel") between Castleton Commodities Shipping Co. Pte. Ltd., Singapore ("CCS"), as Owners, and Hudson Shipping Lines, Inc., Illinois, USA ("Hudson") as Charterers (hereinafter referred to as the "Hudson Charterparty") to which this Guaranty is attached as Appendix E.

We represent, warrant and undertake that:

(a) we have full power, authority and capacity to enter into and perform our obligations under this Guaranty and have taken all necessary corporate or other action (as the case may be) required to enable us to do so and our entry into this Guaranty will not exceed any power in our constitutional documents;

(b) this Guaranty constitutes valid and legally binding obligations of ourselves enforceable in accordance with its terms;

(c) all consents, licences, approvals and authorizations required to make this Guaranty valid, enforceable and admissible in evidence and to authorize and permit the execution, delivery and performance of this Guaranty by ourselves have been obtained or made and will remain in full force and effect and there has been no default in the observance of any of the terms or conditions of any of them; and

(d) we have not and will not take any security or counter-security from CCS in respect of any of our obligations under this Guaranty without your prior written consent (which consent shall not be unreasonably withheld or delayed).

In consideration of Hudson entering into the said Hudson Charterparty with our subsidiary, CCS, we, Castleton Commodities International LLC (USA) (hereinafter referred to as the "Guarantor"), do hereby irrevocably and unconditionally guaranty (as primary obligor and not merely as surety) to Hudson:

(a) the due, punctual and faithful performance and observance by CCS of all its obligations, agreements and covenants contained in the Hudson Charterparty; and

(b) the punctual payment of all moneys whatsoever which may from time to time fall due to be paid by CCS under or pursuant to the Hudson Charterparty (including, without limitation, any amount payable by way of liquidated or other damages for breach of any of the terms and conditions of the Hudson Charterparty, provided, however, that in no instance will Guarantor be liable to Hudson for punitive or exemplary damages).

Without prejudice to any other rights or remedies that Hudson may have against the Guarantor and/or CCS under this Guaranty and/or the Hudson Charterparty and/or otherwise, as a separate and independent stipulation we, as primary obligor and not merely as surety, hereby irrevocably and unconditionally agree to indemnify you on demand and keep you indemnified against all costs, charges, expenses, claims, liabilities, losses, duties and fees (including, but not limited to, legal fees and expenses on a full indemnity basis) and taxes thereon suffered or incurred by you directly as a result of any breach

or non-performance whatsoever of, or non-compliance by CCS whatsoever with, any of its obligations under or pursuant to the Hudson Charterparty or as a result of any of those obligations being or becoming void, voidable or unenforceable by reason of bankruptcy or insolvency of CCS.

Further, the Guarantor hereby accepts and agrees that in the event that any notice is issued and/or any order is made or resolution passed for the winding up, dissolution, liquidation, bankruptcy or insolvency of CCS, or similar, the same shall, for the purposes of this Guaranty, comprise a breach of CCS obligations under the Hudson Charterparty and the Guarantor shall be liable to indemnify Hudson in accordance with the terms of this Guaranty.

Guarantor shall be directly and primarily liable for any amount due from, and any performance obligation, covenant or agreement of, CCS under the Hudson Charterparty, without requiring that Hudson first proceed against CCS or join CCS in any proceeding brought to enforce this Guaranty. Guarantor agrees that any renewal, extension of time, amendment or modification to the Hudson Charterparty, delay or failure by Hudson in the enforcement of any right under the Hudson Charterparty, or compromise of the amount of any obligation or liability under the Hudson Charterparty made with or without the knowledge or consent of Guarantor shall not affect Guarantor's liability under this Guaranty. Guarantor's liability under this Guaranty shall not be affected by: (i) any bankruptcy, reorganization, insolvency or similar proceeding affecting CCS, nor by any termination or disaffirmance of the Hudson Charterparty or any of CCS' obligations thereunder in connection with such proceeding, (ii) any lack of validity or enforceability of the Hudson Charterparty, (iii) any law, regulation order of any jurisdiction affecting any term of the Hudson Charterparty or any of a party's rights with respect thereto, or (iv) any variation of or supplement to the Hudson Charterparty.

Guarantor hereby waives any claim or other right now existing or hereafter acquired against CCS that arises from the performance of Guarantor's obligations under this Guaranty, including, without limitation, any rights of contribution, indemnity, subrogation, reimbursement or exoneration.

Guarantor hereby waives presentment, protest, notice of default, demand for payment, and all other suretyship defenses whatsoever with respect to any payment guaranteed under this Guaranty, and agrees to pay unconditionally upon first demand all amounts owed under the Hudson Charterparty, provided, however, that Guarantor reserves any right of setoff, defense or counterclaim that CCS or Guarantor may have or claim to have against Hudson and the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

No failure or delay on the part of Hudson in the exercise of any power, right or privilege under this Guaranty or the Hudson Charterparty and no course of dealing with respect thereto shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any power, right or privilege thereunder preclude any other or further exercise thereof or the exercise of any other power, right or privilege. All rights and remedies existing under this Guaranty and the Hudson Charterparty are cumulative to, and not exclusive of, any rights and remedies provided by law or otherwise available.

This Guaranty and all obligations of Guarantor hereunder shall be in full force and effect from the date hereof and shall continue in full force and effect until CCS has duly performed, paid and fulfilled the terms of the Hudson Charterparty.

If Hudson retains an attorney to enforce this Guaranty or to bring any action or any appeal in connection with this Guaranty or the Hudson Charterparty, Hudson shall be entitled to recover its (and/or its insured's) reasonable out-of-pocket attorneys' fees, costs, and disbursements in connection therewith, as determined by the court before which such action or appeal is heard, in addition to any other relief to which Hudson may be entitled. Any amount owing under this Guaranty shall bear interest from the date such amount was payable to Hudson to the date of repayment at a rate equal to the lesser of:  (i) the London Interbank Offer Rate on each date of repayment plus five percent (5%) and (ii) the maximum rate permitted by law.

Each reference in this Guaranty to Guarantor shall be deemed to include the successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty. If any provision of this Guaranty is held to be invalid or unenforceable, the validity and enforceability of the other provisions of this Guaranty shall not be affected.

All sums due and payable by the Guarantor shall be paid in full in immediately available, freely transferable, cleared funds exclusive of any fees or tax of any nature due thereon and shall be free and clear of any set-off, deduction or withholding (whether on account of tax or otherwise) of any nature.

Guarantor and Hudson agree that any notice, request, demand or other communication to be made or delivered pursuant to this Guaranty shall be given in writing in the English language and shall be addressed as follows:

To Guarantor at:
[

]
Fax number: [ ]
For the attention of: [ ]
To Hudson at:
[

]
Fax number: [ ]
For the attention of: [ ]

Notice given by fax shall be deemed received the day of transmission unless it is transmitted on a non-business day or after 3:30 p.m. in the place of receipt, in which case it shall be deemed received the next business day, always provided, however, that any notice given by fax shall also be sent by registered mail or dispatched for delivery by hand or by courier not later than on the day of such transmission. Notice delivered personally or by courier shall be deemed received the day of delivery.

This Guaranty shall be governed and construed according to the laws of the State of New York, United States of America. The parties agree that all actions or proceedings in any way, manner or respect, arising out of or from or related to this Guaranty shall be litigated only in U.S. federal courts having situs in the Southern District of Manhattan, New York. Each party hereto hereby consents and submits to the jurisdiction of any local, state or federal court located within said county and state and hereby waives any rights it may have to transfer or change the venue of any such litigation.

Yours faithfully,
Castleton Commodities International LLC

________________
Name:
Designation:

Address for Notices:
________________
________________
________________
________________

**APPENDIX (F) SHIPYARD SPECIFICATIONS**