<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

AND

<u>IN THE MATTER OF AN ARBITRATION</u>

B E T W E E N :

CASTLETON COMMODITIES SHIPPING CO. PTE. LTD.

<u>Claimant</u>

- and -

HSL SHIPPING & LOGISTICS (NA) INCORPORATED
(formerly called HUDSON SHIPPING LINES INCORPORATED)

<u>Respondent</u>

---

## PARTIAL FINAL AWARD

---

Arbitral Tribunal:

David Owen QC

Sir Gordon Langley

Richard Siberry QC (Chairman)

1

**Introduction**

1.   The disputes the subject of this arbitration arise under two bareboat charterparties, each dated 11 April 2014, between the Claimant, Castleton Commodities Shipping Co. Pte. Ltd. ("**Castleton**" – a company incorporated in Singapore), as Owners and the Respondent, then known as Hudson Shipping Lines Incorporated but since re-named HSL Shipping & Logistics (NA) Incorporated ("**Hudson**" – a company incorporated in Illinois, USA), as Bareboat Charterers. These charterparties ("**the Downstream Charters**") were each for an Ultramax general bulk carrier of about 61,000 DWT to be built by Japanese shipbuilders Shin Kurushima Toyohashi Shipbuilding Co. Ltd. ("**the Builders**"), with the Builders' hull numbers S 3668 and S 3670 ("**the Vessels**").

2.   The Downstream Charters were in identical terms save for the provisions separately identifying each Vessel.  They were each for a term of 7 years, but included annual options for Hudson to purchase the Vessel after completion of the third, fourth, fifth and sixth years of the Charter, and, if none of these purchase options had been exercised, an obligation for Hudson to purchase the vessel on expiry of the 7 year term, in each case at a specified price. The purchase was to be on the terms of a Memorandum of Agreement annexed to each Downstream Charter ("**the Downstream MOAs**" - and together with the Downstream Charters, "**the Downstream Agreements**").

3.   The Downstream Charters comprise one side of a series of transactions whereby Castleton bareboat chartered the Vessels from a Panamanian company to be nominated and guaranteed by KN Maritime Co. Ltd. of Tokyo ("**KN Maritime**") , an associated company of the Builders, for the same 7-year term and with the same purchase options and obligation, but at lower daily rates and purchase prices ("**the Upstream Charters**", with annexed "**Upstream MOAs**" – together "**the Upstream Agreements**"), and sub-chartered the Vessels to Hudson on essentially back-to back terms but with additional charterparty terms unique to the Downstream Charters.

4.   Material terms of the Downstream and Upstream Charters and MOAs will be set out below.

5.    Prior to the negotiation and conclusion of both Upstream and Downstream Charters, on 10 February 2014 Castleton and Hudson had signed a Letter of Intent ("**the LOI**") which it was common ground constitutes an important part of the commercial background to the Downstream Charters and accordingly is an admissible aid to the construction thereof. Material terms of the LOI will also be set out below.

6.    By the LOI Hudson agreed to make a cash deposit of US$ 3,300,000 per Vessel, described therein as the "**LOI Commitment Amount**", to be deposited into an escrow account and held there until execution of the Downstream Charters and Downstream MOAs. The sum of US$ 6,600,000 was duly deposited by Hudson on the terms of an escrow agreement dated 26 February 2014 ("**the Escrow Agreement**") between Hudson, Castleton, and Citibank N.A. ("**Citibank**") as the Escrow Agent, in the escrow account opened thereunder ("**the Citibank Escrow Account**").

7.    The Downstream Charters, which refer to the LOI Commitment Amount as "**the CP Purchase Price**", also stipulate for the provision by Hudson of security for the performance of its obligations thereunder to Castleton, including its purchase obligation, to be calculated on a "mark to market" basis under "**Charterers' Performance Guarantee**" provisions therein. Castleton's obligations to Hudson were to be secured by a guarantee to be issued by Castleton's parent company, Castleton Commodities International LLC, USA ("**CCI**"), a company incorporated in Connecticut, USA, from where Castleton carries on its business.

8.    Both Upstream and Downstream Charters (and the MOAs annexed thereto) have been duly executed by the respective parties thereto, and due notice has been given by KN Maritime that the first Vessel, hull No. S 3668 (to be named MV LOCH NESS), will be delivered under the Upstream Charter on 31 May 2016. Castleton has provided the required parent company guarantees to Hudson.  Castleton has received payment of the CP Purchase Price for each Vessel, by drawdown under and in accordance with the terms of the Escrow Agreement. Hudson has also provided a performance bond of US$ 1.25 million per Vessel (the "**Initial Bond Amount**") as provided for in the Charterers' Performance Guarantee provisions in the Downstream Charters.

9.    However Hudson has declined to execute a Joint Order Escrow Agreement as provided for in those Charterers' Performance Guarantee provisions (and which the parties had

3

been negotiating until mid-February 2015), nor has it provided the "**Initial Cash Amount**" of US$ 3 million per Vessel as provided for in the Charterers' Performance Guarantee provisions, or additional security which Castleton say is due on the basis of "mark to market" calculations said to have been carried out in accordance with those provisions. Castleton say that as of 31 March 2016, the total amount due by way of security for the two Vessels was over US$ 20 million, this being due to adverse movements in the shipping market since the Downstream Charters were concluded. Hudson instead raised questions concerning which of several versions of the Upstream charters were effective, and whether KN Maritime was aware of and approved and consented to the contractual framework of the Downstream Agreements, and in particular a "right of subrogation" granted therein.

10.    It was in these circumstances that Castleton commenced these arbitration proceedings, under each Downstream Charter, in May 2015. Castleton now claims declarations that the Downstream Charters are effective and that Hudson is in (repudiatory) breach of the same by reason of its failure to provide security in accordance with the Charterers' Performance Guarantee provisions of the Downstream Charters; and further or alternative relief.

11.    Hudson defends Castleton's claims on two principal bases.  First, Hudson contends that pursuant to the express and / or implied terms of the Downstream Charters, they are not effective according to their own terms, by reason of non-compliance with a condition precedent.  Second, even if the Downstream Charters are *prima facie* effective, Hudson contends that Castleton wrongly notified Hudson on 15 May 2014 that all conditions precedent to the effectiveness of the Downstream Charters had been satisfied - when they had not been, the Upstream Charters not then having yet been fully executed – and wrongly proceeded to withdraw the CP Purchase Price from the Citibank Escrow Account; and that in consequence Hudson has claims for damages against Castleton (both pursuant to the LOI and the Downstream Charters) in respect of which Hudson is entitled to exercise rights of equitable set-off amounting to substantive defences to Castleton's claims.

**The arbitration proceedings**

12.   The Downstream Charters each contain, at clause 30 of Part II of the Barecon 2001
      Form on which they were based, an arbitration agreement the material terms of which
      are as follows:

> *"30.  Dispute Resolution.*
>
> *(a) This Contract shall be governed by and construed in accordance with
> English law and any dispute arising out of or in connection with this Contract
> shall be referred to arbitration in London in accordance with the Arbitration
> Act 1996 or any statutory modification or re-enactment thereof save to the
> extent necessary to give effect to the provisions of this Clause.*
>
> *The arbitration shall be conducted in accordance with the London Maritime
> Arbitrators Association (LMAA) Terms current at the time when the
> arbitration proceedings are commenced.*
>
> *The reference shall be to three arbitrators.....*"

13.   Castleton commenced this arbitration in early May 2015 by duly appointing the
      undersigned, David Owen QC, of 20 Essex Street, London WC2R 3AL, United
      Kingdom, as its arbitrator, and giving notice of such appointment to Hudson, who
      responded by duly appointing the undersigned, Sir Gordon Langley, of Fountain Court
      Chambers, Fountain Court, Middle Temple Lane, London EC4Y 9DH, United
      Kingdom, and giving Castleton notice of such appointment.

14.   Although strictly speaking there have been two references to arbitration, one under the
      arbitration agreement in each Downstream Charter, this arbitration has throughout been
      treated, by and with the consent of all concerned, as a consolidated reference of the
      disputes under both Downstream Charters.

15.   On 4 February 2016 the party-appointed arbitrators notified the parties that they had
      duly appointed the undersigned, Richard Siberry QC, of Essex Court Chambers, 24
      Lincoln's Inn Fields, London WC2A 3EG, United Kingdom, as third and presiding
      arbitrator, thereby completing the constitution of the Tribunal.

16. Castleton has been represented in this arbitration by London Solicitors Ince & Co. LLP, by Los Angeles attorneys Holland & Knight, and by Julian Kenny QC of Counsel, who appeared on its behalf at the merits hearing referred to below.  Hudson has been represented by London Solicitors Stephenson Harwood LLP, and by Caroline Pounds of Counsel, who appeared on its behalf at the merits hearing.

17. Castleton served Claim Submissions on 13 May 2015. Hudson served Defence and Counterclaim Submissions on 8 July 2015, in which it contended that, for the reasons therein set out, including non-compliance with an alleged condition precedent, the Downstream Charters were not yet effective. Castleton responded in Reply and Defence to Counterclaim Submissions served on 23 October 2015, and Hudson served Rejoinder and Reply to Defence to Counterclaim Submissions on 20 November 2015. At this stage, the disputes between the parties turned on the issue as to whether the Downstream Charters had become, or were to be treated as having become, effective.

18. The parties served completed LMAA Questionnaires in December 2015.

19. A procedural hearing by telephone conference call took place on 17 February 2016, at which Castleton sought permission to amend its Claim Submissions, and consideration was given to directions for the further conduct of this arbitration and to the fixing of a hearing date.  On the preceding day Stephenson Harwood had given notice on behalf of Hudson that Hudson intended to commence proceedings against Castleton in the USA for alleged breaches of the LOI, which is subject to New York law and to arbitration in accordance with the Rules of Commercial Arbitration of the American Arbitration Association ("**the AAA**"), and (subsequent to the procedural hearing) to apply for permission to amend its Defence and Counterclaim submissions to plead transaction set-off in respect of its claim under the LOI by way of defence to Castleton's claims in these London arbitration proceedings.

20. Consequent upon the procedural hearing the Tribunal issued a Directions Order dated 17 February 2016, amongst other things giving permission to Castleton to amend its Claim Submissions and to Hudson to serve consequential amendments to its Defence and Counterclaim Submissions, giving directions for further disclosure and service of witness evidence, and fixing the hearing of this arbitration for 20 – 22 April 2016.

21.   Castleton served its Amended Claim Submissions on 19 February 2016.

22.   On 29 February 2016 Hudson served draft Amended Defence and Counterclaim Submissions, incorporating not only consequential amendments but other amendments including not only the foreshadowed plea of transaction set-off in respect of a claim under the LOI, but also a plea of set-off founded on an allegation that Castleton had been in breach of an implied term of the Downstream Charters in giving notice to Hudson on 15 May 2015 that the Upstream Charters had been executed, when they had not been.

23.   Following exchange of submissions between the parties, on 8 March 2016 the Tribunal gave Hudson permission to make these amendments, and Hudson served such Amended Defence and Counterclaim Submissions on 11 March 2016. Castleton responded by serving Amended Reply and Defence to Counterclaim Submissions on 21 March 2016, and Hudson responded by letter dated 4 April 2016.

24.   Meanwhile on 7 March 2016, Hudson filed a Request for Arbitration with the AAA regarding a claim for relief under the LOI based on an allegation that Castleton had improperly drawn down the US$ 6.6 million LOI Commitment Amount from the Citibank Escrow Account. Castleton filed a Response to this Arbitration Demand on 22 March 2016, in which it denied any breach of the LOI, contending that its withdrawal of the LOI Commitment Amount was appropriate in all respects. The Tribunal will refer further below to the reliance placed by Hudson on these proceedings ("**the American Arbitration**") in the present arbitration.

25.   Following delivery of skeleton arguments and a List of Principal Issues on 18 April 2016, the merits hearing took place over 3 days, 20 - 22 April 2016 ("**the Hearing**"). After oral openings by Counsel, the following witnesses were called to give oral testimony:

   (1) Mr Keith Denholm, Castleton's Managing Director and head of dry bulk freight trading, called on behalf of Castleton;

   (2) Mr Duane Duclaux, Deputy General Counsel at CCI, also called on behalf of Castleton;

7

(3) Mr Benjamin Malkin, General Counsel for Hudson, called on its behalf.

All had provided statements in advance of the Hearing.

26. Following oral closing submissions by Counsel, the Tribunal declared the proceedings closed with respect to the issues debated at the hearing.

## The Downstream and Upstream Charters and annexed Downstream and Upstream MOAs

27. The Downstream Charters and annexed Downstream MOAs were all signed on behalf of the parties and dated 11 April 2014. They are on the "Barecon 2001" standard form, comprising a completed "box form" Part I, the printed clauses of Part II with some deletions and other modifications, the printed clauses of Part III applicable to newbuilding vessels, again with some deletions and modifications, and with 18 typed additional clauses, and various appendices including, at Appendix D, the Downstream MOAs in place of the "Hire/Purchase Agreement" at Part IV of the Barecon 2011 form.

28. There are two original versions of each of the Upstream Charters and annexed Upstream MOAs, these two versions being identical save for the dates, signatories and recorded places of signature. In the version that has been referred to as "**the Singapore version**", the Upstream Charters themselves (in First and Second Originals) are dated Singapore 28 April 2014, and have been signed on behalf of KN Maritime, but the annexed Upstream MOAs are neither dated nor signed. In the version that has been referred to as "**the Stamford version**", the Upstream Charters themselves (in First and Second Originals) are dated Stamford, Connecticut, 19 May 2014, and both the Upstream Charters and the (undated) annexed MOAs were signed by Mr Denholm on behalf of Castleton on 19 May 2014 (his signatures being notarised by an in-house Notary Public), and on behalf of KN Maritime on 29 May 2014. The circumstances in which there came to be two versions of the Upstream Charters and Upstream MOAs are described below. It is, however, now common ground that the Stamford versions of the Upstream Charters and Upstream MOAs are properly executed on behalf of both parties, and are valid and binding contracts between KN Maritime and Castleton.

8

29.    As indicated above and described more fully below, the Upstream Charters and annexed Upstream MOAs, together with the Downstream Charters and annexed Downstream MOAs, were intended by Castleton and Hudson to form part of one overall transaction, a "package", whereby Castleton chartered the Vessels from KN Maritime and sub-let them to Hudson, on essentially back-to-back terms, with corresponding purchase options and obligations, with Castleton, the party in the middle, intended to make a profit on the transaction as the consideration for having provided Hudson with the opportunity of chartering and acquiring these two Japanese built Vessels. As a result, the terms of the Upstream Charters and MOAs were negotiated by Castleton with substantial input from Hudson, again described in more detail below; and the terms of the Downstream Charters and Downstream MOAs are identical to those of the Upstream Charters and Upstream MOAs, save for such things as (1) differences in parties' names, charter rates and sale prices, (2) differences in notice periods designed to ensure that the contracts could work together, and (3) differences in the number and content of the typed additional clauses, in that clauses 12 – 15, 17 and 18 of the Downstream Charters do not appear in the Upstream Charters but were specifically negotiated and agreed between Castleton and Hudson (clause 16 of the Downstream Charters, which refers to the MOA, appears in identical terms in clause 12 of the Upstream Charters).

30.    It is convenient at this stage to set out material express terms of the Downstream Charters and annexed Downstream MOAs, indicating which have given rise to controversy, before also setting out the implied terms for which Hudson contends.

31.    Clause 22 of Part II of the Downstream Charters provides as follows (with deletions and additions to the printed form indicated):

> *"(a)*    ***Assignment, Sub-Charter and Sale*** *The Charterers shall not assign this Charter nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve.*
> **[addition to printed form]** *During any sublet by bareboat charter, the technical manager should be taken over without changing from the previous manager and full responsibility of bareboat charterers described in Box 4 should be always remain in force.*
> *(b)*    **[restriction on sub-sale – deleted]** *"*

9

It is important to note that this clause is in identical terms to the equivalent clause in the Upstream Charters (though of course the "*bareboat charterers described in Box 4*" are different).

32. Clause 4 of the "Additional Clauses" (or Rider Clauses) to the Downstream Charters (and the identical Clause 4 of the Upstream Charters), provides for delivery of the Vessels as follows:

> *"4) Delivery of vessel*
>
> *The vessel shall be delivered to the charterers during the period April 1st, 2016 to September 30th, 2016 at the building yard at Toyohashi Shipyard or Onishi of Shin-Kurushima dockyard, in Japan at the time of dropping dock master at off sea of the dockyard."*

33. Clause 6 of the Downstream Charter Additional Clauses (mirrored in the Upstream Charters but with lower purchase prices) provides as follows:

> *"6) Purchase option price and purchase obligation price*
>
> *Charterers have a purchase option to purchase of the vessel after completion of third full year of bareboat charter and provided further that Charterers have an obligation to purchase of the vessel after completion of full term of charter.*
>
> | *Purchase option date:* | *purchase price:* |
> | --- | --- |
> | *3 years after CP start date* | *US$27,250,000.* |
> | *4 years after CP start date* | *US$25,500,000.* |
> | *5 years after CP start date* | *US$24,000,000.* |
> | *6 years after CP start date* | *US$22,500,000.* |
> | *Purchase obligation date:* | *purchase price:* |
> | *7 years after CP start date* | *US$20,500,000."* |

34. Clause 12 of the Downstream Charter Additional Clauses (the first of the Additional Clauses not to be mirrored in the Upstream Charters), provides for the payment by Hudson of the Contract Purchase Price, as follows:

10

*"12) CONTRACT PURCHASE PRICE OF HEAD CONTRACT*

*Charterers and Owners hereby agree that a condition to the effectiveness of this charterparty agreement shall be the payment by Charterers to Owners of the sum of three million three hundred thousand US dollars (US$3,300,000) into Owners designated account (the "CP Purchase Price"). In accordance with that certain Letter of Intent dated February 10, 2014 between Owners and Charterers (the "LOI"), Charterers have remitted the sum of US$3.3 million (the "CP Purchase Price Funds") into that escrow account established with Citibank, N.A. ("CITI") pursuant to the escrow agreement between Owners, Charterers and CITI dated as of February 26, 2014 ("Escrow Agreement"). The parties acknowledge and agree that (i) the CP Purchase Price Funds shall be released to Owners in accordance with the terms of the Escrow Agreement and the Owners shall deliver to Charterers concurrently a true and complete copy of all documents submitted to CITI as required under the Escrow Agreement for drawing the CP Purchase Funds from escrow; and (ii) the CP Purchase Price Funds released by CITI to Owners under the terms of the Escrow Agreement will be applied in full by Owners in full or partial satisfaction of Charterers obligation to pay the CP Purchase Price under this charterparty agreement and the Charterers agree to remit the shortfall amount if any into Owners designated account within two (2) business days of Owners request therefor.*

*......"*

Both parties relied on this clause, Castleton contending that Hudson remained under an obligation to pay the CP Purchase Price referred to therein if Castleton did not obtain such payment under the Escrow Agreement, and Hudson pointing out that the conditions precedent to the effectiveness of the Downstream Charter were not confined to those set out in Additional Clause 18 (see below).

33.   Clause 13 of the Downstream Charter Additional Clauses is the clause under which Castleton advances its claims. For that reason its lengthy terms are set out in full below, but in its skeleton argument Castleton conveniently and uncontroversially summarised its effect as follows:

(1) Hudson is to provide security for the performance of its obligations under the Downstream Charters and MOAs, principally in the form of cash deposited in an escrow account. The value of the security to be provided is calculated as the difference, at the end of each quarter, between the total value of Hudson's obligations under each of the Downstream Charters and MOAs (i.e. the total amount payable by way of future hire and purchase price) and the total value of the

*de facto* security which Castleton has in the form of the Vessel (i.e. the value of the Vessel's potential earnings on the market to the end of the Charter period plus her estimated resale value at that time).

(2)  The machinery that clause 13 sets out for the calculation and payment of this security is as follows:

    (i)  Hudson is required to provide an "**Initial Amount**" of security US$4.25 million for each Vessel, to be provided as a performance bond of US$1.25 million ("**the Initial Bond Amount**") and cash of US$3 million ("**the Initial Cash Amount**");

    (ii)  A calculation of the required security is to be made on the last calendar day of each quarter ("**the Valuation Date**");

    (iii)  On that day, Castleton, which is designated as the "**Valuation Agent**" determines the estimated fair market value of the Vessels at the end of the Charter period (based on a ship valuation website) and of their potential earnings in hire during the Charter (based on the Baltic Supramax Time Charter forward market prices), from which operating expenses are subtracted;

    (iv)  On the basis of those valuations, what is called the "**Credit Support Amount**" is calculated. The Credit Support Amount is the fair market value of Vessel and her potential earnings plus the Initial Amount of security to be provided by Hudson plus any further cash security already provided at any previous Valuation Dates;

    (v)  One then calculates the "**Exposure Amount**", which is the total amount of hire which remains to be paid by Hudson under the Downstream Charters, plus the price payable by Hudson to buy the Vessel at the end of the Charter term;

    (vi)  If the Exposure Amount exceeds the Credit Support Amount, then Hudson is required to pay the escrow agent the difference, that payment being called a "**Delivery Amount**";

    (vii)  If the Credit Support Amount exceeds the Exposure Amount, then the escrow agent is required to repay the difference to Hudson, that repayment being called a "**Return Amount**".

*"13) Charterers Performance Guarantee*

*Charterers to provide performance guarantee to Owners in support of Charterers obligations under this charterparty agreement as set forth below in the form of performance bond, cash collateral or equivalent in a form satisfactory to Owners.*

*Secured Party: Castleton Commodities Shipping Co. Pte. Ltd.*

*Pledgor Party: Hudson Shipping Lines, Inc.*

*Valuation Agent: Castleton Commodities Shipping Co. Pte. Ltd.*

*Initial Amount: US$4.25 million per vessel consisting of US$3.0 million cash (the "Initial Cash Amount") and a US$1.25 million performance bond (the "Initial Bond Amount")*

*The Initial Bond Amount shall be reduced annually (the first reduction to be on the first anniversary date of the delivery date of the vessel) by US$150,000 per Annum*

*Bareboat Lease*

*Obligation: US$7,850/day x remaining bareboat hire days under the charterparty*

*Vessel Purchase Obligation: US$20.5 million*

*Exposure Amount: the sum of the bareboat lease obligation and the vessel purchase obligation*

*Minimum Transfer amount: US$250,000*

*Calculation Frequency: on the last day of each calendar quarter beginning on the Execution date of the charterparty agreement continuing through and including the execution date of the final purchase obligation, each a "Valuation Date"*

*Fair Market Value: Fair Market Value shall be defined as the sum of the Charterparty FMV and the Vessel FMV as each are defined below:*

*Charterparty FMV: Charterparty FMV shall equal (the weighted average of Baltic Supramax time charter index forward value assessment (BFA Supramax 5 TC) for each applicable calendar year (the year of delivery through the purchase obligation year of the vessel) (2016 to 2023), plus the Fixed Vessel Feature Adjustment (below), less the Fixed Operating Expense Amount (below)) X remaining bareboat hire days (excluding any off-hire). For years where the BFA is quoted quarterly, only the future quarters for such year shall be used to compute the weighted average. For future years where no swap value is traded, the value shall be that of the last available published swap year*

*Where:*

*Fixed Operating Expense Amount = US$5,000 per day per vessel*

*Fixed Vessel Feature Adjustment = US$4,000 per day per vessel*

*Vessel FMV: Vessel FMV shall equal fair market value of vessel (as published by Vesselvalues.com) depreciated to 7 year old vessel equivalent (straight line depreciation over 25 years to scrap value based on US$400/LDT, where LDT = 8,845 tons)*

*Credit Support Amount: Credit Support Amount shall equal the initial amount plus the Fair Market Value plus the Transfer Balance*

*Where:*

*Transfer Balance is defined as sum of all delivery amounts paid by Pledgor Party to Secured Party pursuant to the Transfer Mechanism less the sum of all Return Amounts paid by Secured Party to Pledgor Party.*

*Transfer Mechanism: on each valuation date,*

*a) if the Exposure Amount exceeds the Credit Support Amount by the Minimum Transfer Amount then Pledgor Party will make a cash payment to the Secured Party for the difference, the "Delivery Amount', such that the Credit Support Amount shall always meet or exceed the Exposure Amount as of such Valuation Date;*

*Or*

*b) if the Credit Support Amount exceeds the Exposure Amount by the Minimum Transfer Amount, then the Secured Party will make a cash payment to the Pledgor Party for the amount of the difference in excess of the Initial Amount, the "Return Amount",*

*Provided, in either case, that the Pledgor Party will maintain Credit Support for the benefit of the Secured Party during the entire term of the charterparty agreement in an amount not less than the Initial Amount and cash credit support in an amount not less than the initial Cash Amount. All cash payments made between the parties pursuant to the Transfer Mechanism, shall be due and payable within seven (7) business days' of written notice.*

*Performance Bond: the Initial Bond Amount shall be satisfied by Pledgor Party through a performance bond issued by an insurance or bond company having an A.M. Bests credit rating of "A" (excellent) or higher and a financial strength of "X" (surplus between US$500 - US$750 million) or higher, a "Qualified Issuer". Pledgor Party agrees to: (i) submit a complete good faith application to such an insurance or bond company for issuance of such performance bond within two (2) business days of executing the charterparty, such bond to be issued within ten (10) business days of that submission, and (ii) maintain such bond for the duration of its Initial Amount obligations hereunder. If such bond is only capable of being issued on an annual basis, the terms of such bond shall provide for the issuance of continuation certificates 60 days prior to the expiration of each successive annual period.*

*Secured Party shall have the right to monitor the financial strength and credit rating of the qualified issuer. In the event that qualified issuer no longer meets the minimum A.M. Best credit and financial ratings above, then Secured Party may require Pledgor Party to replace and reissue such performance bond with*

14

*an insurance or bond company who meets such requirements. Further, said insurance or bond company shall provide the parties a minimum thirty (30) days' notice of a material change in said bond.*

*Failure by the Pledgor Party to maintain such performance bond as set forth herein shall require Pledgor Party to replace the then applicable required amount of such performance bond with additional cash collateral.*

*The performance bond shall be maintained at the cost of Pledgor Party.*

*Joint Order Escrow Account: the cash payments made by Pledgor Party hereunder in connection with the applicable portion of the Initial Amount and any Delivery Amount(s) shall be retained in an interest bearing escrow account to be established with a mutually acceptable financial institution or title company, pursuant to a joint order escrow agreement. The escrowed funds shall be subject to disbursement in accordance with the terms and provisions of the joint order escrow agreement."*

35.   Clause 16 of the Downstream Charter Additional Clauses (identical to clause 12 of the Upstream Charters), provides for the terms on which the purchase of each Vessel is to take place, stating (as Hudson has emphasised) that the Downstream MOAs are an "*integral part*" of the Downstream Charters:

### *"16) MEMORANDUM OF AGREEMENT*

*Owners and Charterers agree that the purchase of the Vessel by the Charterers pursuant to Rider Clause 6 shall be on the terms of this Charterparty agreement and the terms of the Memorandum of Agreement in the form attached hereto as an appendix and incorporated into this Charterparty agreement as an integral part thereof, with the terms of the purchase and the purchase price of the Vessel being as determined pursuant to the Charterparty agreement including Rider Clause 6 and subject to the terms and conditions set forth in the Memorandum of Agreement."*

36.   Clause 17 of the Additional Clauses to the Downstream Charters contains undertakings by Castleton in the following terms:

### *"17) OWNERS COVENANT*

*With respect to:*

*(1) The proposed 7 years bareboat charterparty agreement (the "Upstream Charterparty") between Castleton Commodities Shipping Co. Pte. Ltd. ("CC Shipping") and a Panamanian company to be nominated and guaranteed by KN Maritime Co. Ltd., Tokyo (collectively "KN Maritime") that sets forth CC Shipping's rights and obligations as charterer thereunder, including but not*

*limited to the right to charter the vessel referenced in Rider Clause 4 above, such Upstream Charterparty to become effective upon the full and final agreement of terms thereto between CC Shipping and KN Maritime; and*

*(II) The Memorandum of Agreement of even date of the Upstream Charterparty and which is integrated into and made part of the Upstream Charterparty (the "Upstream MOA") related to the acquisition by CC Shipping from KN Maritime of that same vessel that is the subject of the Upstream Charterparty,*

*Owners covenant and agree to the following:*

*1) Subject to Charterers exercise of its rights to subrogation under subsection 2 below which shall operate as a waiver of Owners obligation to enforce any of its rights or obligations under section 13 of the Upstream MOA, to enforce any and all rights available to CC Shipping against KN Maritime under the Upstream Charterparty and the Upstream MOA and to perform any and all obligations thereunder to the extent that CC Shipping's failure to enforce or prosecute such right or perform such obligation will materially compromise (I) the right of Charterers under this Charterparty to receive the benefits of its bargain for entering into this Charterparty Agreement, or (II) Owners or Charterers ability to perform any of their material obligations under this Charterparty Agreement or the Memorandum of Agreement attached hereto between Owners and Charterers; and*

*2) Absent a Charterers event of default under this Charterparty (which is continuing beyond any applicable notice and cure period) or Charterers cancellation of delivery of the Vessel hereunder, upon the occurrence of an event of default by KN Maritime under the Upstream Charterparty or repudiation by KN Maritime of its vessel sale or delivery obligations under the Upstream Charterparty or the Upstream MOA, Owners under this Charterparty agreement hereby agree to grant Charterers a right of subrogation to any Owners rights to enforce performance or prosecute a claim for damages under section 13 of the Upstream MOA upon Charterers notice to Owners of Charterers exercise of such subrogation right and at the Charterers sole cost and expense. Notwithstanding anything set forth herein to the contrary, the exercise of such subrogation rights hereunder by Charterers shall not eliminate, waive or vary any of Owners enforcement or prosecution obligations under the Upstream Charterparty or Upstream MOA other than those rights or obligations under that section 13 of the Upstream MOA."*

It is a central part of Hudson's case that clause 17.2 on its true construction contains an obligation on the part of Castleton, in the circumstances specified therein, to assign to Hudson its rights and remedies against KN Maritime under section 13 of the Upstream MOAs, set out below (as opposed to conferring rights of subrogation); and that the restriction upon assignment of "this Charter" in  clause 22 of Part II of the Upstream MOAs would prevent, impede or hinder Castleton from complying with that obligation.

37.   Clause 18 of the Additional Clauses to the Downstream Charters sets out certain conditions precedent to the effectiveness of the Charters, and also imposes certain express obligations upon Castleton with regard to satisfaction of these conditions precedent (whilst at the same time apparently providing that they are waivable by Castleton). It provides as follows:

> **_"18) CONDITION PRECEDENT TO EFFECTIVE DATE OF THIS CHARTER PARTY_**
>
> *Owners and Charterers hereby agree that the following will be conditions precedent to the effectiveness of this Charterparty Agreement:*
>
> *1) Execution of the Upstream Charterparty by and between CC Shipping and KN Maritime; and*
> *2) Execution of the Upstream MOA by and between CC Shipping and KN Maritime; and*
>
> *3) Receipt by Charterers of an original Letter of Guarantee in the form attached hereto as Schedule 1, duly executed by Castleton Commodities International LLC (USA).*
>
> *Owners agree to use their best efforts to expeditiously cause the full execution of the documents referenced in this clause 18 by 9 May 2014.*
>
> *Owners agree to provide prompt notice to Charterers upon the satisfaction of each of the conditions precedent listed above, or waiver by Owners in Owners sole and absolute discretion of any or all of such conditions precedent."*

38.   It was fundamental to Hudson's case that the Downstream Charters have not become effective that clause 18, either on its true construction or by necessary and/or obvious implication therein, should be read or understood as providing also that

> *"The terms in which the Upstream Charterparty and Upstream MOA are executed must be such as to enable Castleton to perform its obligations under this Charterparty and the attached MOA."*

This formulation of the term contended for was put forward by Hudson in its closing submissions on Day 3 of the Hearing, though a different formulation had been pleaded and advanced by Hudson in opening, namely that:

*"It was a condition precedent to the effectiveness of the Charterparties that the terms of the Upstream Charterparties and Upstream MOAs as executed were not such as to prevent, impede or hinder Castleton from complying with its obligations pursuant to Rider Clause 17 of the Charterparties."*

39. Hudson's case was that by reason of the restriction on assignment in clause 22 of Part II of the Upstream Charters (which, as stated above, was in identical terms in the Downstream Charters), the terms of the Upstream Charters as executed were not compliant with this term, and therefore that the Downstream Charters had not become effective.

40. Hudson also contended (by its case as first introduced in its Amended Defence and Counterclaim Submissions) that it was an express or implied term of the Downstream Charters that Castleton would not give notice that any of the conditions precedent in clause 18 had been satisfied unless and until they had in fact been satisfied; that Castleton's notice on 15 May 2014 that all the conditions precedent had been satisfied was given in breach of that implied term, because the Upstream Agreements had not been executed on behalf of Castleton when such notice was given; and that (for reasons explained more fully below) had such notice not been given the LOI would have expired and the whole transaction would have come to an end. Hudson contended that it was entitled to set off against Castleton's claims its claim for damages for its losses resulting from such breach, which included the CP Purchase Price paid to Castleton and any liability that Hudson might *prima facie* be found to be under to Castleton in these proceedings (further or alternatively to its claim for a transactional set-off in respect of its LOI claim in the American Arbitration).

41. The Additional Clauses of the Downstream Charters concluded:

*"By execution below, these Riders are made part of the Charterparty agreement effective as of the date written thereafter. In the event of a conflict between the terms of these Riders and the terms of the Charterparty Agreement to which these Riders are attached, the terms of the Riders shall control."*

42. Save that clause 22 of Part II of the Downstream Charters will be referred to simply as "clause 22" (as will the identical clause 22 of the Upstream Charters), and save where

expressly indicated below, references to clauses of the Downstream Charters should be read as references to the Additional or Rider Clauses therein.

43.  As indicated above, the Downstream and Upstream MOAs are in identical terms, save for differences consequent on the different parties thereto. Thus section 13 of both sets of MOAs provided:

> "*13. Sellers' default:-*
>
> *If the Sellers fail to execute a legal transfer or to deliver the Vessel, and within the time specified above said clause 5 and in accordance with BBC clauses, the Buyers shall have the following rights:-*
>
> *(i) the right to cancel this contract in which case the down-payment in full shall be returned to the Buyers together with interest at the rate of twelve percent (12%) per annum;*
> *(ii) the right to pursue Seller for specific performance of the Sellers' obligations under this Memorandum of Agreement; and*
> *(iii) the right to pursue any cause of action against Sellers for any and all damages available under contract or at common law."*

It is these prospective rights, as set out in the Upstream MOAs, that are the subject of clause 17 of the Downstream Charters.

**Fact findings**

44.  Before considering the issues in this arbitration, it is necessary to set out the background to and commercial context in which the Downstream Charters and MOAs came to be concluded, and to describe the interrelationship between the negotiations for the Upstream and Downstream Agreements (with particular reference to the extent to which Hudson reviewed and approved the terms of the Upstream Charters), and to refer to the circumstances and timing of execution of both sets of documents, and of Castleton's drawdown of the CP Purchase Price under the Escrow Agreement.

45. There was little dispute as to the primary facts.

**The Letter of Intent and the Escrow Agreement (and background thereto)**

46. Castleton has a longstanding business relationship with the Builders. In April 2013, the Builders and KN Maritime suggested to Mr Denholm that Castleton might acquire two ships – the Vessels - that the Builders were planning to construct.

47. Mr Denholm saw an opportunity to resell the ships at a profit. He began looking for a buyer. In October 2013, Mr Neil McLaughlin of DVB Bank suggested to him that Hudson might be interested in acquiring them.

48. A meeting was arranged in November 2013 at which Mr Denholm met Mr Malkin at DVB Bank's offices in New York. They discussed a potential transaction under which Castleton would acquire the Vessels from the Builders and then sub-charter them to Hudson.

49. Following that meeting, discussions continued, and, by 19 January 2014, the parties had reached an "in principle" agreement on the terms of a transaction under which Castleton would enter into charters with the Builders, which would include options and an eventual obligation to purchase the Vessels, and Castleton would charter the Vessels to Hudson on essentially back-to-back terms, with corresponding purchase options and obligation – the main commercial terms of that side of the transaction (such as charterparty rates and purchase options/obligation and prices) having been agreed on various "subjects".

50. It subsequently became clear that the upstream agreements would be concluded with KN Maritime, which is an affiliate of the Builders.

51. On around 26 January 2014, Castleton provided Hudson with:

> (1) A draft Letter of Intent setting out the terms under which the parties would continue to negotiate a transaction as described above; together with

       (2) An early draft of proposed upstream charters and MOAs between Castleton and the Builders.

52.     On 26 January 2014, Mr Malkin provided Hudson's detailed comments on the draft Letter of Intent, stating amongst other things that Hudson needed an opportunity to review and comment upon upstream contracts "*that will, (directly or indirectly) become binding on Hudson*". He added that he would be sending "*some mutually beneficial comments to the Bareboat Charter for [Mr Denholm's] negotiations with the Japanese...*"

53.     Mr Malkin sent those comments by email on 27 January 2014: he provided Hudson's detailed comments on the draft charters. Castleton described this email as constituting Hudson's first review of the upstream terms. Amongst other things Mr Malkin commented on clause 22, stating with respect to clause 22(a), "*needs to be able to Sub-Charter to [Hudson]*", but he did not raise any objection to the restriction on assignment in that clause. He also provided comments on and suggestions for Rider clauses for the Downstream Charters.

54.     On 5 February 2014, in the course of negotiations for the LOI, Castleton emailed Hudson stating, amongst other things, that it would not lift subjects with the Shipowner unless and until it had a fully enforceable Barecon charter with Hudson; and that it could not make Hudson known to the Owners/Builders prior to delivery of the Vessels, but that it might agree to a limited review by Hudson of the draft (upstream) documents, and allow input from Hudson with no guarantees as to final wording.

55.     The LOI itself, which takes the form of a letter dated 10 February 2014 addressed by Castleton to Hudson and countersigned on behalf of Hudson, provides, so far as material, as follows:

> *"Castleton Commodities Shipping Co. Pte. Ltd. ("CCS") is pleased to submit this Letter of Intent ("LOI") to Hudson Shipping Lines Inc. ("HSL") regarding bareboat charterparty agreements, which include escrow agreements as contemplated therein (the "Charterparty Agreements") and purchase agreements, which include escrow agreements as contemplated therein (the "Purchase Agreements") memorializing the chartering and purchase*

*obligations related to two (2) newbuild Ultramax cargo vessels (the "Vessels").*

*This LOI sets forth the principal terms and conditions pursuant to which CCS or its designated guaranteed subsidiaries (the "Owners") would agree to bareboat charter and sell the Vessels to HSL, and HSL would agree to bareboat charter and purchase the Vessels (the "Transaction"), with such terms being specifically set forth in the Charterparty Agreements and Purchase Agreements as may be attached hereto as Attachment A and Attachment B, respectively, and revised from time to time.*

*1.     Scope of the LOI. The parties agree to use commercially reasonable efforts to complete the Transaction in accordance with this LOI and enter into the Charterparty Agreements and Purchase Agreements. The Owners agree to direct all communications regarding the Transaction to Mr. Ben Malkin. HSL agrees to direct all communications regarding the Transaction to Mr. Keith Denholm.*

*2.     Vessels and Delivery. The Vessels that are the subject of the Transaction are two newbuild 61,000 dwt Ultramax eco-spec vessels as principally described in Schedule 1 hereto to be built in the shipyards of the Shin Kurushima Dockyard Group Located in Japan (hull numbers to be declared upon signing of definitive contracts), such Vessels to have an expected delivery between May 2016 and September 2016.*

*3.     Condition Precedent The Transaction is subject to, on the one hand, the Owners' completion of its negotiation and execution of bareboat charterparty agreements and purchase agreements with the shipbuilders on terms satisfactory to the Owners (collectively, the "Shipbuilder Agreements") and then, on the other hand, the Owners and HSL completing negotiation of the Charterparty Agreements and Purchase Agreements on terms materially similar to the terms of the Shipbuilder Agreements.  The Owners will exert good faith and commercially reasonable efforts to complete the negotiation and execution of the Shipbuilder Agreements within thirty (30) days following the signing of this LOI, provided however, the Owners will have no duty to execute the Shipbuilder Agreements if the Owners and HSL have not reached a binding agreement on the terms of the Charterparty Agreements and the Purchase Agreements.  The Owners and HSL agree that so long as Owners are able to negotiate the Shipbuilder Agreements on terms materially similar to terms acceptable to HSL in the Charterparty Agreements and the Purchase Agreements as determined in consultations between Owners and HSL and such acceptance is evidenced in writing by HSL acceptable to Owners, Owners will proceed with the Transaction contemplated by this LOI.*

*4.     Performance Guarantee The Owners and HSL agree that in support of its future anticipated obligations under the Charterparty Agreements HSL will, in the first instance, make a cash deposit to the designated Joint Order Escrow Account as set forth in Schedule 2 in the amount of three million three hundred thousand US dollars ($3,300,000) for each Vessel for a total amount of six million six hundred thousand US dollars ($6,600,00) (the "LOI*

*Commitment Amount") within seven (7) business days of the execution of this LOI. The LOI Commitment Amount will remain in such Joint Order Escrow Account until such time as Owners and HSL have executed definitive forms of the Charterparty Agreements and Purchase Agreements whereby the LOI Commitment Amount will be released to the Owners' designated bank account. If the Owners and HSL have not executed definitive forms of the Charterparty Agreements and Purchase Agreements prior to the Termination Date of this LOI (as defined below), the LOI Commitment Amount will be returned in full without interest to the HSL designated bank account within seven (7) business days after that Termination Date ...*

*...*

*8.     <u>Termination</u> This LOI will terminate, except with respect to the binding portions hereof, if definitive agreements have not been executed and delivered by March 10, 2014, or such later date as the parties shall mutually agree upon (the "Termination Date").*

*....*

*11.     <u>Governing Law</u>. This LOI will be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles.*

*....*

*15. <u>Disputes</u>. Any disputes regarding this LOI or the parties' rights and obligations under this LOI will be submitted to binding arbitration before a single arbitrator selected in accordance with the rules of Commercial Arbitration of the American Arbitration Association ("AAA") and conducted in accordance with the AAA's rules of Commercial Arbitration and applying New York law. The arbitration proceedings shall be conducted in the US at a site agreed by the parties hereto. EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY FOR ANY DISPUTE ARISING UNDER THIS LOI."*

56. Pursuant to the terms of the LOI and the Escrow Agreement, Hudson paid the US$ 6.6 million LOI Commitment Amount into the Citibank Escrow Account, to be held in the name of Citibank for the benefit of Castleton and Hudson.

57. As appears below the parties agreed to extend the "**Termination Date**" of the LOI (and the "**Funds Return Date**" set forth in the Escrow Agreement), originally 10 March 2014, on several occasions, namely on 7 March 2014, 20 March 2014, 2 May 2014 and 9 May 2014, the last extension being until 16 May 2014.

**The negotiation of the terms of the Upstream and Downstream Charters**

58. On about 18 February 2014, Mr Denholm sent Mr Malkin a revised draft downstream charter (in which the prohibition in clause 22 on charterers sub-chartering on a bareboat basis had been deleted, and which included an early draft of what became clause 13 of the Downstream Charters), and attached draft MOA.

59. By email of 18 February 2014, Mr Malkin commented on those drafts, stating that

> *"many of the Barecon comments ... are directed to the head charter between [Castleton] and Head Owner However, most of the comments are applicable to both charter documents (i.e. they need to be on Back-to Back terms between [Castleton] and Head Owners and [Castleton] and Hudson)."*

Amongst other things he proposed that two provisions be inserted in the Upstream and Downstream Charters relating to '*[Castleton's] Performance Risk*', i.e. the risk that Castleton failed to perform its obligations under the Upstream Charters. They were:

    (1) '*Cure Rights*', permitting Hudson to cure a default by Castleton under the Upstream Charters, and

    (2) '*Step-in Rights*', permitting Hudson to "*assume the position of [Castleton] under [the Upstream Charter] ... in the event that a termination event caused by [Castleton] under [the Upstream Charter] had occurred...*"

He further proposed that each Downstream Charter should contain a provision requiring Castleton to exercise its purchase option under the corresponding Upstream Charter when Hudson exercised its purchase option under the Downstream Charter, adding that the Castleton performance risk could be mitigated by a tripartite agreement, such that Castleton would be deemed to have exercised its purchase option under the Upstream Charter in those circumstances, and Hudson would have a direct claim against the Builder/Owner if it defaulted following such exercise of the Upstream Charter purchase option. He also proposed a number of amendments to the

terms of the Barecon form, Rider Clauses and MOA, which he made clear were intended to apply to both the Upstream and Downstream Charters.

60. Mr Denholm responded to that email the same day, rejecting the proposed '*cure rights*' and '*step-in rights*' because "*there are some things we simply cannot accept. Notably we will not agree to anyone stepping into our shoes with our Japanese friends*". He attached a draft charter and MOA which incorporated the other detailed changes to those agreements that Mr Malkin had proposed. Mr Denholm told Mr Malkin that he would pass equivalent drafts on to the Japanese. He added that he would ask Mr Duclaux to look into some wording that would give Hudson some additional comfort on Castleton's performance.

61. The Escrow Agreement was signed on about 26 February 2014. It provided that:

   (1) Citibank was appointed as Escrow Agent and would open an escrow account (the Citibank Escrow Account) in its own name, for the benefit of Castleton and Hudson.

   (2) Hudson was to deposit US$ 6.6 million in the Citibank Escrow Account.

   (3) Castleton was to deliver certified true copies of the Downstream Charter and Downstream MOA for each Vessel, together with a signed statement by Castleton certifying that the documents in question were true copies of the originals (together, "**the Payment Documents**").

   (4) Upon receipt of the Payment Documents from Castleton, Citibank would pay the US$6.6 million to Castleton.

   (5) If there was a remaining balance in the Escrow Account on 10 March 2014 (the Funds Return Date), Citibank was to serve a notice on the other parties, following receipt of which, unless the Funds Return Date was extended by Hudson within 5 days, the remaining balance was to be returned to Hudson.

   The Escrow Agreement was subject to New York law and jurisdiction.

62. On 27 February 2014, Hudson paid US$ 6.6 million into the Citibank Escrow Account.

63. During March 2014, the parties continued to negotiate the terms of both the upstream and the downstream transactions.

64. On 4 March 2014, Mr Denholm sent Mr Malkin an email setting out KN Maritime's comments on the draft Upstream Charter incorporating Mr Malkin's proposed amendments. It is clear from those comments that KN Maritime had not by that time agreed to delete the clause 22 prohibition on sub-chartering on a bareboat basis, but were aware that this was a deal breaker and hoped to resolve the issue shortly. In the event, it was resolved on about 24 March 2014 – see below.

65. On 7 March 2014, both the Funds Return Date and the LOI Termination Date were extended to 24 March 2014. On the same date, Mr Denholm sent Mr Malkin a copy of the draft Upstream Barecon form.

66. On 11 March 2014, Mr Denholm sent Mr Malkin a revised draft Upstream Charter with his amendments and comments to KN Maritime highlighted (but with commercial details redacted).

67. On 13 March 2014, Mr Malkin responded by sending Mr Denholm a draft Upstream Charter with Mr Malkin's mark-up comments added to those in the draft sent by Mr Denholm 2 days previously. Castleton described this as Hudson's second review of the draft Downstream Agreements. Mr Malkin stated that many of Mr Denholm's comments to KN Maritime had been retained as they were considered important for Hudson (or still required further resolution/information). He added:

> *"Further, the back-to-back barecon between [Castleton] and Hudson will also need to include some additional provisions including but not limited to an Indemnity/Liquidated damages/guarantee provisions for [Castleton's] obligations under the C/P agreements.*
>
> *Finally, the barecons will need to be reconciled so as to account for adequate timing of the default/cure periods up and down the chain."*

68. As negotiations were still ongoing, on 20 March 2014, there were further extensions of both the Funds Return Date and the LOI Termination Date, this time to 24 April 2014

69. On 24 March 2014, Mr Malkin sent a multi-coloured email to Mr Denholm, setting out each party's then current position on the terms of Upstream Charter. The email concludes,

> "*Keith, prior to final sign-off with the Japanese on the Barecon, I would like to see what the entire document looks like (with all riders, addendum, attachments, etc.).*
>
> *And then we need to focus on the provisions that relate only between [Castleton] and [Hudson] (naming, performance guarantees, etc)."*

70. Also on 24 March 2014, Mr Denholm emailed Mr Malkin advising him that KN Maritime was prepared to agree to Castleton sub-chartering on a bareboat basis, subject to the addition of wording in clause 22(a) regarding the technical manager remaining unchanged in the event of such a sub-charter. Thenceforth all three parties were agreed that with this addition, the words "*nor sub charter the Vessel on a bareboat basis*" were to be deleted from clause 22(a), and to the addition of the requirement relating to no change in technical manager. It was with these changes that clause 22(a) was included, in identical terms, in both Upstream and Downstream Charters (with clause 22(b) of the standard form, containing a restriction on sale, being deleted).  In none of the emails concerning clause 22 had Mr Malkin objected to the restriction on assignment in clause 22(a), though it is fair to say that the focus of the discussion of clause 22 had been on the need to obtain KN Maritime's agreement to lifting the restriction on bareboat chartering.

71. On 26 March 2014, Mr Denholm emailed Mr Malkin, passing on KN Maritime's final counterproposals on the Upstream Charters, and stating:

> "*We are almost there but after a long night discussing the final outstanding items with owners, I am not confident I can move them any or much further so really would appreciate you looking closely at what he is saying....*"

72. Mr Malkin replied to Mr Denholm by email the following day, stating:

> "*Thank you for the below and appreciate what you are saying; I think that we may have received all that we are going to get. I am OK with the below and I*

> *think the next step is to address the barecon between [Hudson] and [Castleton]."*

Mr Malkin confirmed in a telephone call to Mr Denholm that this meant that he was happy with the terms of the Upstream Charters and was signing off on them.

73. Mr Denholm emailed Mr Malkin on 27 March 2014, stating:

> *"In the spirit of being open with you to demonstrate we are back to back apart from the money items, I have attached both draft barecons. I have highlighted the slight variations between our cp and that of the one we have with head owners. However for ease of reading from a blackberry they are as follows* [he then listed the variations, none of which are material to the present disputes] ...
> *I need to let Ishioka San [of KN Maritime] know by tonight... if we are good with the terms now and I obviously cannot do this without your agreement."*

74. Later that day, Mr Malkin replied by email, saying,

> *"As stated previously, the C/P between [Castleton] and the Japanese seems to be in order (since you advised that we would unlikely be getting any more items) and unless you hear from me otherwise overnight is good to go."*

These terms which he thereby approved (following what Castleton described as Hudson's third review of the draft Downstream Agreements) were identical in all material respects to the terms of the Upstream Charters as finally concluded. Mr Malkin added that Hudson had a problem with the "*Seller's Default*" clause, clause 13, in the draft MOA, which then only provided for a remedy of damages, stating "*the damages are not adequate for Seller's failure to deliver the vessel.*" This complaint was addressed in the final draft MOA sent by Mr Duclaux on 10 April 2014, in which clause 13 had been amended to its final form  (set out above) by the adoption of terms proposed by Mr Malkin on 3 April 2014,  which included a right on the part of Buyers to pursue Sellers for specific performance.

75. The parties continued to negotiate the terms of the Downstream Charters in early April 2014. Following a conference call on 2 April 2014, on the following day Mr Duclaux sent Mr Malkin clean and blackline versions of the Riders to the Downstream Charters, including revisions discussed during that conference call. These revisions included

amendments to the Charterers' Performance Guarantee provision, but as yet no draft of what became clause 17.

76.   Later on 3 April 2014 Mr Malkin provided his comments on these drafts. With regard to the Riders, he stated as follows:

> *"Need a specific rider paragraph referencing the obligation of [Castleton] to provide a payment and performance guarantee acceptable to [Hudson], which addresses the purchase right, rights of subrogation, a return of the initial consideration (paragraph 11 of rider) and damages for a termination or breach of the barecon or MOA - also reference in such rider paragraph or rider 11 that Owner shall be liable for damages to Charterer for Owner's failure to effect a legal transfer or to deliver the Vessel to Charterer upon exercising its option or the obligation or the loss of Charterer's right as a result of the termination of the barecon."* [underlining added]

Thus it was Mr Malkin who first requested a clause conferring what he referred to as "*rights of subrogation*" on Hudson. He also requested that the terms of the MOA be incorporated into the Charter. He further proposed some additional wording for clause 22 of the Upstream Charters, expressly providing liberty to charterers to sub-charter the Vessels on a voyage, time or bareboat basis, but this wording was not adopted.

77.   On 8 April 2008, Mr Duclaux sent Mr Malkin revised clean and blackline drafts of Rider clauses for the Downstream Charters for review and comment. In response to Mr Malkin's request for a Rider clause addressing "*rights of subrogation*", these drafts included at clause 16, for the first time, a version of what became clause 17 of the Downstream Charters, providing (in the circumstances stated in sub-clause (2)) that

> *"Owners hereby agree to subrogate to Charterers any of Owners rights to enforce or prosecute a claim for damages under section 13 of the Upstream MOA".*

78.   On 10 April 2014 Mr Denholm sent Mr Malkin further drafts of the MOA (incorporating the revised and final version of clause 13) and of the Downstream Charters. The latter incorporated the final version of what became clause 17, making clear that the "*right of subrogation*" thereby conferred extended to Owners rights to "*enforce performance or prosecute a claim for damages under section 13 of the Upstream MOA*". It also incorporated some minor amendments agreed with KN Maritime overnight.

79.    Mr Malkin responded later that day, stating that subject to some minor "cleanup" items on the Barecon form, and a point on the wording of Rider clause 12 (which were dealt with in the final version of the Downstream Charters), Castleton's proposed changes (which included the revised, final version of what became Clause 17) were acceptable. He also requested that clause 12 include a requirement for submission to Hudson of certified copies of the fully executed Upstream Agreements, but this was declined by Mr Denholm.

80.    After Mr Denholm had notified Mr Malkin of some minor "cleanups" in the wording of the Upstream Charters, on 11 April Mr Duclaux emailed Mr Malkin First and Second Originals of each of the Downstream Charters and Downstream MOAs, dated 11 April 2014 and duly executed on behalf of Castleton, for countersignature by Hudson. These were all duly countersigned on behalf of Hudson. The Downstream Charters and Downstream MOAs were thereby finalised and concluded.

81.    The next day, Castleton and KN Maritime finalised the terms of the Upstream Charters and Upstream MOAs, although these remained "on subjects" to be lifted by KN Maritime.

82.    It is clear from the foregoing that Hudson, through its General Counsel Mr Malkin, was kept fully informed of the terms of the Upstream Agreements (apart from commercially sensitive pricing terms) as they evolved in the course of negotiations between Castleton and KN Maritime. Mr Denholm's evidence, which the Tribunal accepts, was that all material changes made to the Upstream Agreements were incorporated into the Downstream Agreements. Mr Malkin accepted in evidence that he knew that that was the basis on which negotiations were being conducted, and that he knew (as he trusted Mr Denholm) that whatever Mr Denholm told him had been agreed with KN Maritime had in fact been incorporated in the Downstream Agreements.

83.    On 28 April 2014, KN Maritime passed a message to Castleton through its brokers, Clarksons, stating that all subjects on the Upstream Charters had been lifted, so they were "clean fixed". Mr Denholm emailed Mr Malkin the same day to pass on the

good news. Mr Malkin responded with his congratulations, stating that he looked forward to receiving copies of the executed (Upstream) documents.

84. On the same day Castleton sent KN Maritime First and Second Originals of the Upstream Agreements, dated Singapore 28 April 2014, for signature by KN Maritime, but on the next day, 29 April 2014, KN Maritime sent an email to Castleton apologising and saying that it would not be able to sign until after the Japanese Golden Week holiday. Mr Denholm passed on that message to Mr Malkin the same day.

85. On 30 April 2014, Clarksons sent Castleton a "full clean recap" of the concluded Upstream Charters, indicating that they were to be dated 28 April 2014, the date the subjects had been lifted.

86. On 2 May 2014, the Funds Return Date and the LOI Termination Date were both extended to 9 May 2014.

87. On 6 May 2014, Mr Denholm emailed Mr Malkin stating:

> "*While we wait for the Japanese holidays to end, I have been thinking a little. I know we have to certify to the escrow agent that we have executed Japanese agreements that are in force and effect. Technically we have an executed deal since we have the recap from them and this under English law is as good as a signature. Not sure if we can proceed on this basis or wait?*"

(As he acknowledged in evidence, Mr Denholm was mistaken in believing that Castleton had to certify to the escrow agent that it had executed Upstream Agreements that were in force and effect.) Mr Malkin replied the same day,

> "*I understand and technically agree, but I would prefer to wait until we actually have signed documents in hand, which will make our board much more comfortable.*"

As appears below, Castleton relied upon this exchange as giving rise to an estoppel by convention regarding what was meant, in Clause 18, by "execution" of the Downstream

Agreements. Mr Denholm's response to Mr Malkin's email, also on 6 May 2014, was simply to say,

*"Understood. Reverting soonest."*

88.   On 8 May 2014, Castleton received by email from KN Maritime an electronic copy of the Upstream Charter for Hull 3670, signed on behalf of KN Maritime, with annexed unsigned Upstream MOA. The next day, Friday 9 May, they received an electronic copy of the signed Upstream Charter for Hull 3668, also with annexed unsigned Upstream MOA. The same day, KN Maritime sent their signed First and Second Originals of both Upstream Agreements to Castleton by courier. These are the Singapore versions of the Upstream Agreements, dated 28 April 2014.

89.   The same day, 9 May 2014, Mr Denholm emailed Mr Malkin saying that Castleton had *"the executed contracts... in hand from Japan"*. However he then emailed again later that day to explain that the Upstream MOAs had not been signed and that Castleton's in-house counsel were insisting that be done (notwithstanding that it was not the practice of KN Maritime to sign MOAs until the purchase of the vessel in question), and that he had *"been asked to go back to the Japanese to get them to sign the moa which i will do Sunday night..."*, i.e. 11 May 2014.

90.   Also on 9 May 2014 the Funds Return Date and the LOI Termination Date were both extended to 16 May 2014. Mr Malkin explained in evidence that he had done this without the approval of his President, who was out of town. He acted on his own initiative because of the existing (extended) deadlines of 9 May were about to expire. He accepted in evidence that at the time, he thought of the Downstream Charters as a very advantageous deal for Hudson, in to which he had put a lot of work (as clearly he had), and which he was very keen to see completed. He further accepted that nothing changed between then and 15 May to change these views. This passage in his evidence will be quoted below.

91.   Further to Castleton's in-house counsel's insistence, Mr Denholm asked KN Maritime for signed Upstream MOAs, and, on Monday 13 May 2014, KN Maritime emailed

Clarksons, attaching electronic copies of the MOA now signed by KN Maritime. The First and Second Originals of the signed Upstream MOAs were sent to Castleton the same day.

92.   Castleton never signed any of these versions of the Upstream Charters or Upstream MOAs. That was because KN Maritime's email of 13 May 2014 raised a new point. KN Maritime said, essentially, that if the MOAs were treated as having been signed in Japan, KN Maritime would be liable for stamp duty on the highest purchase price of the Vessels. KN Maritime therefore asked if the signatures on the Upstream MOAs could be notarised in either the USA or Singapore. In a further exchange about the mechanics of notarisation, KN Maritime asked Mr Denholm to arrange for notarisation of Castleton's signature, with the date and place of signature recorded.

93.   On 15 May 2014, Castleton sent Citibank by overnight courier a letter of request for payment of the US$ 6.6 million held in the Citibank Escrow Account ("**the Drawdown Request**"), attaching copies of the fully executed Downstream Charters and Downstream MOAs, certifying that they were true and correct copies of each document. There was no dispute that this was a fully compliant payment request under and in accordance with the terms of the Escrow Agreement, as the Tribunal finds that it was. It was received by Citibank on 16 May 2016. Castleton also sent Citibank an email copy of that letter with its attachments, with a copy to Mr Malkin.

94.   Also on 15 May 2014, Mr Duclaux sent an email to Mr Malkin stating as follows:

> "*Please accept this email as confirmation of the satisfaction of all outstanding Conditions Precedent under the two [Upstream Charters]. As you are aware, a payment notice was sent to… Citibank requesting release of the Escrow Property from the Escrow Account.*
>
> *I have attached .pdfs of the requisite CCI Guarantees for the benefit of Hudson. The originals are being delivered to you by overnight courier.*
>
> *Finally, please find copies of the upstream Charterparty Agreements between [Castleton] and KN Maritime. As we discussed, certain commercially sensitive information has been redacted from these copies…*"

33

He attached to that email copies of the Upstream Agreements as received from KN Maritime, with the Upstream Charters (i.e. the Singapore Versions) signed by KN Maritime but not by Castleton, and the Upstream MOAs unsigned.

95.   The next day, 16 May 2014, upon receipt of the Drawdown Request, Citibank paid the US$ 6.6 million to Castleton.

96.   The same day, Mr Malkin replied to Mr Duclaux's email of 15 May 2014, asking for fully-executed copies of the Upstream Agreements that were not redacted (stating that "*the information is imperative for the purposes of curing default, if necessary, and the exercise of owner's option/obligation*", as well as the shipyard specification for each Vessel.

97.   On 19 May 2014, KN Maritime emailed Castleton, asking them "*for tax reasons*" to execute revised versions of the Upstream Charters, with Castleton's signature notarised, with the place of signature Connecticut, and with the date being the same as that of the notary's stamp.

98.   Castleton agreed to do so and did so. New versions of the Upstream Charters dated Stamford, Connecticut 19 May 2014 were produced and signed by Castleton and Castleton's signature, on both the Charters and the MOAs, was duly notarised. These were then sent as electronic copies to KN Maritime by email on around 21 May 2014.

99.   Then, on 21 May 2014, Castleton and KN Maritime agreed that KN Maritime would sign the hard copies of new version of the Upstream Agreements at a meeting in Tokyo on 29 May.  The Upstream Agreements – referred to herein as the Stamford Versions - were duly signed in Tokyo that day, as planned.

100.  On 19 June 2014, Hudson provided Castleton with two performance bonds, each for US$1.25 million, being the Initial Bond Amount referred to in clause 13 of the Downstream Charters.

101.  Thereafter negotiations took place as to the terms of a Joint Order Escrow Agreement with HSBC Bank to hold the Initial Cash Amount of US$ 3 million per Vessel and

further Delivery Amounts, as provided for in clause 13. However negotiations ceased after mid-February 2015 upon Hudson contending that the Downstream Charters have not become effective, and no such Initial Cash Amount has been paid or provided by way of security by Hudson.

102. Castleton, which maintains that the Downstream Charters have become effective, at the very latest upon the Stamford Versions of the Upstream Agreements being fully executed on behalf of Castleton in Stamford on 19 May 2014, and on behalf of KN Maritime in Tokyo on 29 May 2014, contends that Hudson's failure to pay such Initial Cash Amount (and further Delivery Amounts) is a repudiatory breach of the Downstream Charters.

103. In an attempt to bring a swift end to Hudson's case that the restriction on assignment in clause 22 of the Upstream Charters was or might be an impediment to the exercise of Hudson's rights under clause 17 of the Downstream Charters, Castleton obtained KN Maritime's agreement to a deed of assignment dated 19 February 2016 ("**the Deed of Assignment**"), which provides, amongst other things, as follows:

> "*1. Consent to Assignment*
>
> *1.1 KN Maritime and the Owners, hereby consent and agree that the Charterers may assign any of its rights, benefit, or title, in whole or in part, under the Vessel Agreements to the Assignee (and only the Assignee) subject to the terms and conditions set forth in this Agreement.*
>
> *1.2 Any assignment to the Assignee consistent with this Agreement shall be deemed to have received the Owners' consent to such assignment as required in Part II Section 22 of the BBC (or elsewhere in the Vessel Agreements) and such assignment to the Assignee shall not be a default under any of the Vessel Agreements. Any rights assigned by Charterers shall be deemed to remain the rights and/or obligations of the Charterers consistent with the terms of the Vessel Agreements and the provisions of this Agreement.*"

One of the issues between the parties is whether this consent to assignment was effective to overcome any obstacle to the effectiveness of the Downstream Charters.

**The issues**

104. As the parties agreed, there are two principal issues in this arbitration:

(1) Are the Downstream Charters effective, or have they not yet come into effect by reason of an unfulfilled condition precedent?

(2) If the Downstream Charters are effective, is Hudson entitled to exercise a right of equitable set-off so as to provide it with a substantive defence to Castleton's claims?

The Tribunal will consider each of these principal issues in turn, before turning to the question of the remedies to which either party is entitled in the light of its decisions on those issues.

**Principal Issue 1: Are the Downstream Charters effective or have they not yet come into effect by reason of an unfulfilled condition precedent?**

105. This issue gives rise, at least potentially, to five main sub-issues, as the parties agreed, namely:

(1) Do the Downstream Charters provide, on their true construction or by reason of necessary and/or obvious implication, that the terms in which the Upstream Charters and Upstream MOAs are executed must be such as to enable Castleton to perform its obligations under the Downstream Charters and attached Downstream MOAs?

(2) If so, was such term a condition precedent to the effectiveness of the Downstream Charters?

(3) If there was such a condition precedent, did it have to be satisfied at the time of execution of the Downstream Charters or could it be satisfied subsequently, and if the latter, has it been satisfied by the Deed of Assignment?

(4) If there was such a condition precedent, were the terms of clause 22 of the Upstream Charters such as to mean that the condition precedent was not satisfied? This issue gives rise to further sub-issues, namely:

(a) What is meant by the "*right of subrogation*" which Castleton agreed to grant Hudson by and in the circumstances described in Clause 17(2) of the Downstream Charters: does the clause amount to a form of assignment of, or agreement to assign, rights under section 13 of the Upstream MOAs, or is it

a form of contractual subrogation, i.e. a right to require proceedings under section 13 to be commenced in the name of Castleton?

(b) If the clause amounts to a form of assignment of, or an agreement to assign, such rights, is clause 22 only a restriction on a general assignment of the Downstream Charters, or is it also a restriction on the assignment of rights arising thereunder such as potentially to affect Hudson's rights under clause 17(2)?

(c) If the latter, are rights arising under section 13 of the Upstream MOAs to be understood as rights arising under the Upstream Charters so as to fall within such restriction?

(5) If all the previous sub-issues are answered in favour of Hudson, is Hudson nonetheless estopped from complaining about the terms of clause 22 of the Upstream Charters such as to preclude reliance on the alleged condition precedent:

(a) Was there a representation by Hudson that notwithstanding any unfulfilled preconditions the terms of the Upstream Charters were satisfactory, and reliance thereon by Castleton such as to found an estoppel?

(b) Was there a representation by Hudson that it regarded the Downstream Charters as effective, and reliance thereon by Castleton such as to found an estoppel?

**Sub-issue (1): Do the Downstream Charters provide, on their true construction or by reason of necessary and/or obvious implication, that the terms in which the Upstream Charters and Upstream MOAs are executed must be such as to enable Castleton to perform its obligations under the Downstream Charters and attached Downstream MOAs?**

106. Hudson's pleaded case was as follows:

> "*Hudson will say further that, upon the true and proper construction of the Charterparties ....:*
>
> *(i) Pursuant to Rider Clause 17 of the Charterparties, upon the occurrence of an event of default by KN Maritime under the Upstream Charterparties and/or a repudiation by KN Maritime of its vessel sale or delivery obligations under*

the Upstream Charterparties and Upstream MOAs, <u>Castleton agrees to assign to Hudson</u> (upon Hudson notifying Castleton of the exercise of its rights pursuant to Rider Clause 17) all of Castleton's rights pursuant to Clause 13 of the Upstream MOAs, including (without limitation) Castleton's right to seek specific performance and/or claim damages for breach of the Upstream MOAs;

(ii) .... Hudson's right to request an assignment of Castleton's rights against KN Maritime under Clause 13 of the Upstream MOAs right was of critical importance. In the premises, <u>on the true construction of Rider Clause 17</u> and/or pursuant to an implied term of the Charterparties (to be implied as necessary in order to give the Charterparties business efficacy and/or to reflect the common but unexpressed common intention of the parties):

    (a)    Castleton was under an obligation to ensure that the terms of the Upstream Charterparties and Upstream MOAs were not such as to prevent, impede or hinder Castleton from complying with its obligations pursuant to Rider Clause 17 of the Charterparties; and/or

    (b)    It was a condition precedent to the effectiveness of the Charterparties that the terms of the Upstream Charterparties and Upstream MOAs as executed were not such as to prevent, impede or hinder Castleton from complying with Its obligations pursuant to Rider Clause 17 of the Charterparties;

(iii) Further or alternatively, the obligation and condition precedent referred to in sub-sub-paragraphs (ii)(a) and (b) above arise <u>pursuant to Rider Clause 18</u> on its true construction and/or pursuant to a term or terms to be implied therein, for the same reasons as set out in sub-paragraph (ii) above. Without prejudice to the generality of the foregoing, Hudson will say that "Execution" of the Upstream Charterparties and Upstream MOAs for the purposes of Rider Clause 18(1) and (2) of the Charterparties requires execution of the Upstream Charterparties and Upstream MOAs in terms that do not prevent, impede or hinder Castleton from complying with its obligations pursuant to Rider Clause 17 of the Charterparties." (underlining added)

107.   In its closing submissions Hudson modified this pleaded case in three ways. First, it did not pursue its contention that the alleged term arose on the true construction of clause 17. Second, it altered the formulation of the express or implied term for which it contended: Hudson contended instead that clause 18 should be read as follows, with the words of conditions precedent 1 and 2 to be construed as being subject to the words underlined, or alternatively with those words being implied (which came, so Hudson submitted, to the same thing):

<u>"18) Condition precedent to effective date of this charter party</u>

> *Owners and Charterers hereby agree that the following will be conditions precedent to the effectiveness of this charterparty agreement:*
>
> *1. Execution of the Upstream Charterparty by and between CC Shipping and KN Maritime; and*
>
> *2. Execution of the Upstream MOA by and between CC Shipping and KN Maritime;*
>
> *and*
>
> *<u>The terms in which the Upstream Charterparty and Upstream MOA are executed must be such as to enable Castleton to perform its obligations under this Charterparty and the attached MOA.</u>*
>
> *3. Receipt by Charterers of an original letter of guarantee in the form attached hereto as schedule 1, duly executed by Castleton Commodities International LLC (USA).*
>
> *Owners agree to use their best efforts to expeditiously cause the full execution of the documents referenced in this clause 18 by 9 May 2014."*

Third, whereas in advancing its case on construction, Hudson had originally, both in its pleading (as above) and in its skeleton argument, focused on the word "*Execution*" as having the extended meaning for which it contended, in closing, Hudson submitted that the term for which it contended should be read as arising from the language of conditions precedent 1 and 2 taken as a whole.

108.  In support of its arguments on construction and implication, Hudson referred us to the two recent decisions of the Supreme Court, *Arnold v Britton [2015] UKSC 36* and *Marks & Spencer PLC v BNP Paribas Securities Services Trust Company (Jersey) Ltd. [2015] UKSC 72*. In *Arnold v Britton*, Lord Neuberger, at para. 15, gave the following helpful summary of the principles of construction:

> *"When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101, para. 14. And it does so by focusing on the meaning of the relevant words ... in their documentary, factual and commercial context. That meaning has to be assessed in the light of: (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the [contract], (iii) the overall purpose of the clause and the [contract], (iv) the facts and circumstances known or assumed by*

*the parties at the time the document was executed, (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions."*

109.   We were also referred to Lord Clarke's formulation of the 'unitary' process of construction in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 at para 21:

> *"[T]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."*

110.   Hudson accepted that in the light of the decision of the Supreme Court in the *M&S* case, the implication of terms is a distinct process from the logically prior process of construing a contract; but as Lords Neuberger and Clarke pointed out in that case (at paras 26 and 76 respectively) both involve *"determining the scope and meaning of the contract"*.

111.   Against this background, Hudson correctly accepted that in order for any term to be implied into the Downstream Charters, it would need to show either that the term is necessary to give the Downstream Charters business efficacy, or that it is so obvious that it goes without saying.  As regards business efficacy, Hudson adopted Lord Neuberger's observation that a more helpful way of putting this test is whether, without the term sought to be implied, the contract would lack commercial or practical coherence. Another way of putting this test is to ask whether it is necessary to imply the term in order to make the contract work:  per Lord Clarke in *M&S* at para 77. As regards the test of obvious inference, the authoritative guidance remains that of MacKinnon LJ in *Shirlaw v Southern Foundries (1926) Ltd* [1939] 2 KB 206 at 227, as follows:

> *"Prima facie that which in any contract is left to be implied and need not be expressed is something so obvious that it goes without saying; so that, if while the parties were making their bargain, an officious bystander were to suggest some express provision for it in the agreement, they would testily suppress him with a common, 'oh, of course'."*

Hudson accepted that in order for a term to be implied on this basis, the tribunal must be satisfied that *both* parties would, as reasonable men, have agreed to it had it been suggested to them.  The knowledge or ignorance of each party of the matter to be implied, or of the

facts on which the implication is based, is therefore a relevant factor: see *Chitty on Contracts*, at para 14-010.

112.  Hudson also referred the Tribunal to Lord Simon of Glaisdale's statement of the conditions for implication of a term, in delivering the Opinion of the Privy Council in *BP Refinery (Westernport) Pty Ltd v. Shire of Hastings (1977) 180 CLR 266*, at pp. 282-283, and Lord Neuberger's comments thereon in *M&S* at pp. 1850-1851.   Lord Simon said that:

> *"For a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."*

Lord Neuberger said, amongst other things, that it was questionable if Lord Simon's first requirement of reasonableness and equitableness added anything, because if a term satisfied all the other requirements, it is hard to think that it would not be reasonable and equitable. He also pointed out that the second and third of Lord Simon's conditions were alternatives, while adding that it would be a rare case where one but not the other was satisfied.

113.  Hudson relied on the following points of context or factual matrix against which the Downstream Charters had to be construed and questions of implication considered. First, Hudson emphasised that the Upstream and Downstream Agreements comprised one overall transaction, such that they were either to stand or fall together, and that it was equally important to both Castleton and Hudson that both sets of Agreements were executed. That was the evidence of both Mr Malkin and Mr Denholm. Mr Denholm accepted that he needed to ensure that both sets of Agreements were in place and that they were on materially back-to-back terms, and that it was just as important for Hudson that Castleton execute the Upstream Agreements as it was for Castleton that Hudson execute the Downstream Agreements. This was reflected in the terms of the Downstream Charters themselves: thus, for example, clause 17 makes clear that the Upstream Charters need to be in place in order for Hudson to receive the benefits of its bargain. Indeed, Mr Denholm accepted that he needed to ensure that the terms upstream were such as to enable Castleton to perform its obligations downstream. It was

therefore, so Hudson submitted, key to the overall transaction that both the Upstream and the Downstream Agreements were executed and worked together as an overall package and could be performed consistently with one another.

114.   Secondly, Hudson submitted that Castleton's ability to deliver to Hudson what Hudson was entitled to under the Downstream Charters was dependent on Castleton agreeing appropriate terms with KN Maritime in the Upstream Charters. This was the basis on which both parties were proceeding, as made clear by clause 3 of the LOI, which the parties agreed was an admissible aid to construction as forming a key part of the factual matrix, and which made "*the Transaction*" as therein defined, namely the contemplated Downstream Agreements, subject to the completion and execution of "*the Shipbuilder Agreements*" (the contemplated Upstream Agreements) and to Castleton and Hudson completing negotiation of Downstream Agreements "*on terms materially similar to the terms of the Shipbuilder Agreements*".

115.   Against this background, and in support of its case on construction, Hudson submitted that the words, "*Execution of the Upstream Charterparty ...*" and "*Execution of the Upstream MOA ...*" in clause 18 could not mean execution in whatever terms Castleton saw fit. It must mean execution in terms that enable Castleton to perform its obligations under the Downstream Agreements (and specifically, its obligations under clause 17(2), the clause in respect of which Hudson submitted that Castleton's performance would or might be prevented or impeded having regard to the terms of clause 22 of the Upstream Charters) – see the precise formulation of the construction contended for, as set out above. This construction was to be understood as arising on the true construction of conditions precedent 1 and 2 read as a whole: Hudson accepted in closing that it could not be spelled out from the word, "*Execution*" alone, as it had until then contended. It was, so Hudson submitted, what any reasonable individual in the parties' position would understand from the words used.

116.   Hudson relied on the same background facts in support of its alternative case that a term to the same effect was to be implied into the Downstream Charters, and specifically into clause 18 (and in anticipation of sub-issue (2), Hudson's case on both express and implied term thus involved the proposition that compliance with the suggested term was a condition precedent to the effectiveness of the Downstream

Charters). Hudson submitted that the alleged implied term satisfied the tests in *M&S, Shirlaw*, and *BP Refinery*. As to Lord Simon's 5 conditions, taken in a slightly different order, (4) it was capable of clear expression; (5) it did not contradict any express terms of the Downstream Charters; (2) it was necessary to give business efficacy to the Downstream Charters, because without it (to use Lord Neuberger's expression in *M&S*) they would lack commercial or practical coherence, because without the term Hudson would (having regard to its submissions on other sub-issues) be agreeing to charter the Vessels on terms that might have put it out of Castleton's power to perform; (3) it was obvious, meeting the "*innocent bystander test*" in *Shirlaw*;  (1) it was reasonable and equitable – though this flowed from satisfaction of the other  conditions.

117. For reasons explained below, Hudson submitted that compliance with this alleged express or implied term would have required Castleton to obtain KN Maritime's agreement to a further amendment to clause 22 of the Upstream Charters, so that it read as follows (with the words to be added underlined):

> "***Clause 22 - Assignment, Sub-Charter and Sale***
>
> (a) <u>Except that the Charterers may assign their rights pursuant to clause 13 of the Upstream MOA (as attached and incorporated into this Charter) without Owners' consent,</u> the Charterers shall not assign this Charter ~~nor sub-charter the Vessel on a bareboat basis~~ except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve.
> During any sublet by bareboat charter, the technical manager should be taken over without changing from the previous manager and full responsibility of bareboat charterers described in Box 4 should be always remain in force."

118. In response to a point taken by Castleton that pursuant to the final sentence of clause 3 of the LOI, Castleton would have been (and indeed was) obliged to proceed with the Transaction if it was able to negotiate Upstream ("*Shipbuilder*") Agreements on terms materially similar to those of the Downstream  Agreements, and that the agreed terms of clause 22 of the Upstream Charters and of the Downstream Charters were in fact identical, so that Castleton might have been in difficulty if it had sought the suggested amendment to the Upstream Charter clause 22 and KN Maritime had refused, Hudson submitted that "*materially similar*" meant "*similar save where, because of the need for Upstream and Downstream Agreements to work together, it was logically necessary for*

*their terms to differ*". Hudson did not challenge the proposition that the logical consequence of this submission was that identically worded terms (as in the case of clause 22) might not, for the purposes of the LOI, be "*materially similar*".

119.  Hudson also submitted that, whereas Mr Malkin had been involved in the negotiation of the back-to-back terms of the Upstream and Downstream agreements, such as clause 22, he cannot have had in mind how that clause would work together with the unique provisions of the Downstream Charters yet to be agreed, such as clause 17, which was only agreed shortly before execution thereof; and that as Hudson had no direct contact with KN Maritime, it was the responsibility of Castleton to ensure that the Upstream and Downstream Agreements worked together – hence the express or implied term contended for.

120.  Castleton submitted that no such term arose on the true construction of the Downstream Charters, or should be implied. As to construction, the word "*Execution*" as used in clause 18 meant no more than signature by the parties, and the expressions "*Upstream Charters by and between CC Shipping and KN Maritime*" and "*Upstream MOAs by and between CC Shipping and KN Maritime*" were defined in clause 17 as meaning no more than the (proposed) upstream agreements between Castleton and a Panamanian company to be nominated and guaranteed by KN Maritime, the Upstream Charter "*to become effective upon the full and final agreement of terms thereto between [Castleton] and KN Maritime*". That is all a reasonable person standing in the shoes of the parties would have understood these words in clause 18 to mean. There was no requirement in the Downstream Charters as to the terms of those Upstream Agreements, though Castleton relied upon the requirement in clause 3 of the LOI that the terms of the Downstream Agreements should be "*materially similar*" to those of the Upstream Agreements, took the point on the final sentence of clause 3 referred to above, and emphasised that the respective terms of clause 22 were not only materially similar but identical.

121.  Castleton accepted that there might have been an implied term to the effect that Castleton would not substantially rewrite its agreements with KN Maritime between executing the Downstream Agreements and executing the Upstream Agreements; but that had not happened. Indeed, as appears from the above recital of the facts, Mr

Malkin had not only been closely involved in the negotiation of the Upstream Agreements prior to the execution of the Downstream Agreements on 11 April 2014 on essentially back-to-back terms, in the sense of having had substantial input, via Mr Denholm, in the content of those terms (for example, in the 3 reviews identified by Castleton as set out above); he had also been informed of (and not objected to) every change to the wording of the Upstream Agreements following his third review ending on 27 March 2014 (with "*I am OK with the below*"), right up to the time of execution of the Downstream Agreements on 11 April 2014 and the fixing of the Upstream Charters on subjects the following day. That close involvement and knowledge meant that it would be unreasonable to imply a term the effect of which might be to impose an obligation on Castleton to procure different terms from KN Maritime. By 11 April 2014 the parties knew (and Hudson had effectively agreed) the identity and content of the Upstream Agreements: clause 17 of the Downstream Charter was referring to an Upstream Charter the terms of which had already been fixed. In the circumstances Castleton cannot have been under an obligation to procure an Upstream Charter on different terms.  There was, so Castleton submitted, no responsibility on its part, as the middleman passing suggestions as to terms up and down the chain, to ensure that the terms of the Upstream Agreements and the Downstream Agreements were such that they worked together.

122. The Tribunal has concluded that there is no such term as alleged by Hudson, either on the true construction of clause 18, or as a matter of necessary or obvious implication.

123. Dealing first with construction, the Tribunal accepts Hudson's propositions that the Downstream Charters must be construed (1) on the basis that the Upstream and Downstream Agreements comprised one overall transaction, such that they were either to stand or fall together and it was equally important to both Castleton and Hudson that both sets of Agreements were executed, and (2) having regard to the terms of the LOI and in particular the "*material similarity*" requirements therein.  However, the references in clause 18 to the "*the Upstream Charterparty ...*" and "*the Upstream MOA ...*" were to those Agreements as defined in clause 17 – nothing more, nothing less. As clause 17 provides, "*The proposed 7 years bareboat charterparty agreement (the "Upstream Charter") between Castleton ... and a Panamanian company to be nominated and guaranteed by KN Maritime Ltd., Tokyo ("collectively 'KN Maritime')*"

was to "*include the right to charter the Vessel ...*", and was "*to become effective upon the full and final agreement of terms thereto between [Castleton] and KN Maritime*". The Upstream Charters did confer upon Castleton the right to charter the Vessel. The Downstream Charters themselves contain no other express terms regarding the content of the Upstream Charters.

124.   The Tribunal accepts that a reasonable person in the shoes of the parties, at the time the Downstream Agreements were executed, would (having regard to the LOI and to the way in which the negotiations had been conducted) have understood that the Upstream Agreements were, with regard to those provisions which were not unique to the Downstream Agreements, to be on terms "*materially similar*" to those of the Downstream Agreements – as indeed they were. Thus the Tribunal agrees that it would not have been open to Castleton to conclude Upstream Agreements on terms substantially different from equivalent terms in the Downstream Agreements. The LOI requirement for material similarity certainly gave scope for some immaterial differences (for example, in relation to notice periods) that did not prejudicially impact the overall transaction, but it cannot be read as meaning "*similar save where, because of the need for Upstream and Downstream Agreements to work together, it was logically necessary for their terms to differ*", as Hudson contended. Hudson's proposition that identical clauses would not be "*materially similar*" if it was necessary for their terms to be different to enable the Upstream and Downstream Agreements to work together was logically absurd, and is rejected. The terms of clause 22 were both identical and materially similar in Upstream and Downstream Charters.

125.   For these reasons, which were substantially those advanced by Castleton, the Tribunal rejects Hudson's case that clause 18 is to be construed as if it contained the additional words suggested.

126.   Turning next to Hudson's case that the same wording is to be implied, the Tribunal has concluded that such implication is neither necessary nor obvious, nor does it satisfy other requirements for the implication of terms. It is not necessary, because the Downstream Charters work without the suggested gloss. If Castleton is unable to perform any of the obligations it has undertaken thereunder, Hudson will have remedies in respect of such non-performance. The fact that it is not obvious is perhaps best

illustrated by the fact that the term now contended for only emerged on the final day of the Hearing. As demonstrated by the development of Hudson's case, the alleged term could have taken a number of different forms, and there would have been considerable scope for debate between the parties as to the precise ambit and nature of any obligation to be undertaken by Castleton (for example as to whether the putative obligation was positive or negative in nature; whether it related merely to the terms of the Upstream Charters, or to the effect of those terms, and how it fitted in with the detailed communications between Castleton and Hudson regarding the terms of the Upstream Charters). Moreover, the Tribunal considers that it would be neither reasonable nor equitable to imply such a term having the suggested effect of imposing an obligation on Castleton to procure any different terms from KN Maritime than those that had already been agreed and signed off on by Mr Malkin. The Tribunal accepts Castleton's submission that there was no obligation on it to ensure that the respective terms of the Upstream and Downstream Agreements were such that the Agreements worked together. Having regard to Castleton's role as the intended middleman in a chain of Charters, and the extensive involvement of Mr Malkin on behalf of Hudson in the negotiation of the terms of both Upstream and Downstream Agreements, it was up to Hudson to ensure that the terms to which they agreed, in the knowledge of the terms (apart from the purely commercial terms) of the Upstream Agreements, were satisfactory from its point of view.  If indeed Hudson did not give thought to how clause 17 of the Downstream Charters would work having regard to the terms of clause 22 of the Upstream Charters, any consequent problems would be Hudson's problem, and could not be laid at Castleton's door.

127.  For these reasons, which are again substantially those relied on by Castleton, the Tribunal rejects Hudson's case that the term contended for is not to be implied into clause 18, or for that matter, anywhere else in the Downstream Charters.

128.  There is an additional reason why no such term should be implied into clause 18. It is inherently unlikely, in the opinion of the Tribunal, that the parties would have intended such a term, which would be capable of giving rise to significant and prolonged debate as to whether or not it had been complied with, to be a condition precedent to the effectiveness of the Downstream Charters. As Castleton submitted, the unsuitability of the suggested term as a condition precedent is a good reason for not implying it.

129. For completeness, the Tribunal should record that it would have rejected the express or implied term pleaded by Hudson and persisted in until Day 3 of the Hearing, as set out above. The breadth in which that term was expressed would have made it even more improbable that Castleton would have agreed it, and rendered it even more susceptible to debate as to compliance or non-compliance.

130. It follows from the above, not only that Hudson fails on sub-issue (1), but also that Principal Issue 1 must be resolved in favour of Castleton. That is because the CP Purchase Price was released to Castleton on 16 May 2104, fulfilling the condition precedent in clause 12, and the conditions precedent in clause 18 therein were all satisfied upon execution of the Upstream Agreements by KN Maritime on 29 May 2014; and accordingly, the Upstream Charters have since then been effective and binding.

131. Thus the other sub-issues under Principal Issue 1 do not arise for decision. Since they were all fully argued, however, the Tribunal will express its conclusions upon them, in some cases more briefly than others.

**Sub-issue (2): If there was an express or implied term such as contended for by Hudson, was it a condition precedent to the effectiveness of the Downstream Charters?**

132. The Tribunal has concluded that there was no such express or implied term. If there had been, on Hudson's case it would have been incorporated in the clause 18 conditions precedent, so as it turned out at the Hearing this was not a real issue.

133. Insofar as Hudson left open the possibility that the alleged implied term might not have been tied into clause 18, outside the confines of clause 18 one would have had to imply not only the term contended for, but also its alleged status as a condition precedent. It would not in our judgment have met either of the requirements for implying that status set out in para 250 of the judgment of Flaux J in *Astra Zeneca UK Ltd. v. Albemarle International Corp. [2011] 2 CLC 252*. Moreover, the fact that the parties have spelled out what are to be the conditions precedent to the effectiveness of the Downstream Charters, in clauses 12 and 18 thereof, militates strongly against the implication of any

further conditions precedent (as does the content of this alleged implied term – see above),

**Sub-issue (3): If there was such a condition precedent, did it have to be satisfied at the time of execution of the Downstream Charters or could it be satisfied subsequently, and if the latter, has it been satisfied by the Deed of Assignment?**

134.   The Tribunal will deal with this (in the event) hypothetical question very briefly. If there was such a condition precedent incorporated into clause 18, by definition it referred to "*The terms in which the Upstream Charterparty and Upstream MOA are executed*" (underlining added). Accordingly it could not be satisfied by later amendment of executed versions of those Agreements, nor, *a fortiori*, could it be satisfied by the Assignment, executed some 21 months after execution of the Upstream Charters.

135.   That conclusion would, had this issue been of significance, have absolved us from grappling with the issue as to the meaning and effect of clause 1 of the Deed of Assignment, and in particular the impact of the puzzling final sentence of clause 1.2, which Castleton was forced to characterise as a form of "legal fiction".

**Sub-issue (4): If there was such a condition precedent, were the terms of clause 22 of the Upstream Charters such as to mean that the condition precedent was not satisfied?**

**Sub-issue (4)(a): What is meant by the "*right of subrogation*" which Castleton agreed to grant Hudson by and in the circumstances described in Clause 17(2) of the Downstream Charters: does the clause amount to form of assignment of, or agreement to assign, rights under section 13 of the Upstream MOAs, or is it a form of contractual subrogation, i.e. a right to require proceedings under section 13 to be commenced in the name of Castleton?**

136.   Although this sub-sub-issue is moot having regard to the Tribunal's decision on sub-issue (1), Hudson's case as to the effect of clause 17(2) formed the basis of its complaint about the content of clause 22 of the Upstream Charters, and its contention

that Castleton had thereby failed to comply with the alleged express or implied term for which Hudson contended. Instead of starting with consideration of sub-issue (1), as did the parties in their submissions, the Tribunal might equally have started with a consideration of this and the other sub-sub-issues arising under sub-issue (4). This sub-sub-issue in particular is important, and potentially provides a complete answer to Hudson's case on Principal Issue 1.

137.  It is convenient here to set out again the terms of clause 17 material to this sub-sub-issue. They are as follows:

> "*Owners covenant and agree to the following:*
>
> *1) Subject to Charterers exercise of its rights to subrogation under subsection 2 below which shall operate as a waiver of Owners obligation to enforce any of its rights or obligations under section 13 of the Upstream MOA, to enforce any and all rights available to CC Shipping against KN Maritime under the Upstream Charterparty and the Upstream MOA and to perform any and all obligations thereunder to the extent that CC Shipping's failure to enforce or prosecute such right or perform such obligation will materially compromise (I) the right of Charterers under this Charterparty to receive the benefits of its bargain for entering into this Charterparty Agreement, or (II) Owners or Charterers ability to perform any of their material obligations under this Charterparty Agreement or the Memorandum of Agreement attached hereto between Owners and Charterers; and*
>
> *2) Absent a Charterers event of default under this Charterparty (which is continuing beyond any applicable notice and cure period) or Charterers cancellation of delivery of the Vessel hereunder, upon the occurrence of an event of default by KN Maritime under the Upstream Charterparty or repudiation by KN Maritime of its vessel sale or delivery obligations under the Upstream Charterparty or the Upstream MOA, Owners under this Charterparty agreement hereby agree to grant Charterers a right of subrogation to any Owners rights to enforce performance or prosecute a claim for damages under section 13 of the Upstream MOA upon Charterers notice to Owners of Charterers exercise of such subrogation right and at the Charterers sole cost and expense. Notwithstanding anything set forth herein to the contrary, the exercise of such subrogation rights hereunder by Charterers shall not eliminate, waive or vary any of Owners enforcement or prosecution obligations under the Upstream Charterparty or Upstream MOA other than those rights or obligations under that section 13 of the Upstream MOA."*

138.  It was Hudson's case that the "*right of subrogation*" which Castleton agreed to grant to Hudson by and in the circumstances described in Clause 17(2) of the Downstream Charters amounted to a form of assignment of, or an agreement to assign, Castleton's

prospective rights to enforce performance or prosecute a claim for damages under section 13 of the Upstream MOAs; and that the restriction on assignment of "*this Charter*" in clause 22 of the Upstream Charters was a potential impediment to Castleton's assignment of such rights, and thereby represented a failure of Castleton to satisfy the alleged express or implied term that the terms in which the Upstream agreements were executed had to be such as to enable Castleton to perform this and other obligations under the Downstream Agreements.

139.   It was common ground that a right of subrogation properly so-called, i.e. a right conferred on A to exercise, for A's sole benefit, a right of B against C (without the necessity for B to assign his right to A), by A using B's name to sue C, can arise by contract as well as, in the insurance context, by operation of law – see passages cited from *Ong on Subrogation (2014)*, at pp. 1-2; *Mitchell & Watterson on Subrogation Law and Practice*, para 1.02. That right may be exercised upon the grant of a power of attorney by B to A to take proceedings in B's name, or pursuant to an appropriate order of the court or arbitral tribunal if B, having conferred such a contractual right, does not co-operate.

140.   Castleton submitted that the "*right of subrogation*" which it agreed by clause 17(2) to grant to Hudson in the circumstances therein described was just such a contractual right of subrogation. There was no basis upon which the Tribunal could conclude that the phrase should be given anything other than its ordinary and natural meaning, or that the parties had made a linguistic mistake, and that what they had meant was assignment not subrogation. Castleton pointed to the use of "*assignment*" elsewhere in the Downstream Charters, namely in clause 22, and that the advantage of conferring a right of subrogation, rather than assignment, was that it avoided any potential difficulties flowing from the clause 22 restriction on assignment.

141.   Hudson submitted, to the contrary, that notwithstanding what was submitted to be the loose use of the word "subrogation" in clause 17(2), what is referred to therein (and in clause 17(1), referencing clause 17(2)) is – and can only be - a right to an assignment. Not only does subrogation normally arise by operation of law, e.g. in the insurance context. Hudson submitted that it would have made no practical or commercial sense for the parties to have agreed merely that Hudson was to be "subrogated" (in the true legal meaning of that word)

to Castleton's rights. For that would (in Mr Duclaux's words) only grant Hudson *"the right to compel Castleton to bring a claim against KN Maritime in Castleton's name only"*. But any such right: (a) would be of little practical utility given that Hudson would remain dependent on Castleton bringing the necessary action against KN Maritime; (b) would therefore be very difficult to enforce (to the extent that it could be enforceable at all); and (c) would not in any way meet Hudson's concerns (as clearly articulated to Castleton during their pre-contractual exchanges) that Hudson should have a direct claim against the Builder/Owner if it defaulted following exercise of the Upstream Charter purchase option: see e.g. Mr Malkin's email of 18 February 2014. Mr Denholm had admitted in evidence that Castleton's expressed concerns about not wishing Hudson to deal directly with KN Maritime would not apply with the same force to a situation where there was a default by KN Maritime in complying with its delivery obligations on sale.

142. Hudson submitted that it was not unusual, in the contractual context, for parties to use the word "subrogation" loosely when what they meant was assignment, and referred to passages in the speech of Lord Hoffmann in *Banque Financiere de la Cite v. Parc (Battersea) Ltd. [1999] 1 AC 221*, at pp. 231-232, where he stated that "*the subject of subrogation is bedevilled by problems of terminology and classification which are calculated to cause confusion*", and that on payment of a loss it is customary for an insured to provide his insurer with a "letter of subrogation" which amounts to an express assignment of his rights of recovery. Hudson also submitted that if "subrogation" meant subrogation and not assignment, then clause 17(2) added nothing to Hudson's rights under clause 17(1).

143. The Tribunal has concluded that the "right of subrogation" Castleton agreed to confer by clause 17(2) was indeed a right of contractual subrogation, not a right of assignment (or an agreement to assign). The Tribunal can see no basis for assuming that the parties made a linguistic mistake, and that what they had meant was assignment not subrogation. On the contrary, there is every reason to suppose, from an objective perspective, that the parties used "subrogation" deliberately, as opposed to assignment. First, the parties were both represented in the negotiations by (amongst others) in house American counsel whom it may be assumed knew that there was a distinction between subrogation and assignment. Indeed it was Mr Malkin who, on 3 April 2014, first requested a clause conferring what he referred to as "*rights of subrogation*" on Hudson, and Mr Duclaux who drafted clause 17 in terms to which Mr Malkin agreed on 10 April

2014. Second, clause 22 refers to assignment, and there is no reason to suppose the parties intended to invoke the same legal concept in clause 17(2) whilst using a different legal expression. On the contrary, it would objectively make sense for the parties to have chosen "subrogation" deliberately to avoid any difficulties with assignment stemming from clause 22.

144. Third, it is not correct to say that if "subrogation" means "subrogation", clause 17(2) adds nothing to clause 17(1). Clause 17(1) imposes certain obligations on Castleton to enforce its rights and perform its obligations under the Upstream Charters. Some of those obligations may be specifically enforceable against Castleton, as well as their breach sounding in damages.   But Castleton by clause 17(2) agrees (in the circumstances therein described) to confer a right of subrogation, viz. a right for Hudson to use Castleton's name to sue KN Maritime "*at [Hudson's] sole cost and expense*". That is a more direct right of enforcement than a right to require Castleton to enforce its rights by itself pursuing (and having conduct of) proceedings against KN Maritime, albeit maybe for the ultimate benefit of Hudson. Contrary to Hudson's submissions, it would not be dependent on Castleton bringing the necessary action, because Hudson could readily take steps to enforce its right of subrogation, which is potentially of great practical utility. Contrary to another of Hudson's submissions, the references in s 17(1) and 17(2) respectively to "*Charterers exercise of its rights to subrogation under subsection 2 below*" and to "*Charterers exercise of such subrogation rights*" are entirely consistent with these being rights of subrogation and not assignment.

145. For the foregoing reasons, therefore, the Tribunal decides sub-sub-issue (4)(a) in favour of Castleton.

**Sub-sub-issue (4)(b): If clause 17(2) amounts to a form of  assignment of, or an agreement to assign, rights, is clause 22 only a restriction on a general assignment  of the Downstream Charters, or is it also a restriction on the assignment of rights arising thereunder such as potentially to affect Hudson's rights under clause 17(2)?**

146. Although this sub-sub-issue is doubly moot, the Tribunal will deal with it briefly.

147. Castleton submitted that clause 22 (in its complete, printed, form) was, by reason of its restrictions, not only on assignment of "this Charter", but also on bareboat chartering and sale, concerned with the identity of the effective performing party, and did not restrict assignment of individual rights arising under the Charter. The restriction on assignment of "this Charter" was to be understood as a restriction on a general assignment if rights akin to a general assignment to creditors, a concept which persists in other common law jurisdictions.

148. Although Hudson correctly accepted that the language of clause 22 was somewhat loose, in that obligations cannot be assigned and the clause is not directed at novation, Hudson submitted that on the ordinary and natural meaning of the words used the clause restricted assignment of individual rights. Hudson cited *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals ltd. [1994] 1 AC 85* in support of its submission on this sub-sub-issue. In that case, a restriction on assignment of "this contract" was held to be a restriction on assignment of any benefit of or under the contract – see per Lord Browne-Wilkinson at pp. 103 and 106.

149. The Tribunal has concluded that Hudson's arguments are to be preferred, and that clause 22 on its true construction restricts not only assignment of each Downstream Charter, lock, stock and barrel, i.e. of all the rights arising thereunder; it also restricts assignment of individual rights arising thereunder. That conclusion is supported by the reasoning of the House of Lords in *Linden Gardens*, albeit in relation to a contract in a very different context. Moreover, if, contrary to the Tribunal's conclusions, clause 17(2) of the Downstream Charters provided for a potential assignment of the right to take delivery of the Vessel from KN Maritime, that would affect the identity of the effective performing party under the Upstream MOA, as pursuant to such an assignment it would be Hudson which would be seeking specific performance against KN Maritime in the event of default by the latter.

**Sub-sub-issue (4)(c): If clause 22(a) is also a restriction on the assignment of rights arising under the Downstream Charters, are rights arising under section 13 of the Upstream MOAs to be understood as rights arising under the Upstream Charters so as to fall within such restriction?**

150.  This again is a moot point in view of the Tribunal's earlier conclusions. Suffice it to say that in view of the various references in the Upstream Charters to the Upstream MOAs , and in particular the provision in clause 12 that

> " .... *the purchase of the Vessel by the Charterers pursuant to Rider Clause 6 shall be on the terms of this Charterparty agreement and the terms of the Memorandum of Agreement in the form attached hereto as an appendix <u>and incorporated into this Charterparty agreement as an integral part thereof,</u> with the terms of the purchase and the purchase price of the Vessel being as determined pursuant to the Charterparty agreement including Rider Clause 6 and subject to the terms and conditions set forth in the Memorandum of Agreement"* (underlining added),

the Tribunal is satisfied that clause 22 operates as a restriction on assignment of rights under section 13 of the Upstream MOAs, as well as rights arising under the Downstream Charters themselves.

151.  The Tribunal adds, in conclusion on sub-issue (4), that it is difficult to envisage circumstances in which KN Maritime could reasonably withhold its consent to an assignment of the right to take delivery of the Vessel under the Upstream MOA in the circumstances envisaged in clause 17(2). The suggested prejudicial restriction in clause 22 of the Upstream Charters is probably more apparent than real, such that even if the term contended for by Hudson had been established, and clause 17(2) of the Downstream Charters had conferred prospective rights of assignment not subrogation, clause 22 of the Upstream Charters was probably not such as to disable Castleton from performing its obligations under clause 17(2), and there would have been no necessity for Castleton to procure the amendment to clause 22 of the Upstream Charters that Hudson has submitted was required.


**Sub-issue (5): If all the previous sub-issues are answered in favour of Hudson, is Hudson nonetheless estopped from complaining about the terms of clause 22 of the Upstream Charters such as to preclude reliance on the alleged condition precedent:**

> **(1) Was there a representation by Hudson that the terms of the Upstream Charters were satisfactory, and reliance thereon by Castleton such as to found an estoppel?**

**(2) Was there a representation by Hudson that notwithstanding any unfulfilled preconditions it regarded the Downstream Charters as effective, and reliance thereon by Castleton such as to found an estoppel?**

152. The Tribunal will deal with this sub-issue and its sub-sub-issues briefly, in view of the fact that it too is doubly hypothetical in light of the above decisions.

153. It is well established that the requirements for an estoppel by representation are as follows:

  (1) There must be a clear and unequivocal representation by the party alleged to be estopped;

  (2) The party to whom that representation is made must have relied on the representation. This requirement will not be satisfied if it can be shown that the other party's conduct was not influenced by the representation;

  (3) The representee must have altered his position so as to make it inequitable for the representor to go back on his representation.

  (see *Chitty on Contracts (32nd ed.), at paras. 4-090 – 4-096*)

154. On the hypotheses that, contrary to the Tribunal's decision on sub-issue (1), there was an express or implied condition precedent to the effectiveness of the Downstream Charters that the Upstream Charters had to be executed in such terms as to enable Castleton to perform its obligations under the Downstream Charters and attached Downstream MOAs, and that contrary to the Tribunal's decision on sub-sub-issue (4)(a) and its concluding comments on sub-issue (4), clause 17(2) conferred a (prospective) obligation to grant rights of assignment which clause 22 of the Upstream Charters would disable Castleton from performing, Castleton would be unable to establish a representation that, notwithstanding the foregoing, the terms of the Upstream Charters were satisfactory. It would therefore fail at the first hurdle with regard to that alleged representation.

155. With regard to the second alleged representation,  as Hudson submitted there was nothing in its conduct which would have conveyed any message to Castleton about unfulfilled preconditions of which Hudson was unaware. This estoppel allegation again

falls at the first hurdle. There was in any event no direct evidence of relevant reliance. The Tribunal is not prepared to accept Castleton's suggestions that it should be inferred that if Hudson had not acted in such a way as to indicate that it regarded the Downstream Charters as binding, for example by providing the Initial Bond Amounts called for under clause 13, Castleton would not have bothered to negotiate the draft Joint Order Escrow Agreements or provided Hudson with unredacted copies of the Upstream Agreements as it eventually did.

156. Accordingly had it become relevant, the Tribunal would have decided sub-issue (4) in Hudson's favour.

**Principal Issue 2: If the Downstream Charters are effective, is Hudson entitled to exercise a right of equitable set-off so as to provide it with a substantive defence to any of Castleton's claims?**

157. This second principal issue also gives rise to a number of sub-issues, as follows:

    (1) Are Hudson's claims, under the LOI and/or for damages for breach of an alleged express or implied term of the Downstream Charters that Castleton would not give an inaccurate notice under clause 18, capable in principle (and subject to sub-issue (2)) of giving rise to an equitable set off against Castleton's claims under and in connection with clause 13?

    (2) Does the Tribunal have jurisdiction to adjudicate upon Hudson's claim to set off its claims under the LOI against Castleton's clause 13 claims?

    (3) Was there an express or implied term that Castleton would not give an inaccurate notice under clause 18?

    (4) Is Hudson estopped by convention from contending that Castleton's notice on 15 May 2014 that the conditions precedent under clause 18 had all been satisfied was inaccurate (and therefore in breach of the alleged express or implied term)?

    (5) If sub-issues (1), (3) and (4) are all answered in favour of Hudson, what if any loss was suffered by Hudson by reason of Castleton's breach of the alleged express or implied term?

**Sub-Issue (1): Are Hudson's claims, under the LOI and/or for damages for breach of an alleged express or implied term of the Downstream Charters that Castleton would not give an inaccurate notice under clause 18, capable in principle (and subject to sub-issue (2)) of giving rise to an equitable set off against Castleton's claims under and in connection with clause 13?**

158.   Hudson contends that it is entitled to set off, against Castleton's claims under and in connection with clause 13 of the Downstream Charters:

   (1) Its claims under the LOI, currently the subject of the American Arbitration – which include a monetary claim for the return of the US$ 6.6 million LOI Commitment Amount released to Castleton under the Escrow Agreement on 16 May 2014 (also put as a claim for damages for breach of the LOI and for unjust enrichment);

   (2) Its counterclaim for damages in the sum of at least the US$ 6.6 million CP Purchase Price, for breach of the alleged express or implied term that Castleton would not give an inaccurate notice under Clause 18;

   these claims being advanced on the basis that but for the alleged breaches, the Payment Documents would not have been presented, or steps would have been taken to prevent the release of the Escrow Funds, such that Castleton would not have received the LOI Commitment Amount / the CP Purchase Price, the LOI would have terminated, and the Downstream Charters would not have become effective.

159.   As was common ground, where equitable set-off is properly invoked, it operates as a substantive defence, and it can apply not only where the main claim and cross-claim arise under the same contract, but also where they arise out of different contracts arising from the same transaction or business relationship between the parties. The most recent formulation of the connection between the main claim and the cross-claim necessary for equitable set-off is that of Rix LJ in *Geldof Metaalconstructie v Simon Carves Ltd* [2010] 1 C.L.C. 895 at para. 43. As he stated:

   (1) The main claim and the cross-claim must be so closely connected that it would be manifestly unjust to enforce the main claim without taking the cross-claim into account;

(2) This is not a two-stage test, but a test which comprises two elements, each with its own importance:

    i. The "close connection" requirement constitutes the "formal element" of the test, and is designed to *"ensure that the doctrine of equitable set-off is based on principle and not discretion"* (see para 43(v) of *Geldof*);

    ii. The "manifestly unjust" requirement constitutes the "functional" element of the test, and is designed to *"remind litigants and the courts that the ultimate rationality of the regime is equity"* (*ibid.*).

160.    Hudson submitted that there was a sufficiently close connection between Castleton's clause 13 claim and Hudson's claims, both under the LOI, which was the precursor to and part of the same overall transaction as the Downstream Charters, and under the Downstream Charters themselves, the logic of Hudson's claims being that the Downstream Charters ought never to have become effective; and that it would be manifestly unjust to allow Castleton to enforce its claim without taking Hudson's claims into account.

161.    It was also common ground that equitable set-off may operate as a defence not only in response to a claim for monetary relief, but also by way of defence to a claim for specific performance, where such claim is based on alleged non-payment of money: see *BICC Plc v Bundy Corporation* [1985] 1 Ch 232, and *Goode on Legal Problems of Credit and Security* 5th *ed.*, para.7-52. Accordingly, as Hudson submitted, the fact that Castleton's claim was in effect for specific performance of clause 13, but arising from Hudson's failure to establish and fund the Joint Order Escrow Account provided for therein, was not a bar to set-off.

162.    However, as Castleton emphasised, a set-off – whether equitable or legal – is a defence whereby debts or other money obligations owed by A to B are set-off (or netted) against obligations owed by B to A. As stated in Halsbury's Laws of England, Vol 11, para 410:

    *"The effect of equitable set-off is to produce a net balance in favour of one party or the other; and the original claims are subsumed into that net balance.*

> *Where equitable set-off is available the defendant relying on the set-off is not legally obliged to pay the claimant's claim in full, but only has a legal liability to pay the net balance (if any) in the claimant's favour.*"

163.     Castleton submitted that it is therefore a necessary condition of a set-off that there be mutuality or commensurability of obligations between the claim and the cross-claim, i.e. that the defendant's obligation must be to make a payment to (or for the benefit of) the claimant, and vice versa.

164.     Castleton submitted that that is not the case here:

    (1) The monetary claims advanced by Hudson, both under the LOI and for breach of the alleged express or implied term of the Downstream Charters, are for sums alleged to be payable to and for the benefit of Hudson;

    (2) In contrast, the security that Hudson is obliged to provide under clause 13 will be payable to HSBC (as the intended escrow agent), to be held for the benefit of both Castleton and Hudson, and (absent breach of the Downstream Agreements) will be returned to Hudson following full performance of Hudson's obligations. It will not belong to Castleton, nor will it be held by HSBC on trust for Castleton alone.

165.     Castleton relied on Lord Russell CJ's statement in *Palmer v Day [1895] QB 618* (a case in which it was held that auctioneers were entitled to set off, against the proceeds of sale of pictures that they were selling on behalf of the debtor owner's trustee in bankruptcy, sums due from the debtor by way of charges in respect of earlier transactions), at p.622, that "*The dealings must be such as will end on each side in a money claim. Otherwise the claims are incommensurable*", and therefore not capable of being set off (see also *Derham on the Law of Set-Off (4ᵗʰ ed.)*, at paras. 3.02 and 9.01). Castleton submitted that B cannot net a right to receive damages from A against an obligation to pay money to C as a stakeholder for A and B. Such obligations are not mutual or commensurate such as to be capable of giving rise to an equitable set-off.

166.    Hudson's response to this argument about lack of mutuality or commensurability was to emphasise that the security to be provided by it under clause 13 was for the exclusive benefit of Castleton. That is of course true in the sense that the whole purpose of clause 13 is to ensure that Castleton is at all times fully secured in respect of Hudson's obligations under the Downstream Charters, and the payment to HSBC as the intended escrow agent is the administrative mechanism designed to achieve this. The position was, so Hudson submitted, analogous to the situation where (as Castleton accepted) a trustee suing to enforce a debt owed to his beneficiary can be met by a plea to set off a debt owed by the beneficiary.

167.    Hudson also invoked the parties' agreement (as recorded in para. 22 of the agreed List of Principal Issues) that for the purposes of the Hearing

> "*it is to be assumed that [Hudson] will be successful in its claim in the American Arbitration.*"

Hudson relied on this agreement to found the submission that it was effectively being asked to provide security for a claim that could never succeed, because it was to be assumed that the LOI claims upon which one of its set-off pleas was based would succeed, so that Castleton would to that extent never be able to enforce prospective claims for which the Clause 13 security was intended.

168.    It was admitted by Castleton that it would not be able to obtain payment out from the Joint Order Escrow Account in respect of a debt owed by Hudson under a Downstream Charter without taking account of a set-off. Indeed, as Castleton accepted, if monetary cross-claims were successfully relied upon by way of set-off against a claim by Castleton for payment out from the Joint Order Escrow Account (the latest draft of which made clear that neither party could unilaterally withdraw funds), the award would be for the net sum owing to Castleton after taking account of the successful set-off.

169. Hudson also relied on *Palmer v Day,* and in particular, on a statement by Lord Russell CJ (at p. 623) to the effect that the deposit of the pictures with the auctioneers with authority to sell and receive the proceeds constituted the giving of credit to the

61

auctioneers. Hudson submitted that putting up security in the present case would be just such a giving of credit to Castleton, against which Hudson's claims could be set off. However the decision in *Palmer v Day* is a decision on the meaning of "*mutual credits*" and "*mutual dealings*" under section 38 of the Bankruptcy Act 1883, and as such is of little assistance on this point.

170. Castleton posed the following conundrum as an illustration of the lack of mutuality between Castleton's claim for the provision of security and Hudson's claims. Suppose Hudson was allowed to set off, against Castleton's claim that it is entitled to security in the sum of US$ 20 million, its damages claim for US$ 6.6 million, and that Hudson paid the balance into escrow. Then suppose also that by the end of this year the shipping market has improved, such that Hudson would have been entitled to the return of the entire US$ 20 million had that been paid. Has Hudson's set-off, against money that would if paid into escrow ultimately have been returned to Hudson, discharged Castleton's putative liability to pay damages of US$ 6.6 million (which Castleton submitted would be the logical consequence of Hudson's set-off argument)? Or if not, how does clause 13 operate in those circumstances? Hudson did not suggest an answer to this conundrum.

171. The Tribunal has concluded that Castleton is correct in its submission that there is no mutuality or commensurability between Castleton's clause 13 claim and Hudson's LOI claims or its claims for breach of the alleged express or implied term as to accuracy of clause 18 notices; and for that reason that Hudson's claims cannot be advanced by way of set-off. Castleton's claim is a claim for the provision of security, albeit in a broad sense for the benefit of Castleton, but to be held by the escrow agent as stakeholder on behalf of both Castleton and Hudson – not on trust for Castleton alone (in which event, as Castleton accepted, there would be sufficient mutuality and commensurability). The obligation to provide security to be paid into a Joint Order Escrow Account is not commensurable with the putative obligation to pay damages or other monetary relief.

172. The Tribunal does not consider that the parties' agreement that it is to be assumed for present purposes that the American Claim will succeed means that the Tribunal is in effect being asked to assume that Hudson currently has an award for the sum claimed therein. So the question of what would be the position if Hudson currently had such an award which could be set off against a claim for payment out from the Joint Order

Escrow Account to be established by the parties does not arise. But in any event, the issue at present is not whether sums should be paid out from the Joint Order Escrow Account, but whether Hudson should be required to pay sums into such an account, to be held by HSBC (or some other financial institution) as stakeholder, on behalf of both Castleton and Hudson, as security for performance of Hudson's obligations under the Downstream Charters but subject to potential payment out to Hudson of "*Return Amount[s]*" in accordance with the provisions of Clause 13 and/or following full performance of Hudson's obligations.   Castleton is entitled to such security, which will not be "lost" to Hudson as Hudson submitted, but which may be returned, in part or in full, to Hudson, and will not be paid out to Castleton to the extent that claims by Hudson give rise to a valid set-off.

173. For completeness the Tribunal records that Castleton also took the point that because it is (allegedly) currently entitled to security in the sum of over US$ 20 million, and as Hudson's monetary claim in the American Arbitration, albeit put in a number of different ways,  was in essence for the return of the US$ 6.6 million LOI Commitment Amount (as indeed appears to be the case), the alleged set-off would not be good as against the claim for the Initial Cash Amount to be paid.   There is some force in this point, but the fact that Castleton is not currently seeking an order for provision of security in any specific sum other than the total Initial Cash Amounts of US$ 6 million (see the Remedies section below) poses a potential difficulty with this submission that, in view of the Tribunal's decision on sub-issue (1), the Tribunal does not have to resolve.

174. Because we have decided this first sub-issue in favour of Castleton, the other sub-issues under Principal Issue 2 do not strictly arise for decision. However, as they have all been fully argued, we shall express our opinion on them, again in some instances more briefly than others.

**Sub-issue (2): Does the Tribunal have jurisdiction to adjudicate upon Hudson's claim to set off its claims under the LOI against Castleton's Clause 13 claims?**

175.     It was common ground that the mere fact that Hudson's claims under the LOI are subject to arbitration in the USA would not have had the consequence that the

Tribunal had no jurisdiction to adjudicate upon Hudson's reliance on such claims by way of equitable set-off in this arbitration. The position is accurately stated in *Derham (op.cit.),* at para 4.62:

> *"a defendant will not be precluded from raising a cross-claim as a defence by way of equitable set-off merely because the parties had agreed that the cross-claim should be the subject of arbitration, or that it should be determined by the courts of a foreign jurisdiction".*

The leading authority supporting that proposition is *Aectra Refining and Marketing Inc v Exmar NV [1994] 1 WLR 1634* – see Hoffmann LJ at pp. 1649-50 (although, on the facts, it was held that no transaction set-off was available); see also *Ronly Holdings Ltd v JSC Zestafoni G Nikoladze Ferroally Plant [2004] 1 CLC 1168* at para. 33(i), and *Goode (op. cit.),* at para. 7-47.

176. However, Castleton submitted that the parties had by their conduct, in the case of Hudson in submitting to the AAA a Demand For Arbitration under the LOI, and in the case of Castleton in filing a Response to that Arbitration Demand, effectively agreed to exclude the Tribunal's jurisdiction to adjudicate upon Hudson's plea of equitable set-off in respect of its claims under the LOI, thereby varying the arbitration agreement in the Downstream Charters.

177. The Tribunal has no hesitation in rejecting that argument. Submission by Hudson of a Demand for Arbitration in accordance with the arbitration agreement in the LOI, and the filing by Castleton of a Response to that Arbitration Demand so as to enable it to defend Hudson's claims under the LOI, cannot possibly be construed respectively as a offer by Hudson to exclude this Tribunal's jurisdiction to adjudicate upon Hudson's equitable set-off plea, and an acceptance by Castleton of that offer. No other facts were relied upon as giving rise to the alleged agreement to circumscribe this Tribunal's jurisdiction.

178. In short, whereas Hudson has submitted its claims under the LOI to AAA arbitration, it has not submitted the question of whether it is entitled, in the present arbitration, to rely on those claims by way of equitable set-off against Castleton's claims.

179. The happy consequence of this conclusion is that the Tribunal does have jurisdiction to decide whether in principle Hudson's claims under the LOI are capable of giving rise to an equitable set-off. In view, however, of the Tribunal's decision that they are not so capable, the Tribunal does not have to consider the question of when and how it would have been appropriate to adjudicate upon the merits of the LOI claims for the purposes of the set-off plea, bearing in mind that for the purposes of the Hearing it is to be assumed that Hudson would be successful in its claim in the American Arbitration, that that ongoing arbitration will presumably also decide the merits of those claims, and the possibility that a determination of the merits for the purposes of the set-off plea could potentially give rise to an issue estoppel (see *Russell on Arbitration*, para 6-017, and in particular footnote 77).

**Sub-issue (3): Was there an express or implied term that Castleton would not give an inaccurate notice under clause 18?**

180. The final paragraph of clause 18 of the Downstream Charters provides:

> *"Owners agree to provide prompt notice to Charterers upon the satisfaction of each of the conditions precedent listed above, or waiver by Owners in Owners sole and absolute discretion of any or all of such conditions precedent."*

181. As Hudson submitted, the underlying rationale of this provision was clearly to ensure that Hudson was made aware of when the Downstream Charters became legally effective and thus when it came under an obligation to perform the Downstream Charters.

182. Hudson's case was that, either on the true construction of this provision, or pursuant to a term to be implied therein, Castleton was also under an obligation not to give notice that any of the conditions precedent listed in clause 18 had been satisfied, unless and until the relevant conditions precedent had, in fact, been satisfied. Hudson submitted that:

(1) Any reasonable person in the shoes of the parties at the time they concluded the Downstream Charters would have understood that "*notice*" that the conditions precedent had been satisfied meant proper notice, being a notice that reflected the reality of the conditions precedent having, in fact, been satisfied; and therefore

that the term for which Hudson contended arose on the true construction of Rider clause 18;

(2) Alternatively, there was no difficulty in implying a term to like effect, because:

    i. First, the term is necessary to give the Downstream Charters business efficacy in circumstances where, without it, those contracts would lack commercial or practical coherence (for Castleton would be at liberty to tell Hudson that the conditions precedent listed in clause 18 had been satisfied – leading Hudson to consider that the Downstream Charters were effective and therefore imposed legal obligations upon it – even if this was not in fact the case);

    ii. Second, if one were to ask the reasonable observer in the parties' shoes at the time of their contracting whether Castleton should be permitted to give notice that the conditions precedent had been satisfied when, in fact, they had not been, the answer to that question could only properly be *"of course not!"*.  The implied term therefore arises as a matter of obvious inference.

183.    Castleton's response was that no such term was either necessary or obvious, because:

    (b)    It was under a common law obligation in deceit not to give an erroneous notice deliberately; and

    (c)    There was no sensible commercial purpose in implying a warranty that the notice of satisfaction of conditions precedent be free of innocent mistakes.

184.    Further to Castleton's second point above, it contended that:

    (1) The purpose of the obligation to give notice in clause 18 was not to inform Hudson of the fact that the Upstream Documents have been executed, but rather so that Hudson knew when the Downstream Charters were legally effective.

(2) A factually inaccurate notice was sufficient and satisfactory for that purpose because, in the event that Castleton give an erroneous notice of satisfaction of the pre-conditions, it would be taken to have impliedly waived any pre-conditions which have not in fact been satisfied – Castleton having a right under clause 18 of "*waiver by Owners in Owners sole and absolute discretion of any or all of such conditions precedent*".

185.   The Tribunal has concluded that Hudson's arguments on this sub-issue in support of the alleged implied term are correct, and that Castleton's should rejected. It is clearly implicit in clause 18 that notice of satisfaction of conditions precedent, necessary to enable Hudson to know when the Downstream Charters became effective, should be not only prompt but also accurate: the implied term contended for by Hudson satisfies the test of obvious inference.

186.   The Tribunal can see no proper basis for treating an inaccurate notice as amounting to an implied waiver of any condition precedent, even if, as the language suggests, it was open to Castleton to waive the conditions precedent regarding the execution of the Upstream Agreements. The Tribunal does not, however, find it necessary to decide the issue as to whether those conditions precedent could be waived by Castleton such that they did not have to be satisfied, notwithstanding the obvious interest of Hudson in execution of the Upstream Agreements.

187.   Accordingly, the Tribunal has concluded (subject to sub-issue (4)) that Castleton's notice of 15 May 2014 was given in breach of that implied term.

**Sub-issue (4): Is Hudson estopped by convention from contending that Castleton's notice on 15 May 2014 that the conditions precedent had all been satisfied was inaccurate (and therefore in breach of the alleged express or implied term)?**

188.   Castleton's case that Hudson was estopped by convention from relying upon the inaccuracy of Castleton's notice on 15 May 2014 that the conditions precedent had all been satisfied did not feature in its pleadings or skeleton argument. It was introduced in the course of the hearing, without objection from Hudson.

189.    The argument was founded on the exchange of emails between Mr Denholm and Mr Malkin on 6 May 2014, which is set out above but repeated here for convenience.

> Mr Denholm to Mr Malkin:
>
> "*While we wait for the Japanese holidays to end, I have been thinking a little. I know we have to certify to the escrow agent that we have executed Japanese agreements that are in force and effect. Technically we have an executed deal since we have the recap from them and this under English law is as good as a signature. Not sure if we can proceed on this basis or wait?*"
>
> Mr Malkin to Mr Denholm in reply:
>
> "*I understand and technically agree, but I would prefer to wait until we actually have signed documents in hand, which will make our board much more comfortable.*"

190.    Castleton relied upon this exchange as having the effect that thenceforth the parties were proceeding on the conventional basis that "*executed*" meant "*binding and effective*" – which the Upstream Charters were (as Mr Denholm correctly asserted) following final agreement on all their terms on 12 April 2014 and upon KN Maritime lifting all "*subjects*" on 28 April 2014. As to reliance, Castleton contended that if, instead of replying, "*I understand and technically agree*", Mr Malkin had responding by stating that "*execution*" required signature by both parties, Mr Denholm would have signed the Downstream Agreements immediately he received signed copies from KN Maritime. Although he gave no evidence to that effect, this was, so Castleton submitted, a matter of obvious inference.

191.    Hudson contended that there was no basis for the alleged estoppel, there having been no such convention and in any event there being no basis for a finding of reliance. Attention was drawn to Mr Denholm's response, "*Understood, Reverting soonest*", to Mr Malkin's reply.

192.    The Tribunal agrees that there is no basis for the alleged estoppel by convention. Mr Malkin's expressed wish to wait until signed documents were in hand is inconsistent with the parties proceeding on the basis that execution was unnecessary. There may, as Mr Denholm pointed out, have been an "executed deal",

but there was no agreement in this exchange to dispense with the requirement for the documents memorialising that deal to be executed by signature of the parties, a position which Mr Denholm "understood". In any event, there was no evidence (and no obvious inference) of reliance. Accordingly, Hudson succeeds on this sub-issue.

**Sub-issue (5): If sub-issues (1), (3) and (4) are all answered in favour of Hudson, what if any loss was suffered by Hudson by reason of Castleton's breach of the alleged express or implied term?**

193.     Hudson has succeeded on sub-issues (2) – (4), but has failed on the crucial sub-issue (1). So as with sub-issues (2) – (4), the Tribunal's decision on sub-issue (5) is moot. However, as the point was fully argued, and because Hudson's set-off plea in respect of Castleton's breach of the implied term as to accuracy of Clause 18 notices could not (even if Hudson had prevailed on sub-issue (1)) succeed without proof that it had suffered monetary loss as a result of that breach, the Tribunal will deal with the point in some detail.

194.     Hudson's case was that if Castleton had not given an inaccurate notice on 15 May 2014 that the conditions precedent had all been satisfied, the Payment Documents would not have been presented under the Escrow Agreement, the CP Purchase Price would not have been paid, the LOI would have expired, and the Downstream Charters would never have become effective.

195.     In support of its submission that the Payment Documents would not have been presented, Hudson relied upon the evidence of both Mr Malkin and Mr Denholm that both parties had been proceeding on the (mistaken) basis that:

> *"only upon conclusion of both Upstream and Downstream Documents would the LOI Commitment Amount be released from the Joint Escrow Account to [Castleton]"* (para. 22.4 of Mr Malkin's statement, with which Mr Denholm agreed).

Consistently with this, in his email to Mr Malkin of 6 May 2014, Mr Denholm stated:

> *"I know we have to certify to the escrow agent that we have executed Japanese agreements that are in force and effect."*

196.     As the chronological account set out above makes clear, whereas it was on 15 May 2014 that Castleton (1) notified Hudson (incorrectly) that all the conditions precedent had been satisfied, (2) emailed copies of the Payment Documents to Citibank (with a copy to Hudson), and (3) despatched hard copies of the Payment Documents to Citibank by overnight courier (the precise sequence of these three events does not matter), it was not until the following day, 16 May 2014, that Citibank received the Payment Documents and promptly released the CP Purchase Price to Castleton. The Stamford versions of the Upstream Agreements (the only ones signed by both parties thereto) were executed by Castleton and by KN Maritime on 19 and 29 May 2014 respectively.

197.     Hudson relied on Mr Malkin's statement evidence (para 86) that:

> *"As set out in Hudson's claim in the US Arbitration, if Hudson had known that [Castleton] had not met its obligation on 15 May to have in hand fully executed forms of Upstream Documents, Hudson could have, at least, notified the Escrow Agent or taken other steps (i.e. by way of injunctive relief) to prevent the release of the escrow funds to [Castleton]. In those circumstances, by the LOI's own terms, the US$ 6.6 million escrow would then have been returned to Hudson the next day and the LOI would have been terminated. That is not to say, of course, that in those circumstances Hudson might not have sought to continue discussions with [Castleton] in relation to the newbuilds. But in circumstances where [Castleton] had failed so far to deliver to us their side of the bargain, all aspects if the deal would have been open for renegotiation."*

198.     Hudson also drew attention to Mr Malkin's evidence, in the course of cross-examination, that when on 9 May 2014 he granted the last extension to the Funds Return Date and the LOI Termination Date, to 16 May 2014, he had done so without his President's approval, that his President had not been happy with him for acting without such approval, and that he could not say whether his President would have approved a further extension. However, he gave this evidence in the context of the following series of questions and answers, which it is appropriate to set out in full:

> *"Q. [Mr Kenny QC] Can I ask you -- moving on to a different topic -- to look at D1, page 271 and 272? Now, these are documents in which you are extending the drop dead date on the letter of intent and also on the escrow agreement; yes?*
> *A. That's correct.*
> *Q. I think this is the fourth or fifth time you had extended it, isn't it?*
> *A. I recall that it was the last time.*
> *Q. You had done it a number of times previously, hadn't you?*

*A. Yes.*

*Q. At the time that you made this extension on 9 May or gave this extension on 9 May, you thought of these charters as an advantageous deal?*
*A. Absolutely.*
*Q. And you had put a lot of work into it, hadn't you?*
*A. Yes.*
*Q. And you were very keen to see it completed?*
*A. Yes.*
*Q. And nothing had changed, had it, between 9 May and 15 May to change any of those views?*
*A. No.*
*Q. So if Mr Denholm had asked you for another day's extension or another week's extension, you would have granted it, wouldn't you?*
*A. I can't -- that's hypothetical -- the facts were they didn't ask for another extension and no other extension was granted.*
*THE CHAIRMAN: Well, I think counsel is entitled to put what you rightly say is a hypothetical question.*
*A. Okay, if I may, I will give you some further clarity. When I gave this extension, my president was out of town  and I gave this extension without his approval and without talking to anybody and under my own  recognisance, so I can't guarantee that I would have  been able to give another extension because he was not happy with me that I gave an extension without his  approval, whether he would have given it or not. So I can't say yes or no.*
*MR KENNY: It's sufficient for my purposes that I have put  the speculation to him and the witness is reluctant to speculate.*
*SIR GORDON LANGLEY: Mr Malkin, may I ask you this: Hudson still wanted the ships at this time?*
*A. Yes.*
*SIR GORDON LANGLEY: Very much so?*
*A. We did, I just can't speculate that I would have --*
*SIR GORDON LANGLEY: No, I quite follow that.*
*A. Yes, we wanted the ships, I had trust in them and I ...*
*THE CHAIRMAN: So assuming your president is back in town by*
*    the 15th, let's say --*
*A. Yes.*
*THE CHAIRMAN:  -- what would your recommendation have been, if Castleton had come to you and said "Can we have a seven-day extension"?*
*A. I can't say but I probably would have said: they have been honest the whole time, let's give them, they say that they are really close, getting the deal done,*
*    I know at the time they were waiting on executed charterparties, they said -- I mean, the story was they were so close to getting the executed documents, give*
*    them a couple more days.  That's what I would have said."*

199.     In response, Castleton submitted that the inaccurate notice caused Hudson no loss: Castleton had done everything necessary to draw down the CP Purchase Price, as it was entitled to in accordance with the terms of the Escrow Agreement; the Downstream Charters would have become effective in any event when the Upstream Charters were executed; and it was irrelevant that the LOI drop dead date was on 16

May 2014 because there were already binding Upstream Agreements in place. In response to Hudson's reliance on Mr Malkin's evidence that had Hudson known that Castleton's 15 May 2014 notice was inaccurate, it could have taken steps to prevent payment out under the Escrow Agreement, Castleton submitted that if no inaccurate notice had been served, Hudson would not have known that the Upstream Agreements had not been executed. Castleton also submitted, based upon the above series of questions and answers, that Hudson would if necessary have granted further extensions to the Funds Return Date and the LOI Termination Date; and that in any event, even if the Escrow Funds had not been drawn down, Hudson would still have been liable to pay the CP Purchase Price pursuant to clause 12.

200.    Castleton further submitted that Hudson was relying upon the wrong counterfactual in seeking to establish loss arising from Castleton's breach of the correct notice implied term, and that the correct counterfactual was the position that would have obtained if Castleton had not previously failed to use its "*best efforts to expeditiously cause the full execution of the ... [Upstream] Documents by 9 May 2014*" (as required by clause 18). On that counterfactual Castleton would have signed the Singapore versions as soon as they arrived from Japan (in the case of the Upstream Charters, on 9 May 2014, and in the case of the Upstream MOAs, on 13 May 2014), in which event the notice served on 15 May 2014 would have been accurate.

201.    The Tribunal has no hesitation in rejecting this counterfactual argument of Castleton, which involved the illogical proposition that damages for Hudson's breach of the correct notice implied term should be assessed on the basis that no such breach would have occurred. The case relied on by Castleton in this connection, *QOGT Inc. v. International Oil & Gas Technology Ltd. [2014] EWHC 1628 (Comm)*, on analysis affords no support for this argument.

202.    However, the Tribunal has concluded that Castleton's inaccurate notice did not cause Hudson any loss, for two separate reasons. First (and contrary to Mr Denholm's understanding, at least when he sent his email of 5 May 2014), execution of the Upstream Agreements was not a precondition of drawdown under the Escrow Agreement. Castleton was entitled to draw down the LOI Commitment Amount / CP

Purchase Price against presentation of certified true copies of the executed Downstream Agreements, as it did. The inaccurate notice was not a cause of the drawdown. Both Mr Denholm, who believed he had an "executed deal" with KN Maritime, and Mr Duclaux, who reviewed the Payment Documents attached to Castleton's drawdown letter, believed Castleton was entitled to make the drawdown, as indeed it was. What is more, although the Escrow Agreement is governed by New York law, and notwithstanding Mr Malkin's evidence that had Hudson known the Upstream Agreements had not been executed, steps might have been taken to prevent the release of the Escrow Fund, no basis has been suggested upon which Citibank could legitimately have refused to pay, or been restrained from paying, against the Payment Documents.

203.     Secondly, the Tribunal is satisfied that if (contrary to the foregoing) Castleton had been proceeding on the basis that it would not draw down on the Escrow Fund unless and until the Stamford versions of the Upstream Agreements had been executed by both parties thereto, it would have sought appropriate extensions to the Funds Return Date and the LOI Termination Date to allow time for such execution to take place. On the basis of Mr Malkin's evidence in the long passage set out above, and in the absence of any evidence of a change in circumstances that might have affected Hudson's keenness to complete the transaction on the terms already agreed, the Tribunal is satisfied that such extensions would in all probability have been granted by Hudson. In the improbable event that they would have been refused, the Tribunal is satisfied that Castleton would then have proceeded to drawdown the Escrow Fund in any event, before the expiry of the Funds Return Date.

204.     Accordingly Castleton succeeds on sub-issue (5). The Tribunal does not find it necessary to decide what the position would have been – e.g. whether Castleton would have been entitled to claim the CP Purchase Price directly from Hudson under Clause 12  - if Castleton had for any reason not been able to draw down under the Escrow Agreement.

**Remedies**

205.       In view of the Tribunal's conclusion that the Downstream Charters became effective upon execution of the Stamford versions of the Upstream Charters by KN Maritime on 29 May 2016 so as to satisfy conditions precedent 1 and 2 under Clause 18 (and following satisfaction of condition precedent 3 thereunder upon receipt by Hudson on 15/16 May 2014 of CCI's parent company guarantees in the prescribed form, dated 9 May 2014, and of the condition precedent in Clause 12 upon release of the Escrow Funds to Castleton on 16 May 2014 in payment of the CP Purchase Price), Castleton is entitled, as it has claimed, to a Declaration that both Downstream Charters are and have since 29 May 2014 been fully effective.

206.       Castleton has also sought an order that Hudson execute the (draft) Joint Order Escrow Agreement with HSBC (or if necessary a fresh Joint Order Escrow Agreement), and pay into the Joint Order Escrow Account thereby established the Initial Cash Amount of US$ 3 million per Vessel, and such other amounts as are due by way of security in accordance with the provisions of clause 13. Castleton contends that, based on its latest quarterly calculation (to 31 March 2016), the total sum now due by way of security for Hudson's obligations under both Downstream Charters, calculated in accordance with Clause 13, is US$ 20,710,243 (as particularised in a calculation sent to Hudson on 1 April 2016), but Hudson's position at the hearing was that it was not in a position to admit that the sum payable was precisely that amount, and so Castleton has restricted its present monetary claim as indicated above.

207.       Castleton has further sought declarations:

(1) That Hudson's failure to pay the Initial Cash Amount and the outstanding "Delivery Amounts" as per Clause 13 of the Downstream Charters constitute a breach of the Downstream Charters; and

(2) That that breach is repudiatory; or alternatively

(3) That Hudson would be in repudiatory breach if it failed timeously to honour an award of this Tribunal ordering it to pay those sums into escrow, or alternatively;

(4) That Castleton is now entitled to make time of essence for doing so and that, if it does so, a reasonable time for paying those sums is the time within which this Tribunal orders those payments to be made.

208.     Castleton has contended that Hudson's failure to provide security in accordance with Clause 13 amounts to a repudiatory breach of each of the Downstream Charters, because that failure goes to the root of each Contract, depriving Castleton of substantially the whole benefit of what it contracted for, namely a transaction performance of which by Hudson was secured by the "mark to market" Charterers' Performance Guarantee provisions of Clause 13. Castleton submitted that there was a fundamental difference between a secured transaction and an unsecured transaction.

209.     Hudson did not dispute that, if Castleton succeeded on both Principal Issues, Hudson was obliged to fund the Initial Cash Amount pursuant to Clause 13, and its failure to fund the Initial Cash Amount at the proper time, and any other amounts due under Clause 13, would amount to a breach of Clause 13.

210.     However, Hudson denied that any such breach was or would be repudiatory. It contended that the Charterers' Performance Guarantee was "*merely a collateral obligation which provides a degree of comfort to Castleton around performance of Hudson's more fundamental obligations (i.e. the obligation to pay hire and to purchase the Vessels at the end of the charter term, if not before*", those fundamental obligations remaining fully effective (Hudson's skeleton argument, para 82(1)). Hudson also pointed out that it had already provided security in the amount of US $1.25 million per Vessel in the form of the Initial Performance Bonds called for under Clause 13.

211.     Hudson also resisted Castleton's claims for the alternative relief indicated above.

212.     Rather than making an order requiring Hudson to execute a Joint Order Escrow Agreement in any particular form or with any particular financial institution, the Tribunal considers that it should be sufficient if it declares that Hudson is obliged

forthwith to co-operate with Castleton in establishing a Joint Order Escrow Agreement, and thereupon to pay into the Joint Order Escrow Account to be opened pursuant thereto the Initial Cash Amount of US$ 3 million per Vessel, and such other amounts as are presently due by way of security in accordance with the provisions of Clause 13. (However, for the sake of completeness, if any issues arise as to the establishment of the account or the provision for security, the Tribunal will deal with them, and expressly reserves jurisdiction to do so.)

213.    The Tribunal agrees with Castleton that Hudson's failure to provide security in accordance with Clause 13 is indeed a repudiatory breach of each of the Downstream Charters. There is, as Castleton submitted, a fundamental difference between a secured transaction and an unsecured transaction, and the fact that the presently almost entirely unsecured obligations of Hudson remain fully effective (the Initial Bond Amounts providing only very limited security) is no answer to the absence of (adequate) security for what were contracted to be obligations fully secured on a "mark to market" basis. Hudson's failure to provide that full security required by Clause 13 goes to the root of each Contract, depriving Castleton of substantially the whole benefit of what it contracted for.

214.    Accordingly, Castleton is entitled to a declaration to that effect. The issue of what if any alternative relief might have been appropriate does not arise.

**Costs**

215.    Both parties were in agreement that if either party was successful on both Principal Issues 1 and 2 (and irrespective of the fact that the other party may have succeeded on certain of the sub-issues), then the successful party should be awarded its costs of the arbitration (which would include sums paid in respect of the Tribunal's fees and expenses), to be assessed if not agreed.

216.    In the event, Castleton has been successful on both Principal Issues 1 and 2, and is therefore entitled to its costs of the arbitration to date, to be assessed if not agreed.

Dispositive Award

217.     ACCORDINGLY, AND FOR THE REASONS SET OUT ABOVE, IT IS HEREBY DECLARED, AWARDED AND DIRECTED AS FOLLOWS:

(1) Both Downstream Charters are and have since 29 May 2014 been fully effective;

(2) Hudson is obliged forthwith to co-operate with Castleton in establishing a Joint Order Escrow Agreement, and thereupon to pay into the Joint Order Escrow Account to be opened pursuant thereto the Initial Cash Amount of US$ 3 million per Vessel, and such other amounts as are presently due by way of security in accordance with the provisions of additional Clause 13 of the Downstream Charters;

(3) Hudson has been and remains in repudiatory breach of both Downstream Charters by reason of its failure to provide security in accordance with Clause 13;

(4) Hudson shall bear and pay its own costs of this arbitration, and the fees and expenses of the Tribunal, to the date of issue of this Award, and shall pay Castleton's costs of this arbitration to date (to be assessed if not agreed), and forthwith reimburse Castleton for such of the fees and expenses of the Tribunal as may have been paid by Castleton.

218.    This award is final as to all matters decided herein, but the Tribunal reserves its jurisdiction to decide all and any other issues arising out of the disputes the subject of the present arbitration (including any issues as to the terms of the Joint Order Escrow Agreement to be established pursuant to clause 13 or as to the quantum of security to be provided under clause 13), and to assess the costs of this arbitration to date recoverable by Castleton, and to issue a further award or awards in respect thereof.


DATED IN LONDON, THE SEAT OF THIS ARBITRATION, 10 MAY 2016


*David Owen*
...................................................................

**DAVID OWEN QC**


...................................................................

**SIR GORDON LANGLEY**


...................................................................

**RICHARD SIBERRY QC**