UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CASTLETON COMMODITIES SHIPPING CO. PTE LTD. | CIVIL ACTION |
| V. | NO. 16-6619 |
| HSL SHIPPING & LOGISTICS NA, INC., ET AL. | SECTION "L" (3) |

ORDER & REASONS

Before the Court is Defendant HSL Shipping & Logistics Na, Inc.'s ("HSL") Motion to Vacate and Dismiss for Lack of Subject Matter Jurisdiction. R. Doc. 16. The Court has reviewed the briefs and the applicable law, as well as the arguments articulated by counsel at oral argument. The Court now issues this Order & Reasons.

I.  BACKGROUND

This case arises out of two contracts which the plaintiff claims are for two bareboat charterparties (the "Charters"). On or about April 11, 2014, Castleton Commodities Shipping Co. PTE LTD. ("Castleton") and HSL contracted for Castleton to charter two "newbuild bulk carriers" to HSL Shipping for three-to-seven years. R. Docs 2, 3. Under the terms of the contracts, HSL was required to purchase the vessels at the end of the charter with the charter payments to be credited to the sale price. According to the Castleton Complaint, the ships to be chartered were nearing construction at a shipyard in Japan at the time of filing, and Castleton has served notice to HSL Shipping that Castleton intends to deliver the ships as provided for in the Charters. R. Doc. 1 at 3.

Due to HSL Shipping's failure to pay a security for the Charters into an escrow account, Castleton commenced arbitration before the London Maritime Arbitration Association ("LMAA"). R. Doc. 4. Both Castleton and HSL Shipping submitted briefs and presented

witnesses before the LMAA, and on May 10, 2016, the LMAA issued a Partial Finding Award in Castleton's favor and ordered HSL Shipping "to co-operate with Castleton in establishing a Joint Order Escrow Agreement, and thereupon pay into the Joint Order Escrow Account to be opened pursuant thereto the Initial Cash Amount of US $3 million per Vessel, and such other amounts as are presently due by way of security . . . ." R. Doc. 5. According to Castleton, HSL refused to comply with the LMAA's order. R. Doc. 1 at 4. Castleton consequently terminated the Charters based on HSL's purported repudiatory breaches of its obligations under the Charters. R. Doc. 1 at 4. Castleton estimates its damages from the breach total $8,040,155 as to the principal amount and $12,060,232 in total after adding interest, costs, and attorneys' fees. R. Doc. 1 at 4–5.

On May 19, 2016, Castleton filed a Complaint against HSL Shipping in the Eastern District of Louisiana. Asserting admiralty jurisdiction and citing Rule B of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, Castleton sought the seizure of HSL property: to wit, bunker fuel aboard the M/V SILVER NAVIGATOR, which at that time was located at United Bulk Terminal, 14537 Highway 15, Davant, Louisiana, Mile 650 AHP, and therefore within the jurisdiction of the Court. R. Doc 2. Castleton also sought to garnish funds, chattels, property, and other goods belonging to HSL in the possession of the M/V SILVER NAVIGATOR. R. Doc. 3. The Court reviewed the motions and was satisfied that the premises for attachment and garnishment appeared to exist on the facts as pled by Castleton. The Court granted the motions. R. Docs. 6, 7.

On May 25, 2016, Castleton filed an Amended Complaint. R. Doc. 16. In the Amended Complaint, Castleton asserted alter-ego liability as to a new defendant, Hudson Shipping Lines, Inc. Liberia ("HSL Liberia"). According to Castleton, HSL Liberia is a shell corporation through which HSL "has commenced its business of chartering vessels, purchasing bunkers and

shipping cargo as a means to shield it from liabilities of creditors such as Plaintiff." R. Doc. 11 at 9.

## II.     PRESENT MOTION

On June 2, 2016, HSL filed a Motion to Vacate, R. Doc. 16, as well as a Motion to Expedite the Motion to Vacate.  R. Doc. 18.  The Court denied the Motion to Expedite on the grounds that the parties had already issued an agreed-to Letter of Undertaking and the seized property was released.  R. Doc. 21.  The Court's Order set submission and oral argument for June 22, 2016.  R. Doc. 21.

After hearing oral argument on the present Motion to Vacate, the Court issued an Order instructing the parties to conduct limited jurisdictional discovery for the purposes of evaluating the maritime nature of the contracts giving rise to the suit.  R. 39.  The parties were instructed to file the jurisdictional discovery with the Court on or before August 1, 2016.  R. 43.  The jurisdictional discovery was timely filed.  R. 45.

### A. HSL's Motion to Vacate

HSL moves to vacate the writs of attachment and garnishment on the grounds that the Court lacks admiralty jurisdiction over Castleton's claims.  R. Doc. 16-1.  In essence, HSL argues that the contracts which were the basis for Castelton's attachments were non-maritime in nature.  HSL begins by discussing the limits of admiralty jurisdiction over contracts.  HSL emphasizes that maritime contracts are linked to the operation of a vessel, rather than the mere existence of a vessel.  R. Doc. 16-1 at 4.  HSL then cites Fifth Circuit precedent, and claims that "vessels under construction give rise to neither a maritime contract nor a maritime tort." *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 301 (5th Cir. 2008) (citing *Caruso v. Sterling Yacht & Shipbuilders, Inc.*, 828 F.2d 14, 15–16 (11th Cir. 1987).

HSL avers that this case is controlled by the Court's recent decision in *D & S Marine Transportation, LLV v. S & K Marine*, Civ. A. No. 14-2048, 2015 WL 419800, at *3 (E.D. La. Jan. 30, 2015). According to HSL, *D & S* stands for the proposition that a contract dispute that arises from an uncompleted vessel cannot be brought pursuant to maritime law. R. Doc. 16-1 at 6. HSL then refers to Castleton's Amended Complaint, which states that the Charters at issue are for vessels "nearing finalized construction," and therefore are uncompleted vessels R. Doc. 11 at 3. With this in mind, HSL alleges that the Charters do not give rise to admiralty jurisdiction, and consequently Castleton's claim should be dismissed. R. Doc. 16-1 at 6–7. HSL also asserts that the writs of attachment issued pursuant to Admiralty Rule B should be vacated on the grounds that the Supplemental Rules for Certain Admiralty and Maritime Claims are only available to those parties with claims arising under the maritime law. R. Doc. 16-1 at 7–9.

### B.  Castleton's Opposition

Castleton timely responds. R. Doc. 30. Castleton provides three arguments in support of its position that both of the Charters are maritime contracts: (1) HSL's primary obligation under the Charters is to lease the Vessels for a three-to-seven year charter; (2) the Court has the discretion to sever any non-maritime portions of the Charters and retain admiralty jurisdiction; and (3) the vessels were launched prior to the filing of the instant suit, which is dispositive on the issue of admiralty jurisdiction over a maritime contract.

Castleton begins by applying the law of charters to the facts of this case. R. Doc. 30 at 6–7. Castleton classifies the instant Charters as "bareboat charters," because the Charters contemplated the charterer operating the ship and being considered the owner of the ship *pro hac vice*. R. Doc. 30 at 6–7 (citing *Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd.*, 722 F.2d 126, 130 (5th Cir. 1983)). Castleton then cites case law which stands for the general proposition

4

that charter parties are maritime contracts.  R. Doc. 30 at 7 (citing *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986)).  With this in mind, Castleton points to the Fifth Circuit's decision in *St. Paul Fire & Marine Insurance Co. v. Board of Commissioners*, 418 Fed. Appx. 305, 307–08 (5th Cir. 2011), and argues that the Court "should focus its inquiry on whether maritime commerce is the principal objective of the contract."  Castleton characterizes the primary focus of the Charters to be "the worldwide employment of the Vessels over a three-to-seven year period in exchange for the payment of daily hire," and avers that this object of the contract is maritime in nature.

In the alternative, Castleton asks the Court to sever consideration of the maritime portions of the Charter Parties from the non-maritime portions.  Castleton anticipates that HSL will argue that the Charters are "mixed" contracts which contain both maritime and non-maritime elements.  Castleton concedes that the obligation to purchase the vessels after the initial charter period may be construed as non-maritime.  R. Doc. 30 at 8.  Nevertheless, Castleton argues that "mixed" contracts still fall within the Court's admiralty jurisdiction if "the maritime elements of a contract are susceptible to separate adjudication . . . ."  *Neilson, Inc. v. Tug Peggy*, 428 F.d at 54, 60 (5th Cir. 1970), *cert. denied*, 401 U.S. 955, 973 (1971).  Castleton also notes that "merely incidental" non-maritime elements of a maritime contract cannot defeat admiralty jurisdiction.  R. Doc. 30 at 8 (citing *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir. 1989)).  The Charter contemplates at least a three-year charter period before the option to purchase arises.  R. Doc. 30 at 9.   According to Castleton, this maritime aspect of the Charter is sufficient to override any non-maritime aspects of the contract.  R. Doc. 30 at 9.

Lastly, Castleton refutes HSL's argument that the Charters cannot be maritime because the vessels at issue have not yet launched.  In the instant motion, HSL quoted Castleton's

Complaint for the proposition that the vessels are "nearing finalized construction at a shipyard in Japan." R. Doc. 16-1 (quoting R. Doc. 11). Castleton concedes that a contract for building a ship is not a maritime contract, but argues that this principle is inapplicable to the instant facts. Castleton qualifies its statement that the Vessels subject to the Charters are "nearing construction," and provides a timeline of the construction of the two vessels. The first vessel, the M/V LOCH NESS, was launched on March 18, 2016, and successful completed its sea trials on May 12, 2016. R. Doc. 30-1 at 6. The second vessel, the M/V LOCH NEVIS, was launched on April 27, 2016, and had its main generators installed on May 17, 2016. R. Doc. 30-1 at 6, 14. With this in mind, Castleton argues that HSL's cited case law is inapposite. R. Doc. 30 at 12–13. Castleston asserts that HSL's argument fails due to its erroneous conclusion that the vessels at issue have not yet launched. Castleton then concludes and cites case law supporting the conclusion that the successful launch of a vessel may trigger "vessel" status and thus the applicability of maritime law to a contract for bareboat charters. R. Doc. 30 at 10–12 (citing *e.g.*, *M/V Marifax v. McCory*, 391 F.2d 909, 910 (5th Cir. 1968).

### C. HSL's Reply

HSL timely replies. R. Doc. 33. According to HSL, the Court must "look not to the form of [the] contract, but rather to its substance." R. Doc. 33 at 3 (quoting *Parcel Tankers, Inc. v. M/T STOLT LUISA PANDO*, Nos. 90-2376, 90-2411, 90-2716, 1990 WL 257638, at *1 (E.D. La. 1990) (citations omitted)). HSL avers that the substance of the Charters is a contract for sale for the following reasons: (1) the original intent of the parties was to contract for the sale of vessels; (2) the Charters contain an obligation to purchase the vessels; (3) the Charters contained a down payment worth approximately fourtheen months' of charter hire; (4) the security of the contract contemplates the eventual purchase of the vessels. R. Doc. 32-2 at 3–7. HSL also contends that

this Court lacks the power to parse out the maritime aspects of a contract in order to acquire maritime jurisdiction. R. Doc. 32-2 at 7–12. Lastly, HSL contends that the mere launch of a vessel is insufficient to confer maritime jurisdiction. The vessel must be "placed into navigation," which HSL defines as entry into maritime commerce. R. Doc. 32-2 at 12–19.

### III. LAW AND ANALYSIS

#### A. The Law of Subject Matter Jurisdiction

28 U.S.C. § 1333 provides that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

Castleton asserts admiralty jurisdiction on the grounds that the Charters which are the bases of the seizure claim are maritime contracts, because they are contracts for the operation of a vessel. HSL claims that they contracts in question are in essence contracts to construct a vessel and not contracts for the operation of a vessel. "To determine admiralty jurisdiction . . . we do not consider merely whether a ship or vessel was involved but rather examine 'the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transaction.'" *St. Paul Fire & Marine Ins. Co. v. Bd. Of Comm'rs*, 418 Fed. Appx. 305, 307–08 (5th Cir. 2011) (quoting *Norfolk S. Ry. Co. v. James Kirby, Pty Ltd.*, 543 U.S. 14, 25 (2004); *see also D&S Marine Trans., LLC v. S & K Marine, LLC*, No. 14-2048, 2015 WL 419800, at *3 (E.D. La. Jan. 30, 2015). "[A] contract for building a ship or supplying materials for her construction is not a maritime contract." *North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding*, 249 U.S. 119, 126–27 (1919) (citations omitted). When the maritime nature of a contract is questioned, the Court must examine the agreed transaction between the parties in order to determine the nature and character of the agreement and the "principal objective" of the

parties. *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 25 (2004). The Court therefore turns to the Charters at issue to evaluate the present jurisdictional question. *See, e.g.*, *Butler Seafood, Inc. v. Butler*, 609 F. Supp. 466, 466–67 (S.D. Fla. 1984).

### B. Discussion

The Charters at issue facially appear to be bareboat charters with provisions for the construction, chartering, and purchase of vessels. R. Docs. 2, 3. The Charters call for the construction of two vessels, the M/V LOCH NESS and the M/V LOCH NEVIS. R. Docs. 1-2 at 10, 1-3 at 10. The Charters allow for a three-to-seven year bareboat charter of the aforementioned vessels by Castleton to HSL, with a requirement to purchase the vessels at the end of the charter. R. Docs 1-2 at 13, 1-3 at 13.

The Court begins with the Fifth Circuit's holding in *Jack Neilson, Inc. v. Tug Peggy*. 428 F.2d 54 (5th Cir. 1970). In *Neilson*, the Fifth Circuit ruled that a five-year bareboat charter with an option to purchase during the charter period and an agreement to buy at the end of the charter period was maritime. In so holding, Judge Wisdom ruled that

> [T]he subject of each contract was a vessel that might be afloat and in the control of the charterer for five years. The contract was drawn therefore with maritime problems in mind, particularly problems relating to bareboat charters. No one can possibly read the complicated contract sued on in this case and arrive at any other conclusion than that the dominant provisions relate to operation of a vessel by a charterer . . . .

*Id.* at 57. But the dominant provisions of the present Charters suggest a different holding. Despite the seven-year potential charter period at issue, numerous aspects of the present Charters place the Charters squarely beyond the Court's maritime jurisdiction.

The Charters provide HSL a purchase option to buy the ships from Castleton. R. Docs. 1-2 at 13, 1-3 at 13. The option ripens after the third year of the bareboat charter arrangement.

R. Docs. 1-2 at 13, 1-3 at 13. If the option is not exercised, the Charters call for the required purchase of the vessels by HSL at the conclusion of the seven-year bareboat charters. R. Docs. 1-2 at 13, 1-3 at 13. While the compelled purchase does suggest that the Charters are not true maritime charter parties, *see Icon Amazing, L.L.C. v. Amazing Shipping, Ltd.*, 951 F. Supp. 2d 909, 917 (S.D. Tex. 2013), the classification of the Charters remains ambiguous absent further analysis. The Court must further examine the details of the Charters in order to determine whether they give rise to maritime jurisdiction.

The price terms of the Charters indicate that the Charters were a mechanism to spread the cost of purchasing the vessels over a period of time, rather than a standard charter party linked to the going market rates for the daily use of vessels. The daily hire rate for the vessels was $7,850.00. R. 11-3 at 13. So in a non-leap year, Castleton agreed to pay $2,865,250 annually for the charters. Turning to the vessel purchase options and obligations, Castleton had the option to purchase each vessel for $27,250,000 after three years, $25,500,000 after four years, $24,000,000 after five years, and $22,500,000 after six years. R 11-3 at 14. The Charters also imposed an obligation to purchase each vessel for a fixed-price balloon payment of $20,500,000 at the conclusion of the seven-year term of the Charters. R. 11-3 at 14, 16.

The parties' jurisdictional discovery indicates that the charter rates were given at a discount. The parties deposed Keith Denholm, Castleton's representative in the negotiation of the Charters. R. 47-2. Mr. Denholm conceded that the charter rate was discounted to below-market rates at the time the Charters were finalized. R. 47-2 at 14. Evidence that the charter rates were not linked to the market value for daily charter hires suggests that the Charters were instead designed with alternative objectives in mind—such as spreading the cost of a vessel purchase over seven years. *See Icon Amazing*, 951 F. Supp. 2d at 917.

9

HSL bore all of the risks associated with ownership of a vessel per the terms of the Charters. When the risks associated with vessel ownership are borne solely by one party, the party is typically the simultaneous owner and operator of the vessel. Conversely, when possessory rights are granted to the non-owner of a vessel, risk is usually distributed between the owner and the operator. Turning to the Charters, HSL bore the risk of declines in the market value of the vessels during the course of the charter, because the acquisition costs were fixed at the time of contracting. R. 11-3 at 14. HSL was also responsible for the financing of any structural changes or equipment additions mandated by applicable regulations. R. 11-3 at 4. Additionally, HSL was required to obtain all insurance over the course of the charter term, including Hull & Machinery coverage, War Risks coverage, and P&I coverage. R. 11-3 at 5–8, 15, 22–24. HSL bore virtually all the risks associated with the vessels during the term of the Charters. The Charters therefore suggest a *de facto* unity of title befitting a contract for sale.

Along with the risks associated with ownership, HSL received the benefits typically attributable to the purchaser of a vessel. HSL had significant authority over the specification of the vessels during construction. Neither the non-party builders of the vessel nor Castleton had the power to change "the specifications or plans of the Vessel as approved by [HSL]" without HSL's consent. R. 11-3 at 10. The Charters also assigned to HSL Castleton's rights as owner of the vessels in the event that the non-party builders breached their delivery and sale obligations to Castleton.[1]  R. 11-3 at 19–20. The assignment of such rights is more typically associated with the purchase of vessels than the charter of vessels.

Lastly, the circumstances of the transfer of the vessels emphasize the sale and purchase objectives of HSL and Castleton. Delivery of the vessels was to occur "at the time of dropping

---

[1] The "delivery obligation" to Castleton is somewhat misleading, as Castleton was never intended to take possession of the vessels under the terms of the Charters.

10

dock master at off sea [sic] of the [non-party builder's] dockyard." R. 11-3 at 13.  As such, HSL directly acquired possession of the vessels from the non-party builders, with Castleton never operating, or even taking physical possession, of the vessels as owner.  The Charters also incorporated into their terms Memoranda of Agreement ("MOA"), which Mr. Denholm, the party who negotiated the Charters for Castleton, acknowledged at deposition are used only for the purchase and sale of vessels.  R. 47-2 at 7–8.  The MOAs served to legally transfer the vessels from the non-party builders to HSL shipping through Castleton, and were executed as part of the Charters themselves.  R. 11-3 at 25–27.  Further, as a condition of taking immediate possession for the charter term, HSL was required to deposit $6,000,000 up front and to acquire a $1,250,000 bond as security for the ultimate purchase of the vessel.  R. 11-3 at 25–26.  HSL also paid $3,300,000 per vessel as a "contract purchase purchase price." R. 11-3 at 16.  HSL's $6,600,000 payment for the two vessels is too exorbitant to qualify as a mere "finder's fee" for arranging two charters.  Instead, as convincingly proved by discovered materials outside the four corners of the Charters, it appears that Castleton was being compensated as a middleman for selling its interest in a sweetheart contract for the construction of vessels.

Based on the preceding, the Court finds that the "principle objective" of the Charters were the construction and sale of vessels, and not charters for the mere operation of a vessel. *See Kirby,* 543 U.S. 14, 25 (2004).  Unlike *Neilson*, where the dominant provisions of the charterparties concerned joint responsibilities under an ongoing charter, the present Charters treat HSL as the *de facto* purchaser of the vessels and relegate Castleton to the role of a middleman awaiting final payment. *See Neilson*, 428 F.2d at 54.  A contract for the construction and sale of a vessel does not sound in admiralty. *See North Pac.*, 249 U.S. at 126–27.  The Court therefore

lacks admiralty jurisdiction over the case at bar. The Court's grant of Castleton's writs of attachment pursuant to the Maritime Rules must be vacated.

### IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that HSL's Motion to Vacate and Dismiss, R. Doc. 16, is hereby **GRANTED**.

New Orleans, Louisiana, this 19th day of August, 2016.

*[signature]*
UNITED STATES DISTRICT JUDGE